Ramzi Abadou (SBN 222567)
ramzi.abadou@ksfcounsel.com
**KAHN SWICK & FOTI, LLP**
912 Cole Street #251
San Francisco, CA 94117
Telephone:  504-455-1400
Facsimile:   504-455-1498

Jeffrey R. Krinsk (SBN 109234)
jrk@classactionlaw.com
David J. Harris, Jr. (SBN 286204)
djh@classactionlaw.com
Trenton R. Kashima (SBN 291405)
trk@classactionlaw.com
**FINKELSTEIN & KRINSK LLP**
550 West C Street, Suite 1760
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile: (619) 238-5425

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JAMES ZIOLKOWSKI, Individually and On Behalf of All Others Similarly Situated, | Docket No.: _____ |
| Plaintiff, | **CLASS ACTION** |
| vs. | COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS |
| NETFLIX, INC., REED HASTINGS, and DAVID WELLS, | |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff James Ziolkowski brings this class action individually and on behalf of all other persons and entities who purchased or otherwise acquired Netflix, Inc. ("Netflix" or the "Company") common stock during the period between July 22, 2014 and October 15, 2014 inclusive (the "Class Period") and who were damaged thereby.   Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and based upon his counsel's investigation as to all other matters.   Such investigation included, among other things, a review and analysis of Netflix's public filings with the U.S. Securities and Exchange Commission ("SEC"), research reports issued by financial analysts concerning Netflix, and other publicly available information about Netflix and its senior managers, including Reed Hastings and David Wells (the "Individual Defendants").

Many of the facts further supporting Plaintiff's allegations are known only by Netflix and the Individual Defendants (collectively, "Defendants"), and/or are exclusively within their custody or control.   Plaintiff believes that substantial additional evidentiary support will be revealed after a reasonable opportunity for discovery.[1]

## NATURE OF THE ACTION

1.      This is a securities class action arising from material misstatements and omissions by Defendants regarding Netflix's media streaming business.   Netflix is predominantly a streaming content provider that allows customers who pay a monthly subscription fee to instantly watch popular television shows and movies through the Internet.   Throughout the relevant time period, Netflix's streaming business has provided the overwhelming majority of the Company's revenue.

2.      Sustained growth of Netflix's subscriber base is vital to the Company's streaming business as well as its stock market valuation.   Sustained subscriber growth requires Defendants to continually acquire new and popular content, which costs Netflix billions of dollars per year.

3.      In May 2014, Defendants raised the price of Netflix's monthly streaming subscription to fund the Company's enormous content obligations.   Defendants knew from past experience and extensive analyses that even small price increases could have a big, negative impact on subscriber growth.   Leading up to and after May 2014, Defendants and the market were focused on the effect

---

[1]      All emphasis added unless otherwise noted.

**CLASS ACTION COMPLAINT**

that Netflix's price increase might have on the Company's ability to grow its subscriber base sufficiently quickly to fund content.

4.      On July 21, 2014—more than two months after Netflix's price increase took effect—Individual Defendants Hastings and Wells told the market that the impact of Netflix's May 2014 price increase on subscriber growth had been "minimal."   Defendants also called the effect "nominal."  They said it was "background noise" which had "no noticeable effect in the business." All of those representations were false and misleading when made, and Defendants knew it when they spoke.

5.      Less than three months later, on October 15, 2014, Defendants were forced to reveal the true effect that their price increase had had on the Company's subscriber growth.  The impact was hugely negative.   In fact, Netflix's subscriber growth numbers were so low that they caused Defendants to slash their projected earnings by nearly half.  In an explanatory letter to shareholders dated October 15, 2014, Defendants admitted that "[a]s best we can tell, the primary cause is the slightly higher prices we now have compared to a year ago."

6.      When the market learned the truth about Netflix's price increase and its brutal impact on subscriber growth, Netflix's stock plummeted by more than 19% on several times the Company's average trading volume.  Over $5 billion of shareholder value was lost overnight, and Plaintiff and the Class suffered enormous investment losses as a result.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5.

8.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa. In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

9.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §§ 78aa, and 28 U.S.C. § 1391(b). Netflix resides and transacts business in this District, and maintains its principal executive offices in this District at 100 Winchester Circle, Los Gatos, CA

2

95032.  Many of the acts that constitute the violations of law complained of herein, including the preparation and public dissemination of materially false and misleading statements, occurred in substantial part in this District.

## PARTIES

10.     Plaintiff James Ziolkowski purchased the common stock of Netflix during the Class Period as set forth in the certification attached hereto and was damaged as a result of Defendants' wrongdoing as alleged herein.

11.     Defendant Netflix, Inc. purports to be the world's leading internet subscription service for viewing TV shows and movies.  Subscribers can instantly "stream" TV shows and movies by through the internet to their TVs, computers and various mobile devices.  Netflix is incorporated in Delaware and maintains its principal place of business and principal executive offices at 100 Winchester Circle, Los Gatos, CA 95032.  The Company's common stock is publicly traded on the NASDAQ under ticker symbol "NFLX."

12.     Defendant Reed Hastings ("Hastings") has served as Netflix's Chief Executive Officer since September 1998, and as its Chairman of the Board since the Company's inception.  Defendant Hastings co-authored and signed a letter to Netflix's shareholders that was dated and publicly filed with the SEC on July 21, 2014 ("July 21 Shareholder Letter").   The July 21 Shareholder Letter contained certain of the false and misleading statements alleged herein.  Defendant Hastings also made false and misleading statements during Netflix's July 21, 2014 quarterly earnings interview ("Q2 Earnings Interview").

13.     Defendant David Wells ("Wells") has served as Netflix's Chief Financial Officer since December 2010.  Along with Defendant Hastings, Defendant Wells co-authored and signed the Company's July 21, 2014 Shareholder Letter, which contained certain of the false and misleading statements alleged herein.

## SUBSTANTIVE ALLEGATIONS

### Background

14.     Netflix is an on-demand streaming media provider.  Netflix allows customers who pay a monthly subscription fee to instantly watch popular movies, television shows, documentaries and

**CLASS ACTION COMPLAINT**

other videos through the Internet.  Netflix subscribers can watch content on a variety of Internet-connected devices, such as computers, smart phones, tablets, Blu-ray disc players, video game consoles and so-called "smart TVs."  At all relevant times, monthly streaming subscriptions have provided the overwhelming majority of Netflix's revenue.

15.     Netflix's streaming revenue comes with a high cost.  To attract and retain monthly subscribers, Netflix must offer an ever-increasing variety of popular content.  The content comes in two main forms, licensed content and original content.  Licensed content includes blockbuster movies like *The Hunger Games*, starring actress Jennifer Lawrence, and popular TV shows like *Breaking Bad*, starring actor Bryan Cranston.  Netflix must pay the owners of such content significant money for the right to offer it to Netflix's subscribers.  Original content includes popular shows created by Netflix itself, including *House of Cards*, starring actor Kevin Spacey, or *Orange is the New Black* (or "*OITNB*").  Original content is more expensive than licensed content, particularly in terms of up-front costs.

16.     At year-end 2012, Netflix's unpaid content obligations alone totaled more than ***$5.6 billion***, compared to approximately $3.6 billion in revenue and $17 million of net income.  By year-end 2013, streaming content obligations had ballooned to about ***$7.3 billion***, compared to $4.4 billion in revenue and $112 million of net income.  In sum, Netflix's streaming content obligations were consistently growing at a ***much*** faster dollar rate than the Company's top and bottom lines.[2]

17.     Leading up to (and continuing through and after) the Class Period, Defendants were not generating enough cash from the business to fund Netflix's content obligations over the long-term.  Consequently, Defendants supplemented Netflix's revenues with increasing levels of debt. Defendants entered 2013 with $200 million in long-term debt.  They exited 2014 with $900 million in long-term debt and announced that they would more than double that debt load in the first quarter of 2015.  Defendants needed all of this debt to fund the content that they were counting on to drive subscriber (and thus profit) growth in the future.  In the market's view, Netflix's rapidly increasing

---

[2] This trend continued through 2014, as streaming content obligations grew to $9.5 billion, compared to $5.5 billion in revenue and $267 million of net income.

**CLASS ACTION COMPLAINT**

debt levels and content obligations are not problematic as long as subscriber growth continues and projects at adequate levels.

18.    For several years now, Defendants have referred to this delicate dynamic as Netflix's "virtuous cycle."  In Defendants' (bullish) view, Netflix's subscriber growth provides it with a growing pot of money with which to purchase more and better content, which itself drives *more* subscriber growth as customers are attracted to improved viewing options.  The "virtuous cycle" can also be properly viewed from the opposite (bearish) direction: Netflix's existing content obligations *require* it to grow subscriptions to generate enough cash to pay those obligations, yet growing subscriptions requires a growing and improving content menu, which means more obligations, and so on.  Regardless of which view one takes of Netflix's "virtuous cycle"—bullish or bearish—Netflix investors and financial analysts all agree that without rapid, sustained subscriber growth, Defendants' "virtuous cycle" falls apart.

19.    Throughout 2013, Defendants' virtuous cycle appeared to be humming along on all cylinders as Defendants reported impressive subscriber growth quarter after quarter.  Netflix's stock more than tripled in value as a result.

20.    In early 2014, however, a new wrinkle appeared in the delicate fabric of Defendants' virtuous cycle.  Defendants disclosed that Netflix would have to increase its most popular streaming subscription price from $7.99 per month to $8.99 or $9.99 per month to adequately fund the Company's content obligations.  At first glance, a $1 or $2 monthly price increase might appear insignificant, but Netflix investors and analysts were *acutely* focused on this new development because the last time Netflix raised its monthly subscription prices by just a few dollars per month (back in 2011), subscriptions turned sharply negative, and the Company's stock followed suit.  In 2011, Netflix subscribers had proven to be extremely price-sensitive, and Netflix's stock had proven to be extremely growth-sensitive.

21.    On May 9, 2014, Defendants raised the price of Netflix's most popular streaming subscription by $1 per month: from $7.99 to $8.99.  This price increase occurred during the first half

**CLASS ACTION COMPLAINT**

of Netflix's second fiscal quarter of 2014 ("2Q14").[3]  Thus, when Defendants reported their 2Q14 financial results on July 21, 2014, the market was anxious to see how (if at all) the price increase had effected Netflix's subscriber growth during the quarter.  Defendants directly and falsely addressed investors' concerns in their July 21, 2014 Shareholder Letter.

**Defendants' False and Misleading Statements at the Start of the Class Period**

22.     After market hours on July 21, 2014, Defendants announced Netflix's 2Q14 financial results.  In a signed letter to shareholders, Defendants Hastings and Wells reported a strong quarter of subscriber growth both domestically and internationally, writing:

> Fellow Shareholders,
>
> Fifteen years after launching our subscription service, we have **over fifty million members** enjoying Netflix in over 40 countries. As we gain new members, we are investing to further improve our content and member experience, and to expand the global availability of our service. (emphasis in original)

Defendants continued:

> Our U.S. member base grew to more than 36 million on the strength of our ever-improving content offering, including Orange is the New Black Season 2. For Q3, we expect about 1.3 million net additions, comparable to Q3'13 in which we premiered Orange Season 1. We are pleased our net additions in the U.S. remain on par with last year.

23.     In addition to reporting solid U.S. subscriber growth, Defendants went out of their way to assure the market that their May 2014 price increase had *not* diminished Q2 subscriber growth in any meaningful way.  Specifically, Defendants wrote:

> In May, we raised prices modestly in most of our markets for new members on our two screens at-a-time HD plan, and introduced a one screen at-a-time, standard definition plan across our markets. Our two screen HD plan continues to be the most popular plan choice for new members. We expect [average revenue per user] to rise slowly as members at the new prices grow as a percentage of total membership. ***There was minimal impact on membership growth from this price change.***

---

[3]  The Company's fiscal years line up with ordinary calendar years, such that its first quarter is January through March, its second quarter is April through June, its third quarter is July through September, and its fourth quarter is October through December.  This Complaint denotes particular quarters as "__QYY" or "Q__."  For example, the time period consisting of the third quarter of 2014 is referred to as "3Q14" or "Q3."

**CLASS ACTION COMPLAINT**

24.     Defendants orally reinforced their written representation during their July 21, 2014 quarterly earnings interview ("Q2 Earnings Interview") with analysts.   During the Q2 Earnings Interview, a JPMorgan analyst asked:

> **And Reed [Hastings], in the letter, you talked about the price changes having a minimal impact on growth overall, but can you just provide a little bit more color?** Do you think, in terms of the nuances, did it impact churn[4], or help reduce churn in any way during the quarter? And what's your view on the way the price change could impact going forward?

Defendant Hastings responded unequivocally:

> **I think we've seen, really, the impact of the price change go through already, so it's pretty nominal,** both in terms of acquisition, which in principle becomes a little bit harder, because of the roughly $1 higher prices, or in retention, which could be a hair better from the grandfathered [subscriptions]. **But it's only $1 difference, so I really think that it's background noise, which is what we want it to be.** We want to think of what we do, as we're steadily improving the content and the growth and the word of mouth, and that **when we make a small change in price, and handle it appropriately, it really makes no noticeable effect in the business, so that's why we're thrilled with that outcome.**

25.     Defendants thus sent a clear and consistent message to investors regarding the effect of Netflix's price increase on 2Q14 subscriber growth.   The effect was "minimal," "nominal," "background noise," which had "no noticeable effect in the business."   Those representations were objectively false and misleading when made, and Defendants knew it on July 21, 2014.   The truth—which Defendants would later be forced to admit—was that the May 2014 price increase had substantially and negatively impacted Netflix's 2Q14 subscriber growth, despite the Company's fluffy overall growth numbers.   The market remained oblivious to this truth for the next three months.[5]

26.     For most of 3Q14—from July 22, 2014 to October 14, 2014—Netflix stock consistently traded well above $400 per share, hitting new all-time highs of more than $489 per

---

[4] "Churn" refers to existing subscribers who cancel their membership.

[5] *See, e.g.,* "Netflix Price Increase Doesn't Slow Growth," The Motley Fool (Jul. 23, 2014), *available at* http://www.fool.com/investing/general/2014/07/23/netflix-price-increase-doesnt-slow-growth.aspx (**"Any fear that raising the cost of a new subscription would hurt growth for the streaming service seems unfounded after [Netflix] released its [July 21, 2014] letter to shareholders."**).

**CLASS ACTION COMPLAINT**

share on September 9.  At market close on October 15, 2014, Netflix stock stood at $448.59 per

share.  A few minutes later, Defendants announced their 3Q14 financial results.

**Defendants Reveal the Truth About Netflix's May 2014 Price Increase**

27.     After market hours on October 15, 2014, Defendants announced Netflix's 3Q13

financial results.  In another signed letter to shareholders (the "October 15 Shareholder Letter"),

Defendants Hastings and Wells reported dismal subscriber growth, stating:

> We added [less than] a million new members in the US, ending Q3 with 37.22 million members, ***with lower net additions than our forecast and versus the prior year.*** Domestic streaming revenue of $877 million, in-line with forecast, grew 25% [year over year] and faster than membership due to the expansion of [average subscription price] from the price changes implemented in Q2.

Defendants had projected 1.33 million additional U.S. subscribers for Q3: ***35% more*** than the

980,000 they were now reporting.

28.     Defendants strained to spin this exorbitant shortfall as just another missed forecast,

stating:

> As a reminder, we provide you our internal forecast for the current quarter. For the prior three quarters, we under-forecasted membership growth. This quarter we over-forecasted membership growth. We'll continue to give you our internal forecast for the current quarter, and it will be high some of the time and low other times.

But none of this explained ***why*** Netflix's subscriber growth had been so poor during 3Q14.   So

Defendants went on to explain precisely why Q3 subscriber growth was abysmal, writing:

> [Y]ear on year net additions in the US were down (1.3 million in Q3 2013 to [less than] 1 million in Q3 2014). ***As best we can tell, the primary cause is the slightly higher prices we now have compared to a year ago.*** Slightly higher prices result in slightly less growth, other things being equal, and this is manifested more clearly in higher adoption markets such as the US.

As one observer noted: "'Slightly less growth' [was] a bit of an understatement."[6]  This was a 35%

shortfall; there was nothing "slight" about it.  In any event, the price increase that Defendants were

---

[6] "Netflix Says $1 Price Increase Crushed Its Subscriber Growth," Slate.com (Oct. 15, 2014), *available at* http://www.slate.com/blogs/moneybox/2014/10/15/netflix_earnings_the_company_says_price_hikes _crushed_its_subscriber_growth.html. (quoting Defendants' October 15 Shareholder Letter).

**CLASS ACTION COMPLAINT**

blaming for this sudden **Q3** slowdown occurred well **before** Q3.  In fact, it occurred during the first half of **Q2**, and Defendants had explicitly represented on July 21 that the price increase's effect on subscriber growth had been "minimal," "nominal," "background noise" having "no noticeable effect in the [Company's] business."  What happened?!

29.     Defendants strained to explain this discrepancy between their July 21 statements and their October 15 statements, writing:

> *In hindsight, we believe that [in] late Q2 and early Q3* [i.e., before our July 21 Shareholder Letter] ***the impact of higher prices appeared to be offset for about two months by the large positive reception to Season Two of Orange is the New Black.*** We remain happy with the price changes and growth in revenue and will continue to improve our service, with better content, better streaming and better choosing. ***The effect of slightly higher prices is factored into our [slashed] Q4 forecast.***

30.     In other words, there **had** been a substantial, negative impact from the Company's May 2014 price increase, and that impact was already occurring in "late Q2 and early Q3": before Defendants spoke on July 21.  Yet, according to Defendants, they had not noticed the price impact on July 21 because it "appeared to be offset for about two months" by the substantially **positive** impact of releasing Season 2 of a hit TV show the same quarter.  One commentator digested his shock, and Defendants' *post hoc* rationalization, as follows:

> *"Slightly less growth" is a bit of an understatement.* The slowdown suggests that streaming customers might be more cost-conscious than it previously seemed. ***When prices first went up in the spring, subscription growth didn't seem to take a hit. But now, the company thinks that may have been due to "the large positive reception to Season Two of Orange Is the New Black."*** [7]

31.     At first glance, Defendants' explanation would seem to make sense, but it was a lie.  The truth was that, when Defendants spoke on July 21, they knew their price increase had substantially hindered subscriber growth in "late Q2 and early Q3."   Defendants' *post hoc*

---

[7] "Netflix Says $1 Price Increase Crushed Its Subscriber Growth," Slate.com (Oct. 15, 2014), *available at*
http://www.slate.com/blogs/moneybox/2014/10/15/netflix_earnings_the_company_says_price_hikes _crushed_its_subscriber_growth.html. (quoting Defendants' October 15 Shareholder Letter).

**CLASS ACTION COMPLAINT**

explanation regarding *Orange is the New Black* Season 2 was nothing but a contrived cover-up for their fraudulent misstatements on July 21.

32.    As a direct consequence of "[t]he effect of slightly higher prices," Defendants slashed their 4Q14 earnings forecast by nearly half.  The market reacted violently to all of these after-hours disclosures on October 15.[8]  The next trading day, October 16, 2014, Netflix stock plummeted from the prior day's closing price of $448.59 to close at $361.70 per share: a nearly 20% decline erasing more than $5 billion of the Company's market value in one day.[9]  Plaintiff and the Class suffered enormous investment losses as a result.

**Additional Allegations Showing Defendants' Scienter**

33.    Defendants admitted in their October 15 Letter that their May 2014 price increase had had a highly negative impact on subscriber growth.  Defendants admitted this impact existed before they spoke on July 21, but Defendants claimed not to have noticed it because the impact "appeared to be offset for about two months by the large positive reception to Season Two of *Orange is the New Black*."  That assertion was simply untrue.  The truth was that:

(a) Defendants knew from pre-Class Period experience that releasing a new season of a popular TV show significantly skews subscriber growth to the upside upon release;

(b) Defendants saw the actual negative effect of their price increase for several weeks before they saw the "offsetting" positive effect of *Orange is the New Black*;

(c) Defendants knew that a disproportionate share of Netflix's overall 2Q14 subscriber growth was driven by *OITNB* enthusiasts who would not be there in Q3 to rescue Defendants from the impact of their price increase; and

(d) Defendants knew from pre-Class Period experience that even small monthly price increases could be devastating to the Company, so they—like the market—were laser-focused on the effects of Netflix's price increase before they spoke on July 21.

---

[8] *See, e.g., "Netflix Price Increase Slows Subscriber Growth,"* New York Post (Oct. 15, 2014), *available at* http://nypost.com/2014/10/15/netflix-price-increase-slows-subscriber-growth; *"Netflix Blames Missed Sub-Growth Targets on Price Increase, As Stock Gets Hammered,"* Variety.com (Oct. 15, 2014), *available at* http://variety.com/2014/digital/news/netflix-misses-sub-growth-targets-adding-980000-u-s-streaming-customers-1201331000.

[9] Netflix executed a 7 for 1 stock split in 2015, after the end of the Class Period.

**CLASS ACTION COMPLAINT**

### A.  Defendants' Pre-Class Period Experience:
### The *"Arrested Development"* Analogue

34.     Long before July 2014, Defendants knew from personal experience that their release of a hit TV show causes a major uptick in subscriber growth upon release.  For example, a year before the Class Period, Defendants had reported strong subscriber growth numbers for 2Q*13*.  At that time, Defendants specifically pointed to their release of a hit TV show—Season Four of *Arrested Development*—as a key (and anomalous) driver of subscriber growth during the quarter. Specifically, in a July 22, 2013 Letter to Shareholders, Defendants wrote:

> We generally expect net additions in [each year's] Q2 to be lower than prior year Q2 due to increased net-add seasonality as we grow. ***This Q2, however, was an exception, we believe due to the launch of Arrested Development [Season 4]. This show already had a strong brand and fan base, generating a small but noticeable bump in membership when we released it.*** Other great shows don't have that noticeable effect in their first season because they are less established.

35.     Later the same day, during Defendants' 2Q13 Earnings Interview, one analyst asked Defendant Hastings to elaborate on the "noticeable bump" Netflix enjoyed from a particular show's release, stating:

> You alluded to the impact of *Arrested Development* in the quarter, but you didn't actually specify how much it had. Could you give us a sense of how many of your subscribers came from adding that programming?

Defendant Hastings responded:

> *Arrested [Development]* was a unique look forward because it already had a developed brand and we were bringing out Season 4. What we did see was a little rise in gross additions, which translate into net additions, ***more than the weekly pattern would have suggested.*** But, it was not particularly -- ***it was enough to move our net [subscriber additions for the quarter] higher than last year***, but it was not tremendously significant . . . .[10]

Nevertheless, Defendant Hastings further downplayed the impact of *Arrested Development*, stating:

> In general, remember that people subscribe and retain with us for a variety of content, not just a single show. So, they might be -- become that *Arrested Development* was

---

[10] It was in fact over 100,000 subscribers.

**CLASS ACTION COMPLAINT**

the excuse to join, but then they start watching all of our other great content, so think of it as part of the content mix.

Another analyst pushed back:

> **But, you chose to single out Arrested Development. Does that mean Arrested Development was responsible for, say, 15% of the subscriber growth this quarter? Can you give us any number to actually quantify what you indicated in the letter?**

Netflix's Chief Content Officer, Ted Sarandos, jumped in to reply, stating:

> **I believe we point it out because it breaks the seasonal pattern in a way that can be attributed more directly to that [show].**

Defendant Hastings then added:

> Julia, when a subscriber, a new member joins, they don't say it's because of *Arrested [Development]*. There's a whole wide variety of reasons. **Arrested, again, is unique because we are starting with an already created brand.** The general case with *Hemlock [Grove]*, with *Orange [is the New Black]*, with *House of Cards*[11] is for us to be the first season in debut. So, think of *Arrested* as an unusual, a nice opportunity, but the general case for Netflix Original programming is more like *House of Cards*, *Hemlock* and *Orange* [Season One].

Ms. Boorstin asked the next logical question:

> Does that indicate that you expect to see an uptick for House of Cards' **second season**, for example?

Defendant Hastings replied:

> **I think [we] would probably see a little bump there in our numbers. That would make sense. Hopefully**, by the time we get to Season 3, 4, 5, if we are fortunate enough to get there, **then we've turned it into a Harry-Potter-esque global massive phenomen[on]** – when is the next season coming? **Then, we certainly would.**

36.  Less than a year later, in June 2014, the release of *Orange is the New Black* Season 2 proved to be precisely that type of "global massive phenomenon." And Defendants knew this when they wrote in their July 21 Shareholder Letter that:

> **The release of Orange is the New Black Season 2 has been every bit the global media event we had hoped for**; critically acclaimed and embraced by a fervent and growing fan base. **In its first month, Orange became the most watched series in every Netflix territory [worldwide]. . . .**

---

[11] All of these popular shows were premiering their first seasons at the time.

**CLASS ACTION COMPLAINT**

When Defendants spoke on July 21, 2014, they had in fact already *seen* a very "noticeable bump" that broke "the weekly pattern" and "the seasonal pattern" of subscriber growth in a way that was "directly attributable" to the release of *Orange is the New Black* Season 2.  That is precisely why Defendants singled out the show on July 21 as a key driver of Netflix's 2Q14 subscriber growth. Yet on October 15, 2014—when Defendants had to explain to investors how their price increase had destroyed subscriber growth only twelve weeks after their price increase had "no noticeable effect in the business"—Defendants acted like the impact of *Orange is the New Black* Season 2 was news to them.  It was not.

37.  In addition, Defendants personally saw the negative impact of their price increase for several weeks *before* they saw the countervailing positive impact from releasing *Orange* Season 2.

**B.  Defendants Personally Monitor Subscriber
Growth "Every Week, Every Day"**

38.  Netflix's price increase from $7.99 to $8.99 per month went into effect on Friday, May 9, 2014.  Defendants' release of *Orange is the New Black* Season 2 did not occur until Friday, *June 6*, 2014.  Thus, there were four full weeks between the time of Defendants' price increase and the release of *Orange* Season 2.

39.  As Defendants admitted in their October 15 Letter, the May 9 price increase substantially effected subscriber growth in 2Q14.  And it did so *immediately* upon taking effect: as consumers who otherwise would have signed up on May 9, May 10, May 11, May 12 (and so on), balked at the newly increased price.  Yet the "global media event" that "offset" the price impact occurred on June 6.  Accordingly, Netflix's subscriber additions broke substantially to the downside for several weeks *before* it sharply rebounded upon the June release of *Orange* Season 2.

40.  Defendants Hastings and Wells personally saw these patterns between May 9 and June 6, the four-week period between price increase and *Orange* release.  Indeed, Defendant

**CLASS ACTION COMPLAINT**

Hastings has publicly admitted that he and his team personally look at Netflix's net subscriber additions "every day" and "every week."  If there was a substantial negative impact from the price increase—as Defendants admitted there was on October 15—then Defendants personally saw it *after* May 8, 2014 and *before* June 6, 2014, when *Orange* Season 2 caused a sharp uptick in subscriptions.

41.     In addition, Defendants personally saw the hugely positive, "offsetting" effect of *Orange* Season 2 upon and after the release on June 6: long before Defendants' spoke on July 21.

### C.  Sophisticated Database Was Defendants' "Source of Truth" Before July 21

42.     Defendants' core operations and the delivery of Netflix's streaming services to subscribers are heavily data-dependent operations.  In fact, Defendants are leaders in the field of "Big Data," a term which loosely refers to the collection and analysis of enormous data sets to inform business decisions.  At the center of Netflix's operation is a state-of-the-art database known as Apache Cassandra ("Cassandra").

43.     Almost the entirety of Netflix's technology infrastructure and operations—including the Company's streaming services—uses "Cassandra" as a multi-faceted database with practically limitless storage capacity.  Netflix stores on Cassandra everything from subscriber data, to movie metadata, to all kinds of viewing statistics, which are searchable down to the customer level.

44.     Cassandra allows Defendants to instantly analyze terabytes of data using a variety of standardized or custom queries.  For example, Cassandra can readily tell Defendants how many hours of a particular program or movie were watched over a particular time period.  Cassandra also records when and how much *each customer* watches a particular program or movie type. Such informational agility allows Defendants to analyze a host of data points and understand consumer behaviors like preferred viewing times or content preferences.[12]

---

[12] This is how Netflix makes personalized viewing recommendations to each of its streaming subscribers through the subscriber interface.   Included in Netflix's subscriber interface are personalized content sections titled "Recently Watched by [Subscriber Name]" and "Recommended

**CLASS ACTION COMPLAINT**

45.     Defendants also utilize Cassandra-based subscriber data to make optimal choices in acquiring *new* Netflix content: be it movies, television shows, or documentaries.  In fact, Cassandra is so integral to Defendants' ultimate decision-making that some of the Company's senior technology personnel refer to Cassandra as Netflix's "source of truth database."

46.     Cassandra is what allows Defendants to monitor net subscriber growth "every day" and "every week" at the click of a button.  And Defendants' monitoring of Cassandra's data gets more sophisticated and detailed than that.  For example, in 2013, Netflix investors had voiced a particular concern about the impact of offering free, one-month trial subscriptions to new customers.  In an April 22, 2013 Shareholder Letter, Defendants Hastings and Wells directly addressed investors' concern with stunning particularity, stating:

> Our decision to launch all episodes [of *House of Cards* Season One] at once created enormous media and social buzz, reinforcing our brand attribute of giving consumers complete control over how and when they enjoy their entertainment. ***Some investors worried that the House of Cards fans would take advantage of our free trial, watch the show, and then cancel. However, there was very little free-trial gaming - less than 8,000 people did this - out of millions of free trials in the quarter.***

This was a remarkable insight on the part of Defendants Hastings and Wells.  It required them to know: (1) not only how many net subscribers were added during the quarter, but how many new subscribers took advantage of the free trial ("Free Trial Subscribers"); (2) how many Free Trial Subscribers watched *House of Cards* within their first month of membership; and (3) how many Free Trial Subscribers who watched *House of Cards* within their first month of membership also cancelled their subscription within their first month of membership.  How did Defendants obtain such specific, on-point data, and obtain it within three weeks of the end of the quarter?  Easy: Cassandra told them.  It was a straightforward database query.  If Defendants had asked, Cassandra would also have told them exactly who those ~8,000 opportunistic *House of Cards* fans were.  This is just one example of the power of Cassandra.

for [Subscriber Name]."   Cassandra allows Netflix to provide these recommendations to its streaming subscribers based not only on individual viewing histories, but also on the aggregate subscriber responses to particular programs.

**CLASS ACTION COMPLAINT**

47. Functionally, the same scenario arose again in July 2014. Investors were deeply concerned leading up to July 2014 about the effect that Netflix's price increase had on subscriber growth. Defendants directly answered investors' concern (before fielding a single question in their Q2 Earnings Interview) by stating that the impact on subscriber growth had been "minimal." They then reinforced that representation by calling the impact "nominal," "background noise," having "no noticeable effect in the business."

48. Defendants knew enough on July 21, 2014 to tout *Orange* Season 2 as "the strength" behind 2Q14 subscriber growth, calling it "every bit the global media event [they] had hoped for." More specifically, Defendants knew that "in its first month, OITNB Season Two became the most watched series in every single Netflix territory." Defendants knew in July 2014:

(a) exactly how many new subscribers joined Netflix during 2Q14;

(b) that a disproportionately large share of those new subscribers had joined Netflix to first and/or only watch *Orange is the New Black*;

(c) that *Orange* Season 2 had lifted "the weekly pattern" and "the seasonal pattern" to an extent that "offset" the known, highly negative impact of Netflix's price increase; and

(d) that no other "global media event" would be unleashed in 3Q14 to "offset" the substantial, known effects that Netflix's price increase was having on subscriber growth.

**D. Defendants Had Seen This Movie Before**

49. May 2014 was not the first time that Defendants had increased the pricing on their monthly subscription plans. It was the second time. Three years prior, in July 2011, Defendants increased the price of their most popular subscription plan by a few dollars per month. The effect of that price increase on Netflix's subscriber growth was devastating. In fact, far worse than slowing growth (as occurred in 2014), the 2011 price increase actually caused Defendants to **lose** more than 800,000 U.S. subscribers in one quarter, and the harmful effects on Netflix's stock persisted for months.

50. The Company's shares declined by more than 75% in the 20-week period following its July 2011 price increase, including a 37% drop in a single day when Defendants revealed the true

**CLASS ACTION COMPLAINT**

impact of their price increase on subscriber growth.[13]  Defendants' 2011 price increase had been so devastating to Netflix that industry observers were still discussing it a full year after it happened.[14]

51.     For all of these reasons, leading up to and after their 2014 price increase, Defendants were acutely focused on the effect it would have—and the effect that it actually had—on subscriber growth.  Defendants knew on July 21, 2014 that small price increases could significantly harm subscriber growth, as they had in the past. As of July 21, Defendants had already seen a marked decrease in subscriber growth for several weeks (beginning on May 9) before they saw the offsetting increase from *Orange* Season 2 in June.  Defendants knew on July 21 from customer-specific, Cassandra-based data that *Orange* enthusiasts were single-handedly responsible for the fact that Netflix's 2Q14 subscriber growth was in-line with expectations instead of far below expectations because of their (second) price increase.  Defendants knew or, at the very least, recklessly disregarded the fact that their July 21 statements were false and misleading when made.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Netflix common stock during the Class Period (the "Class"); and were damaged upon the revelation of Defendants' disclosures on October 15, 2014. Excluded from the Class are Defendants, the officers and directors of Netflix, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

53.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Netflix common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be

---

[13] *See, e.g.,* "Netflix Drops Most Since 2004 After Losing 800,000 Customers," Bloomberg Business (Oct. 25, 2011), *available at* http://www.bloomberg.com/news/articles/2011-10-24/netflix-3q-subscriber-losses-worse-than-forecast ("Netflix Inc. dropped the most in seven years after the video-rental service said it lost 800.000 U.S. subscribers in the third quarter, more than expected, and predicted more cancellations *over a price increase.*").

[14] *See* "Netflix Price Hike's One Year Anniversary: *A Look Back at One of the Great Tech Blunders*," Huffington Post (July 12, 2012), *available at* http://www.huffingtonpost.com/2012/07/12/netflix-price-hike-anniversary_n_1668382.html.

**CLASS ACTION COMPLAINT**

ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Netflix or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

54.     Plaintiff's claims are typical of Class members' claims, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

55.     Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

56.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.  whether the federal securities laws were violated by Defendants' acts as alleged herein;

    b.  whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Netflix;

    c.  whether Netflix's May 2014 price increase had a significantly negative effect on subscriber growth before the Class Period;

    d.  whether Defendants knew (or recklessly disregarded) on July 21, 2014 the fact that Netflix's May 2014 price increase had a substantially negative effect on subscriber growth leading up to the Class Period;

    e.  whether Defendants knew (or reckless disregarded) on July 21, 2014 that Netflix's 2Q14 subscriber growth had been disproportionately driven by a one-time "global media event" (i.e., Defendants' release of *OITNB* Season Two), which had "offset" the known negative effects of the May 2014 price increase;

**CLASS ACTION COMPLAINT**

f.   whether the price of Netflix stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

g.   whether Class members have sustained damages, and the proper measure of damages.

57.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

58.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Netflix common shares have at all relevant times traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and the Class purchased, acquired and/or sold Netflix stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

59.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

**(Against All Defendants For Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder)**

**CLASS ACTION COMPLAINT**

60.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

62.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Netflix stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Netflix stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

63.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Netflix stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Netflix's finances and business prospects.

64.     By virtue of their positions at Netflix, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such

**CLASS ACTION COMPLAINT**

facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

65.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Netflix's, the Individual Defendants had knowledge of the details of Netflix's internal affairs.

66.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Netflix. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Netflix's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Netflix stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Netflix's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Netflix stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

67.     During the Class Period, Netflix stock traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Netflix stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Netflix stock

was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Netflix stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

68. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II
### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

70. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71. During the Class Period, the Individual Defendants participated in the operation and management of Netflix, and conducted and participated, directly and indirectly, in the conduct of Netflix's business affairs. Because of their senior positions, they knew the adverse undisclosed information about Netflix's finances and operations.

72. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Netflix's financial condition and results of operations, and to correct promptly any public statements issued by Netflix which had become materially false or misleading.

73. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Netflix disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Netflix to engage in the wrongful acts complained of herein. The

**CLASS ACTION COMPLAINT**

Individual Defendants therefore, were "controlling persons" of Netflix within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Netflix common stock.

74. Each of the Individual Defendants, therefore, acted as a controlling person of Netflix. By reason of their senior management positions and/or being directors of Netflix, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Netflix to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Netflix and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

75. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Netflix.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative, and the law firms of Kahn Swick & Foti LLP and Finkelstein & Krinsk LLP as Class Counsel;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 1, 2017                                Respectfully submitted,


                                                    Ramzi Abadou (SBN 222567)
                                                    **KAHN SWICK & FOTI, LLP**
                                                    912 Cole Street #251
                                                    San Francisco, CA 94117

**CLASS ACTION COMPLAINT**

Telephone:  504-455-1400
Facsimile:   504-455-1498
ramzi.abadou@ksfcounsel.com


By: *s/Ramzi Abadou*
Ramzi Abadou


**FINKELSTEIN & KRINSK LLP**
Jeffrey R. Krinsk, Esq.
David J. Harris, Jr., Esq.
Trenton R. Kashima, Esq.
550 West C Street, Suite 1760
San Diego, California 92101-3579
Telephone: (619) 238-1333
Facsimile:  (619) 238-5425

*Attorneys for Plaintiff*

**CLASS ACTION COMPLAINT**

## CERTIFICATION PURSUANT TO SECURITIES LAWS

_JAmes A. Ziolkowski_ (name) ("Plaintiff") declares, as to the claims asserted under the federal securities law, that:

1. Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws and retains the firm of Kahn Swick and Foti, LLC, to pursue such action on a contingent fee basis.

2. Plaintiff did not purchase securities of **Netflix, Inc.** at the direction of counsel or in order to participate in a private action under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. During the Class Period, Plaintiff has executed transactions in the securities of **Netflix, Inc.** as follows. See attached Schedule.

5. In the last three years, Plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

6. Plaintiff will not accept payment for serving as a lead plaintiff beyond his/her/its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _Feb. 14_, 2017

_James A. Ziolkowski_
Plaintiff Signature

_JAmes A. Ziolkowski_
Printed Name

Name of Plaintiff: JAMES A. Ziolkowski

Schedule of Plaintiff's Transaction(s) in: **Netflix, Inc.**

Purchase(s):

| Date | Shares | Units | Price | |
|------|--------|-------|-------|-------|
| 10/14/14 | 11,1757 * | | $ 447.40 | $5,001 |
| 10/7/14 | | 10,7824 | 453.81 | $ 5,001 |
| 9/23/14 | | 11,2641 | 493.89 | $ 5,000 |

*  shares bought through electronic Trading firm Sharebuilder which is owned by Capital One Bank