Ramzi Abadou (SBN 222567)
ramzi.abadou@ksfcounsel.com
**KAHN SWICK & FOTI, LLP**
912 Cole Street #251
San Francisco, CA 94117
Telephone:  504-455-1400
Facsimile:  504-455-1498

Jeffrey R. Krinsk (SBN 109234)
jrk@classactionlaw.com
David J. Harris, Jr. (SBN 286204)
djh@classactionlaw.com
Trenton R. Kashima (SBN 291405)
trk@classactionlaw.com
**FINKELSTEIN & KRINSK LLP**
550 West C Street, Suite 1760
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile: (619) 238-5425

*Lead Counsel for Plaintiff and the*
*Putative Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES ZIOLKOWSKI, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> NETFLIX, INC., REED HASTINGS, and DAVID WELLS, <br><br> Defendants. | Docket No. 4:17-cv-01070-HSG <br><br> **CLASS ACTION** <br><br> AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS <br><br> **DEMAND FOR JURY TRIAL** |

This is a putative class action for violations of the federal securities laws.  Lead Plaintiff Michael J. DuDash ("Lead Plaintiff") brings this class action individually and on behalf of all other persons and entities who purchased or otherwise acquired Netflix, Inc. ("Netflix" or the "Company") securities during the period between July 21, 2014 and October 15, 2014, inclusive (the "Class Period"), and who were damaged thereby (the "Class").  Lead Plaintiff asserts violations of Sections 10(b) and 20(a) of the Exchange Act, and Securities and Exchange Commission ("SEC") Rule 10b-5(b) promulgated thereunder. Defendants are (i) Netflix; (ii) Netflix Founder, Chairman and Chief Executive Officer ("CEO") Reed Hastings ("Hastings"); and (iii) Netflix Chief Financial Officer ("CFO") David Wells ("Wells") (together, the "Insider Defendants").  Lead Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and based upon his counsel's investigation as to all other matters.  Such investigation included, among other things, a review and analysis of Netflix's public filings with the U.S. Securities and Exchange Commission ("SEC"), research reports issued by financial analysts concerning Netflix, and other publicly available information regarding the Company and its senior managers.  Many of the facts further supporting the allegations herein are known only by Netflix and the Insider Defendants (collectively, "Defendants"), and/or are exclusively within their custody or control.  Lead Plaintiff believes that substantial additional evidentiary support will be revealed after a reasonable opportunity for discovery.

## NATURE AND OVERVIEW OF THE ACTION

1.     This action arises from Defendants' material misstatements and omissions regarding Netflix's video-streaming subscription business.  Netflix is predominantly a streaming video content provider that enables customers who pay a monthly fee to instantly watch popular movies and television shows through the internet.  Netflix subscribers can watch videos on a variety of internet-connected devices, such as computers, smart phones, tablets, video game consoles and smart TVs.  At all relevant times, the flat monthly fees paid by Netflix's streaming subscribers have provided most of the Company's revenue.

2.     Netflix's streaming subscription business has high up-front costs.  To attract and retain subscribers, Netflix must continually acquire popular movies and television shows for its

1

**AMENDED CLASS ACTION COMPLAINT**

online content library.  Netflix obtains the rights to stream these videos by entering into licensing agreements with movie and show owners, such as Sony Pictures Television and DreamWorks Animation.  Leading up to and during the Class Period, Netflix's unpaid content obligations were growing rapidly, by billions of dollars per year.

3. For this reason, at all relevant times, the sustained growth of Netflix's subscriber base has been vital to Defendants' business plan and Netflix's stock market valuation, such that Defendants have repeatedly referred to Netflix's quarterly and annual subscriber growth ("net subscriber additions" or "net adds") as their "core performance measurement."  As a core business concern, Defendants have long understood that they needed to continuously grow Netflix's subscriber base to fund the Company's content obligations and other expenses, without harming the Company's long-term profitability.

4. From 2012 to 2014, Defendants rapidly grew Netflix's streaming subscriber base, but not rapidly enough to keep pace with the Company's burgeoning content obligations.  From 2012 to 2013, Netflix's unpaid content obligations grew by $1.7 billion, while revenues grew by $800 million and profits by $95 million.  The following year, Netflix's unpaid content obligations grew by $2.2 billion, as revenues grew by $1.1 billion and profits by $155 million.

5. In early 2014, Defendants Hastings and Wells learned, and publicly disclosed, that they needed to increase subscription prices to adequately fund content and provide high-quality video to Netflix's streaming subscribers.  Even Defendants' best-case subscriber growth projections could not sufficiently increase the Company's revenues.  Raising prices, however, was not a strategy that Defendants Hastings and Wells were eager to pursue.

6. On the prior occasion that Defendants had increased Netflix's subscription prices, they encountered major financial and operational difficulties.  In late 2011, immediately after increasing subscription prices by $5.99 per month, Defendants lost 800,000 subscribers in a single quarter and, as a result, Netflix's stock price declined by 37% in a single day, and by 75% in a matter of months.  The Netflix brand also suffered highly negative, multi-year consequences from Defendants' subscription price hike in 2011.  Thus, when Defendants Hastings and Wells decided to raise Netflix's subscription prices again in 2014, they proceeded

**AMENDED CLASS ACTION COMPLAINT**

1  deliberately and were motivated to carefully manage and monitor their subscription price
2  increases of 2014, after their bad experience with doing so in 2011.

3       7.     No later than January 2014, Defendants began testing various pricing structures to
4  determine what form of increase would be best received by subscribers.  The goal was to assess
5  how, if at all, Defendants could increase Netflix's revenue-per-user without substantially
6  hindering Netflix's user growth.  At least one of Defendants' pricing tests involved increasing
7  subscription prices in one of Netflix's smallest markets, and then carefully monitoring the
8  Company's growth trends in that market over the ensuing weeks and months.  In April 2014,
9  after substantial internal studies and analyses, Defendants Hastings and Wells elected to raise
10  Netflix's subscription prices by $1-2 per month worldwide, depending on the country.  These
11  global pricing increases went into effect on May 9, 2014.

12       8.     After the Company's 2011 pricing debacle, Defendants and the broader market
13  were acutely focused on what impact (if any) Netflix's global price increases might have on the
14  Company's subscription growth trends – its core operating metric.  On May 20, 2014 – just
15  eleven days after increasing the Company's subscription prices – Defendant Wells addressed
16  Netflix equity analysts at a J.P. Morgan investment conference in Boston, Massachusetts.
17  There, he explained that Defendants had seen a "small reaction" to their price increases from
18  consumers, but stated that the reaction was "generally as expected."  Defendant Wells qualified
19  his statements by reminding investors that it was still "pretty early" to say what the ultimate
20  impact on Netflix's subscription growth might be.

21       9.     Throughout May, June and July 2014, Defendants Hastings and Wells continued
22  to personally monitor Netflix's subscriber growth numbers on a weekly if not daily basis,
23  comparing those numbers to their prior growth trends and expectations.  At all relevant times,
24  Defendants Hastings and Wells had real-time, user-friendly access to Netflix's past and latest
25  "net add" numbers using Netflix's powerful cloud-based database, called Apache Cassandra
26  ("Cassandra" or the "Cassandra Database").  Defendants accessed Netflix's subscription growth
27  metrics through Cassandra at least every week—and likely, every day or almost every day—in
28  the months immediately before and during (and after) the Class Period.

**AMENDED CLASS ACTION COMPLAINT**

10.     Netflix's second quarter ("2Q14") ended on June 30, 2014.  Defendants reported the Company's 2Q14 operating results to the market on the first day of the Class Period, July 21, 2014, about ten weeks after Netflix's price increases took effect.  Importantly, Defendants reported net subscriber additions for 2Q14 that were largely *in line* with market expectations and, as Defendants put it, "on par with [the second quarter of] last year."  The same day, in a letter to Netflix's shareholders filed with the SEC on Form 8-K, Defendants Hastings and Wells represented that "[t]here was *minimal* impact on membership growth from [our] price change."[1] During the Company's 2Q14 earnings call, Defendant Hastings further represented that any impact from Netflix's price increases on subscriber growth had been "pretty *nominal*," and characterized the impact as "*background noise*" which had "*no noticeable effect* in the business."  These statements were materially false and misleading when made.

11.     The truth that Defendants either knew or deliberately disregarded at the time they made the above misrepresentations was that Netflix's net subscriber additions had continued to slow down dramatically in the days and weeks after Defendant Wells conceded a "small reaction" to Netflix's price increases on May 20, 2014.  This materially negative trend in net adds was no surprise to Defendants given their past experiences in 2011, and their sophisticated pricing tests of early 2014.  Moreover, as of July 21, 2014, Defendants knew or recklessly disregarded that it was *only* through their deliberately timed, one-off release of Netflix's most popular TV show (called "*Orange is the New Black*") that Defendants managed to achieve anything close to their net add targets for 2Q14.  This release on June 6, 2014 enabled Defendants to generate an anomalous, short-term spike in net subscriber additions, which temporarily offset the persistent decline of net adds that Defendants had witnessed *via* Cassandra in the weeks immediately after their price increases.

12.     Investors remained unaware of these facts over the next three months, as Netflix shares climbed to new all-time highs during 3Q14.  Defendants successfully convinced the market that they had seamlessly increased subscription prices without any meaningful hindrance

---

[1]     All emphasis is added unless otherwise noted.

**AMENDED CLASS ACTION COMPLAINT**

to Netflix's subscription growth or any near-term risk to the Company's core business prospects.

13.    Then, on October 15, 2014, Defendants reported the Company's 3Q14 results, which revealed net subscriber additions that were far below market expectations, both in the United States (Defendants' largest market) and in Netflix's international markets.  Netflix's subscription growth figures were so anemic that they forced Defendants to slash their forward earnings projections by nearly half.  In their 3Q14 letter to shareholders, dated October 15, 2014, Defendants Hastings and Wells admitted that "the primary cause is the slightly higher prices we now have compared to a year ago."  What Defendants had very recently characterized as a "pretty nominal," "minimal" impact on growth had suddenly become a very "noticeable," severely negative impact on growth within just ten weeks.

14.    Defendants sought to justify the inconsistency in their statements by representing that the substantial "impact" of Netflix's May 2014 price increases on net adds had been "offset for about two months by the large positive reception to [their release of] Season Two of *Orange is the New Black*."  But Defendants knew about this material, one-time "offset" from monitoring the Cassandra Database throughout May and June 2014, before they spoke on July 21, 2014, and prior to disclosing it to investors on October 15, 2014.  Defendants had witnessed Netflix's net adds slow substantially for several weeks following their price increases, only to anomalously spike up and reach expectations in the last few weeks of the quarter – immediately upon and after their release of *Orange is the New Black* Season Two on June 6, 2014.  After this, Defendants could only gamble and hope that the substantial, growth-slowing impact of their price increases would somehow dissipate in the near future.  Instead, that substantial slowing effect only persisted, causing investors to pay a steep price.

15.    On October 15, 2014, when the market discovered the truth about the sharply negative impact of Netflix's price increases on the Company's subscription growth trends, the Company's share price dropped by approximately 20% on massive trading volume, both after-hours and on the next trading day.  Netflix's market capitalization decreased by approximately

**AMENDED CLASS ACTION COMPLAINT**

$5 billion overnight, and Lead Plaintiff and the Class suffered significant investment losses as the Company's share price fell precipitously.



**JURISDICTION AND VENUE**

16.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5.

17.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa. In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

18.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §§ 78aa, and 28 U.S.C. § 1391(b). Netflix resides and transacts business in this District, and maintains its principal executive offices in this District at 100 Winchester Circle, Los Gatos, CA 95032.  Many of the acts that constitute the violations of law complained of herein,

AMENDED CLASS ACTION COMPLAINT

1    including the preparation and public dissemination of materially false and misleading

2    statements, occurred in substantial part in this District.

3         19.    In connection with the acts, omissions, conduct and other wrongs alleged in this

4    Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate

5    commerce, including but not limited to, the United States mail, interstate telephone

6    communications and the facilities of a national securities exchange.

7                                    **PARTIES**

8         20.    Lead Plaintiff Michael J. DuDash purchased common shares of Netflix during the

9    Class Period, as set forth in his certification attached hereto and filed earlier in this action (*see*

10   *generally* Dkt. 25-1), and was damaged as a result of Defendants' wrongdoing as alleged herein.

11        21.    Defendant Netflix, Inc. purports to be the world's leading internet subscription

12   service for viewing movies and television shows.  Subscribers can instantly "stream" movies

13   and TV shows through the internet to their TVs, computers and various mobile devices.  Netflix

14   is incorporated in Delaware and maintains its principal place of business and principal executive

15   offices at 100 Winchester Circle, Los Gatos, CA 95032.  The Company's common stock is

16   publicly traded on the NASDAQ under ticker symbol "NFLX."

17        22.    Defendant Hastings has served as Netflix's CEO since September 1998, and as its

18   Chairman of the Board since the Company's inception. Defendant Hastings co-authored and

19   signed a letter to Netflix's shareholders that was dated and publicly filed with the SEC on Form

20   8-K on July 21, 2014 ("July 21 Shareholder Letter").  The July 21 Shareholder Letter contained

21   certain of the materially false and misleading statements alleged herein.  Defendant Hastings

22   also made materially false and misleading statements during Netflix's July 21, 2014 quarterly

23   earnings interview.  Defendant Hastings also signed the Company's 2Q14 Quarterly Report

24   filed with the SEC on Form 10-Q on July 22, 2014, which contained certain of the materially

25   false and misleading statements alleged herein.

26        23.    Because of his senior position with the Company, Defendant Hastings possessed

27   the power and authority to control, and did control, the contents of press releases, shareholder

28   letters, investor and media presentations and all filings Netflix made with the SEC during the

**AMENDED CLASS ACTION COMPLAINT**

Class Period.  Defendant Hastings also certified the Company's Class Period financial reports filed with the SEC under the Sarbanes-Oxley Act of 2002, and regularly spoke with investors and securities analysts about the Company.

24.     Defendant Wells (together with Hastings, the "Insider Defendants") has served as Netflix's CFO since December 2010.  Along with Defendant Hastings, Defendant Wells co-authored and signed the Company's July 21, 2014 Shareholder Letter, which contained certain of the materially false and misleading statements alleged herein.  Defendant Hastings also signed the Company's 2Q14 Quarterly Report filed with the SEC on Form 10-Q on July 22, 2014 that contained certain of the materially false and misleading statements alleged herein.

25.     Because of his senior position with the Company, Defendant Wells possessed the power and authority to control, and did control, the contents of press releases, shareholder letters, investor and media presentations and all filings Netflix made with the SEC during the Class Period.  Defendant Wells also certified the Company's Class Period financial reports filed with the SEC under the Sarbanes-Oxley Act of 2002, and regularly spoke with investors and securities analysts about Netflix.

26.     Because of their positions with the Company, the Insider Defendants possessed the power and authority to control, and did control, the contents and forms of Netflix's, annual reports, quarterly reports, shareholder letters, press releases as well as the Company's presentations to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. They personally authored and/or were provided copies of the shareholder letters and SEC filings alleged herein to be materially false and misleading prior to their issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company and their access to material non-public information available to them, but not to the public, the Insider Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were materially false and misleading.

27.     The Insider Defendants each made materially false and misleading statements during the Class Period by speaking on earnings conference calls, signing the Company's SEC

**AMENDED CLASS ACTION COMPLAINT**

filings, and authoring their letters to shareholders and/or making presentations to investors. The Insider Defendants were also intimately involved with and aware of, or deliberately disregarded, all relevant aspects of the Company's core operations as described herein.

28. Each of the Insider Defendants had access to the adverse undisclosed information about Netflix's business and operations through their access to internal corporate data and documents, conversations and contact with other corporate officers and employees, attendance at meetings and through reports and other information provided to them on an ongoing basis. The Insider Defendants were also directly involved in the day-to-day operations of Netflix at its highest levels. The Insider Defendants each bear responsibility for the accuracy of the public reports and press releases detailed herein, and are therefore primarily liable for the misrepresentations and omissions contained therein.

29. The Insider Defendants also each substantially participated in and had exclusive authority and control over the content of Netflix's false and misleading statements and how they were communicated to investors. They also engaged in conduct in furtherance of a fraudulent scheme and course of business and were involved in the preparation and dissemination of Netflix's misleading statements, all of which made it necessary or inevitable that material misrepresentations and omissions would be communicated to, and mislead, investors. Defendants' scheme deceived the investing public regarding Netflix's operations and the intrinsic value of Netflix's securities, and caused Lead Plaintiff and other members of the Class to be damaged as a result of their purchases of the Company's securities at artificially inflated prices.

30. The federal securities laws required the Insider Defendants not to falsify Netflix's statements and prohibited them from using the instrumentalities of interstate commerce or the mails to: (i) employ any device, scheme, or artifice to defraud; (ii) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engage in any act, practice, or course of business which would operate as a fraud upon any person. Their

**AMENDED CLASS ACTION COMPLAINT**

1  conduct violated the Exchange Act and SEC regulations promulgated thereunder in connection

2  with the purchase or sale of Netflix's securities.

3      31.   The Company's shareholder letters, press releases and SEC filings were group-

4  published documents, representing the collective actions of Netflix management.  The Insider

5  Defendants were personally involved in authoring, editing, producing, reviewing and

6  disseminating the false and misleading statements alleged herein, and were aware, or recklessly

7  disregarded, that false and misleading statements were being issued regarding Netflix's

8  streaming business, and approved or ratified such statements in violation of the federal

9  securities laws.

10                                    **BACKGROUND**

11  **From DVDs to Online Streams**

12      32.   Defendant Hastings co-founded Netflix in 1997.  Netflix was originally a DVD

13  rental-by-mail service.  The Company allowed customers to pay a monthly subscription fee in

14  exchange for selecting movie and other DVD rentals from Netflix's website, and receiving and

15  returning their rentals by mail, free of shipping or late-return fees.  For several years, Netflix

16  competed primarily with brick-and-mortar movie rental stores like Blockbuster and Hollywood

17  Video.  Ten years into the business, Netflix held more than a 10% market share of an $8 billion

18  DVD rental market.

19      33.   Despite Netflix's DVD success, Defendant Hastings had other, longer-term plans

20  for the Company.  As he relayed to the *New York Times* in 2007: "[b]ecause DVD is not a

21  hundred-year format, people wonder what will Netflix's second act be[?]"  Defendant Hastings'

22  answer was online streaming video, or "Internet TV."

23      34.   In 2007, Netflix introduced a new streaming service to deliver movies and

24  television shows directly to consumers' personal computers.  The new streaming service

25  eliminated inefficiencies from Netflix's DVD business and provided the opportunity for higher

26  profitability over the long-term.  Streaming was also consumer-friendly.  Netflix's entire

27  streaming library was made available to consumers at the click of a button in exchange for a

28  month-to-month subscription fee.  The popularity of Netflix's on-demand streaming video grew

**AMENDED CLASS ACTION COMPLAINT**

exponentially relative to DVD in the ensuing years, to the point where Defendant Hastings was fully convinced that Netflix's long-term future was Internet TV, rather than DVD-by-mail.  In July 2011, Hastings stated: "[w]e are [now] a streaming company which also offers DVD by mail."

35.     As of mid-2011, Netflix offered subscribers several different subscription plans, with its most popular plan being $9.99 for unlimited streaming plus one DVD-by-mail at a time. This hybrid price point, however, was insufficient to fund Netflix's lofty streaming plans over the long term.  Simply put, $9.99 per month, per customer, was not going to cover the streaming content licenses necessary to drive growth while also maintaining Netflix's otherwise profitable (albeit shrinking) DVD-by-mail business.

36.     Beginning in July 2011, Defendants separated Netflix's legacy DVD business from its burgeoning Internet TV business, and raised monthly subscription prices in the process. Instead of $9.99 per month for unlimited streaming and one DVD, subscribers would now be offered unlimited streaming (only) for $7.99 per month, and one DVD at a time (only) for $7.99 per month.  Customers who desired both streaming and DVD rentals under the old hybrid plan—Netflix's most popular plan at the time—would now have to pay $15.98 per month rather than $9.99 per month, a $5.99 monthly increase.  This $5.99 price increase in 2011 caused major, systemic problems for Defendants.

**Defendants' 2011 Price Increase Decimates Netflix's**
**Subscription Growth and Stock Value**

37.     On July 12, 2011, Defendants announced Netflix's $5.99 price increase to subscribers.[2]  Defendants' announcement stated that Netflix's price increase would be effective immediately for new subscribers, and effective two months later for existing subscribers, in September 2011.

_____

[2] Netflix had promoted Defendant Wells from Vice President of Financial Planning & Analysis to Chief Financial Officer in 2010.

**AMENDED CLASS ACTION COMPLAINT**

38.     Netflix subscribers—and investors—responded very negatively to this development.   The day after Defendants' price hike announcement, "#DearNetflix" was trending on Twitter, and that hashtag was not complimentary. The Company also received over 30,000 negative comments on its Facebook page immediately after posting an update about this pricing change.   More critically, between their price hike announcement of July 2011 and the end of September 2011, Defendants lost approximately **800,000** subscribers.  This was only the second time in Netflix's history that its total subscriber base actually decreased.  Upon losing so many subscribers in just one quarter, Defendant Hastings specifically blamed the July 2011 price increase for Netflix's loss.  The Company's stock price dropped 37% in a single day as a result.  In total, the Company's shares declined by approximately **75%** in the 20-week period following Defendants' July 2011 price increase:



39.     Defendant Hastings' position as the Company's CEO was publicly reported to be in jeopardy as a result of these developments.  While Netflix's Board of Directors ultimately elected not to fire Defendant Hastings, they cut his 2012 compensation in half due to the Company's poorly executed price increase.  Defendant Hastings also suffered a far larger hit to his personal net worth from the sharp decline in Netflix's stock.  *The Wall Street Journal* estimated that Hastings lost up to **$641 million** in net worth because of this collapse in Netflix's share price, due to Defendants' 2011 price increase.

AMENDED CLASS ACTION COMPLAINT

40.     In an October 24, 2011 letter to shareholders reporting Netflix's dismal 3Q11 results, Defendants Hastings and Wells personally wrote: "[t]he last few months . . . have been difficult for shareholders, employees, and most importantly, many members of Netflix.  While we dramatically improved our $7.99 unlimited streaming service . . . , we greatly upset many domestic Netflix members with our significant DVD-related pricing changes . . . .  In doing so, we've hurt our hard-earned reputation, and stalled our domestic growth."

41.     Defendants Hastings and Wells nevertheless defended their pricing decisions in the same letter, writing: "[w]e think that $7.99 for unlimited streaming and $7.99 for unlimited DVD are both very aggressive low prices, relative to competition and to the value of the services, and they are the right place for Netflix to be in the long term."  They added that: "[i]nvestors and members will be relieved to know **we are done with pricing changes,** and that at $7.99 each for streaming and DVD we can move forward for a long time."  Defendants further reassured investors that Netflix's "long-term streaming opportunity [was] as compelling as ever."

**Netflix Recovers on Rapid Subscriber Growth**
**But Major Financial Questions Remain**

42.     The profoundly negative consequences associated with Defendants' 2011 subscription price increase ultimately subsided as streaming subscriber growth (but not DVD growth) resumed in 2012.[3]  A July 2012 article in *CNET*, "Netflix' Lost Year: The inside story of the price hike train wreck," detailed how Defendant Hastings was "blinded by [his] past success" and "nearly derailed his company."

43.     But Netflix stock began rebounding from rock bottom in the third quarter of 2012. During 2013, Netflix shares *tripled* in value, as positive subscriber growth resumed at a pace of several million net subscriber additions per year.[4]  As analysts from William Blair & Company

---

[3] DVD subscriptions continued to shrink each quarter and have consistently shrunk since 2011, but this was always expected and intended by Defendants' Hastings and Wells.  Netflix was now "a streaming company which also offers DVD by mail."  *See* ¶34, *supra.*

[4] Net subscriber additions are equal to new subscriptions ("gross subscriber additions" or "gross adds") minus cancelled subscriptions (or "churn").

**AMENDED CLASS ACTION COMPLAINT**

observed, "Netflix was the top performing stock in the S&P 500 in 2013, increasing 296%, as the market rewarded the company for proving it could increase subscriber growth and [profit] margins above Street expectations."

44.     Netflix's subscription growth—and thus its revenue growth and share price appreciation—was driven largely by what Defendants Hastings and Wells call the "virtuous cycle." Defendants' "virtuous cycle" holds that Netflix's growing subscriber base provides the Company with more cash with which to purchase more and improved video content, which in turn drives further subscriber growth, as customers are attracted to the improved viewing options through marketing and word of mouth. Wall Street analysts covering Netflix have long based their lofty price targets for the Company's stock on the expected success of Defendants' virtuous cycle. BMO Capital Markets explained the case for Netflix shares as follows:

> We expect Netflix to benefit from a virtuous cycle where higher subs [subscribers] drive better content, leading to strong word of mouth, which drives higher subs. This cycle could lead to another sustained period of subscriber gains, helping to drive significant [earnings] expansion over the next few years, despite large investments associated with building content libraries for international expansion. We are, however, maintaining our Market Perform rating, as we believe the shares of NFLX are adequately [valuing] a sustained period of strong subscriber growth and [profit] margin expansion.

***

> **Netflix continues to grow [streaming] subscribers at a fast pace – which, we believe, is the primary focus point for investors looking at the company's stock.**

45.     Defendants' "virtuous cycle," however, was not without controversy, despite Netflix's strong subscription growth in 2013. The reason was Netflix's exploding content obligations, which are the licensing fees that Netflix must pay Hollywood studios (among other content owners) to acquire the rights to stream top-performing movies and programs on Netflix. At year-end 2012, Netflix's unpaid content obligations alone totaled more than $5.6 billion, compared to approximately $3.6 billion in revenue and a mere $17 million of net income. By year-end 2013, unpaid content obligations had ballooned to about $7.3 billion, compared to $4.4

billion in revenue and $112 million of net income.   In sum, Netflix's streaming content obligations were continually growing at a faster dollar rate than Netflix's top and bottom lines.[5]

46.   The question among investors and market analysts was whether Netflix could grow streaming subscriptions (and thus revenues) enough to cover the massive growth in content obligations.   Defendants themselves repeatedly acknowledged this concern.   In January 2011, four years into their streaming business, Defendants Hastings and Wells wrote the following in a letter to shareholders:

We think there are two fundamental questions for investors:

(a) What will our domestic streaming growth trajectory be over the coming years, given our strategy to maintain modest domestic operating margins so that we can invest aggressively in additional streaming content?

(b) How successful will Netflix become outside the United States?

In the same letter, Defendants Hastings and Wells further stated that: "[n]et additions, along with revenue and operating income, *are our core performance measurements.*"   Defendants reiterated this in the Company's January 2012 letter to shareholders, writing: "[a]s stated in our January 2011 investor letter, net additions, along with revenue and [profit margins], *are our core performance measurements for each of our segments.*"[6]   Similarly, during Netflix's July 2013 earnings call, Defendant Hastings emphasized: *"[w]hat we really focus on is net adds,"* and further stated: *"I am looking at net adds all the time. Because, you get various tradeoffs, and really, what we care about is total growth.   So, it's bringing the world in line with how management looks at it, which is in terms of net [subscriber] additions, which we do check every week, every day."*

---

[5] This trend continued through 2014, as unpaid content obligations grew to $9.5 billion, compared to $5.5 billion in revenue and $267 million of net income.   Much of this financial burden was "off-balance sheet," such that it was not yet reflected in the Company's GAAP-based assets and liabilities. These content licensing fees were nonetheless concrete, contractual financial obligations that Netflix would have to pay out in the coming years. Moreover, Netflix's content licensing agreements also contained large *contingent* financial obligations that were not included in the total reported obligations because they could not be reliably quantified at the time of reporting.

[6] After 2011, Defendants began reporting Netflix's quarterly and annual operating results in three separate business segments: domestic streaming, international streaming, and domestic DVD.

**AMENDED CLASS ACTION COMPLAINT**

47.     So long as streaming subscription growth, or "net adds," continued at high rates, Defendants' "virtuous cycle" remained intact, and Defendants' burgeoning content obligations remained palatable for Defendants and for Wall Street.  Skeptical analysts, however, rather than seeing a "virtuous cycle," predicted more of a "tumultuous cycle" in Netflix's financial condition and operations.   In their view, Netflix's growing content obligations required Defendants to grow subscriptions at a high rate, just to pay them off profitably.  Yet growing subscriptions required additional content commitments to attract more viewership, which would require even *more* subscriber growth to continue profitably self-funding.   To Defendants and the market, this presented an almost existential risk to the Company's core strategy.  Analysts at Wedbush Securities explained their skepticism of Defendants' "virtuous cycle" in 2013:

> Simply put, we do not believe that Netflix's current pricing model will allow the company to generate sustainable profits at a high level, although it will allow for sustainable [subscriber] growth.  In order to be sustainably profitable, we believe that Netflix must raise price, *and therein lies the dilemma*: Netflix can be a high-growth, low-profit company, or it can be a low-growth, high-profit company.  We do not believe there is room for balance between the two, and believe that investors are overvaluing Netflix's unprofitable [subscriber] growth.

48.     Even as streaming subscriptions grew rapidly in 2013, Defendants faced significant skepticism, even from bullish analysts covering the Company.  During Netflix's July 2013 earnings call, for instance, one analyst asked: "[w]hen you drive more subscribers at a lower price, or generate a higher profit margin at a higher price—basically, why is $7.99 the right price?"  Defendant Hastings responded: "I would say $7.99 is pretty close to the right price.  I don't think we could be certain that at $6.99 or $8.99 it would be a little bit better or a little bit worse.  *Once you've picked a price, there is a tremendous value in consumer stability*, and we're growing very strongly at the current price, so we feel great about that situation."

49.     The analyst responded: "*[b]ut there's an overwhelming number of questions from investors and other analysts of—are you going to be forced to raise price because you literally can't afford your content commitments?*  So, either you need to raise [capital] or you need to raise the price of your service."  Defendant Hastings responded by stating: "[i]f you look over the past three years, we have raised [our streaming profit] margin in the United States

AMENDED CLASS ACTION COMPLAINT

business from [under] 10% to over 20%.  So, I think there's plenty of evidence that we can grow revenue [*i.e.,* streaming subscriptions] faster than we are growing content cost."[7]

50.     During the same July 2013 earnings call, a *CNBC* reporter then asked Defendant Hastings: "what is the probability that you would either be forced to raise debt or subscription prices in the next twelve months?"  Defendant Hastings replied in relevant part that: "[i]n terms of the likelihood of raising debt or prices, we don't have anything more to add to that than what we said, which is we are very comfortable where we are in the $7.99 price point, and we are growing very strongly.  In terms of debt, it would be pretty unlikely in the next twelve months."

51.     And yet, just *six* months after Netflix's July 2013 earnings call, Defendants issued $400 million of new debt.  Moreover, by January 2014, Defendants were anything but "very comfortable" with Netflix's streaming subscription prices.

**Unexpected Capital Needs Force Defendants**
**to Raise Subscription Prices Prematurely**

52.     In January 2014—six months after Defendant Hastings represented to investors that any new debt "would be pretty unlikely in the next 12 months"—Netflix announced a $400 million long-term debt offering, nearly doubling its long-term debt of $500 million as of year-end 2013.  The new offering occurred despite Netflix's rapid subscription growth throughout 2013.  Defendants disclosed to investors that this new debt issuance was needed largely to fund Netflix's streaming content commitments.  In the back half of 2013, two large categories of financial obligations manifested at Netflix, leaving Defendants in search of additional funds.

53.     ***First***, Defendants entered into several new, expensive content deals in late 2013.  In November 2013, Netflix and Walt Disney Co. announced "an unprecedented deal for Marvel TV to bring multiple original series of live-action adventures for four of Marvel's most popular

---

[7] "Cost," however, refers to Netflix's GAAP-based "cost of revenues," but does ***not*** include all of Netflix's existing, near-term, contractual content obligations; the latter may not be GAAP-recognized "costs" or "liabilities," but they are real-world financial "liabilities" in every sense of the word.  While Defendants were indeed growing revenues faster than their GAAP-based content "costs," they were not growing their revenues faster than Netflix's concrete, near-term financial ***obligations***.  And this was always investors' main concern, regardless of Generally Accepted Accounting Gymnastics.

**AMENDED CLASS ACTION COMPLAINT**

characters exclusively to the world's leading Internet TV Network [Netflix]."   The deal was for the exclusive rights to at least four different *Marvel* series.   Netflix also announced substantial content agreements with, *inter alia*, CBS (October 2013), Fox Television (November 2013), Sony Pictures Television (December 2013) and DreamWorks Animation (December 2013).   In the second half of 2013 alone, Defendants' streaming content obligations rose by over ***$884 million***, excluding contingent obligations.

54.   ***Second,*** one of Defendants' biggest fears leading up to the Class Period was the death of so-called "net neutrality."   "Net neutrality" denotes the principle that internet service providers (or "ISPs") such as Comcast, AT&T and Verizon should enable unfettered consumer access to all internet content, regardless of the content's source.   By contrast, ISPs sought to discriminate against high-bandwidth websites, and other content sources like Netflix, by forcing the largest bandwidth occupiers to pay extra for the high-volume traffic they generate.   One way ISPs could try to force this issue is by "throttling" internet traffic from high-volume websites: in other words, affirmatively decreasing content delivery speeds.   This would decrease the quality of a user's internet experience—in Netflix's case, a user's video quality—and thus hurt the content provider's business.   Such "throttling" incentivized internet content providers like Netflix to effectively pay ransom money, or "interconnection fees," to ISPs.

55.   There was also a more passive way for ISPs to slow content delivery speeds from Netflix.   The ISPs could simply allow Netflix's high-volume, downstream traffic to bottleneck at so-called "peering ports," which are the connections between Netflix's own bandwidth provider and the ISPs.[8]   Traditionally, if peering ports became overly congested, ISPs would temporarily open up new "ports" to maintain the free flow of data, akin to opening up additional lanes on a freeway.   This was typically done not as part of any formal arrangement, but rather as a business courtesy.   ISPs, in turn, would expect the same courtesy from internet content

---

[8] "Downstream" internet traffic refers to data that is received by a computer or network, such as receiving emails, downloading files, visiting websites, or streaming videos from Netflix.

**AMENDED CLASS ACTION COMPLAINT**

providers when/if they experienced spikes in upstream traffic.[9]   However, because some content providers (like Netflix) had far less upstream traffic than downstream traffic, ISPs began to claim they were getting the short end of the deal.   Accordingly, many ISPs stopped holding up their end of the traditional courtesy that was "net neutrality."

56.   Whether actively (by "throttling") or passively (by simply allowing "peering ports" to congest), ISPs began slowing Netflix's streaming content delivery speeds during late 2013, substantially harming Netflix subscribers' streaming experiences.   Defendants were very outspoken against such practices.   For example, Defendants routinely published Netflix's connection speeds through various ISPs leading up to and during the Class Period.   The following graph depicts Netflix subscribers' streaming connection speeds (and thus video quality) through two major ISPs during 2013:



57.   In early 2014, Netflix also published the following argument and chart on its official corporate blog, to show subscribers that ISPs (not Netflix) were the ones hindering their video enjoyment:

_____

[9] "Upstream" internet traffic refers to outgoing data that is sent from a computer or network, such as sending emails or uploading computer files to a website.

**AMENDED CLASS ACTION COMPLAINT**

Some major ISPs, like Cablevision, already practice strong net neutrality and for their broadband subscribers, the quality of Netflix and other streaming services is outstanding. But on other big ISPs, due to a lack of sufficient interconnectivity, ***Netflix performance has been constrained, subjecting consumers who pay a lot of money for high-speed Internet to high buffering rates, long wait times and poor video quality.*** A recent Wall Street Journal article chronicled this degradation using our public data.



***[If] Netflix agrees to pay the ISP interconnection fees, however, sufficient capacity is made available and high quality service for consumers is restored.*** If this kind of leverage is effective against Netflix, which is pretty large, imagine the plight of smaller services today and in the future. Roughly the same arbitrary tax is demanded from the intermediaries such as Cogent and Level 3, who supply millions of websites with connectivity, leading to a poor consumer experience.

58.     The immediate effect of the sharp decreases in connection speeds depicted above was poorer video quality for Netflix's streaming subscribers, and therefore a substantial risk of reducing Netflix's all-important subscription levels.

59.     To make matters worse, on January 14, 2014, the United States Court of Appeals for the District of Columbia invalidated certain of the Federal Communication Commission's ("FCC") net neutrality regulations, as applied to ISPs like Verizon and Comcast.[10]  This ruling only emboldened the ISPs to effectively hold high-bandwidth content providers like Netflix hostage by "throttling" their internet traffic and/or allowing traffic to bottleneck.  On January

---

[10] *See generally Verizon v. F.C.C.*, 740 F.3d 623 (D.C. Cir. 2014).

**AMENDED CLASS ACTION COMPLAINT**

14, 2014, Wedbush Securities published a note titled *Net Neutrality Ruling a Negative for Netflix*, which stated:

> [W]e expect ISPs to behave as if they were profit motivated, and think that they will seek to extract as much value from all websites as the court's ruling will permit.  We think it is far more likely that Netflix will see its users throttled by ISPs unless they pay for unrestricted delivery.  In our view, it is most likely that ISPs would seek to extract a set fee per gigabyte (GB) of data transmitted; *if we are right, the result would be more costly for Netflix than the status quo, with little or no incremental benefit.*  It is impossible to predict [exactly] how this will play out in dollar terms, but directionally, it should mean higher payments by Netflix and/or higher payments by Netflix subscribers.
>
> ***
>
> **Perhaps most importantly, we think the impact on Netflix['s] net income could be substantial, and we think that the imposition of data fees could drive the company to raise prices without a corresponding benefit.**[11] \*\*\*We believe that the average Netflix customer consumes at least 100 GB of Netflix-generated data per month, meaning that if the company were charged $0.01/GB for the data and decided to pass the cost through to its customers, *it would have to raise price by $1 per month.*  If, instead, Netflix chose to absorb the fees, its net income would decline by the same $1.00 per month, which equates to $360 million per year.  We think it is important to note that the consensus [Wall Street estimate] for Netflix EBITDA in 2014 is $554 million, *meaning that $0.01/GB of incremental fees could wipe out 2/3 of their profits.* \*\*\* [A]nd we think ISPs will adopt fee plans in the next several months.

This analysis would ultimately prove prescient, as Netflix would soon raise subscription prices by $1-2 per month, while signing "interconnection fee" agreements throughout 2014 with Comcast, Time Warner Cable, Verizon and AT&T, to decongest streaming traffic and maintain the quality of Netflix videos, particularly during prime viewing hours.   The effect of Defendants' first ISP fee agreement, with Comcast in February 2014, was immediately visible in Netflix's content delivery speeds:

---

[11] Emphasis in original.

AMENDED CLASS ACTION COMPLAINT



60.     Improvements like that had to be paid for: not just with Comcast, but also with Verizon, AT&T and Time Warner Cable.  Consequently, soon after the Court of Appeal's adverse net neutrality ruling, Defendants Hastings and Wells began speaking publicly about potential subscription price increases.  With respect to Netflix's monthly subscription prices, Defendant Hastings stated on January 22, 2014 that: ***"We're testing lots of things.  Some of it's been reported on, some of it's not."***  Indeed, after their pricing debacle of 2011, Defendants were taking great care to determine what impact price increases might have on Netflix's ability to grow subscriptions.  Defendants had learned from their 2011 increase of $5.99 per month that even small increases could have a big, negative impact on growth.

61.     Investors, likewise, took great interest in Defendants' January 2014 price-testing comments because Netflix's 2011 price increase had so greatly damaged subscriber growth and shareholder value.  On January 15, 2014, MKM Partners wrote about Netflix's "Pricing Power," stating: "Management has been talking more about exploring pricing tiers, but remains cautious on sweeping price increases given low penetration and the PR blunder of 2011.***[W]e do not expect any sweeping price action in the next several years."  Similarly, Morgan Stanley wrote on January 23: "Key Question . . . Will Netflix be able to raise pricing over the long-term without adversely affecting subscriber [growth]?"  The same day, Jefferies analysts wrote:

**AMENDED CLASS ACTION COMPLAINT**

**Netflix is exploring different pricing tiers.**[12] *** This obviously raises the question of whether NFLX can drive ARPU [average revenue per user] across its massive subscriber base. While the last pricing increase turned into a PR nightmare, management appears to be much more thoughtful this time around. We don't expect any meaningful impact in the near-term but ***this is worth paying attention to.***

62. One of Defendants' key pricing tests in January 2014 would serve as a preview of Defendants' global price increases in May 2014.

**The Irish Test Case**

63. Before rolling out Netflix's worldwide subscription price increases, Defendants Hastings and Wells evaluated the effect of increasing prices in one small market, such that any significant slowing of growth would be contained within a sliver of Netflix's total subscriber base. In January 2014, Defendants increased the price of Netflix's most popular streaming plan from €6.99 to €7.99 per month, for new subscribers in Ireland only. Defendants Hastings and Wells then personally observed and analyzed Netflix's Irish subscriber numbers—in particular, net subscriber additions in Ireland—throughout the subsequent days and weeks.

64. In a letter to shareholders dated April 21, 2014, Defendants Hastings and Wells announced, "As expected, we saw limited impact from our January price increase for new members in Ireland (from €6.99 to €7.99), which included grandfathering all existing members at €6.99 for two years."

65. Investors took solace in the purported success of Defendants' Irish test case. Janney Capital Markets noted that: "Pricing Power has been central to our [investment] thesis . . . . We were encouraged to hear that the recent price increase in Ireland did not have a major impact on [subscription growth]." Other Netflix analysts made similar comments about the success of Defendants' Irish test case. But the real test for Netflix and for Wall Street's investment thesis would soon follow, as Defendants increased prices on a global scale.

---

[12] Emphasis in original.

AMENDED CLASS ACTION COMPLAINT

**Defendants Announce and Execute Netflix's Global Price Increases**

66.     On April 21, 2014, Defendants Hastings and Wells authored and signed a letter to shareholders discussing Netflix's 1Q14 results.  In this letter, they announced they would soon implement global price increases for all new Netflix streaming subscribers worldwide:

> *As expected, we saw limited impact from our January price increase for new members in Ireland (from €6.99 to €7.99)* which included grandfathering all existing members at €6.99 for two years. In the U.S we have greatly improved our content selection since we introduced our streaming plan in 2010 at $7.99 per month. *Our current view is to do a one or two dollar increase, depending on the country, later this quarter for new members only.* Existing members would stay at current pricing (e.g. $7.99 in the U.S.) for a generous time period. These changes will enable us to acquire more content and deliver an even better streaming experience.

67.     Like Defendants themselves, investors were watching this development closely. Sterne Agee analysts wrote on April 22, 2014 that *"the imminent price increase for new subscribers worldwide could dampen growth somewhat, though management indicated testing in Ireland has shown no impact of a price increase on growth."*  Morgan Stanley agreed, writing that "[t]he market appears to believe [Netflix's] price increase will be absorbed into the customer base with minimal disruption.  *However, most investors agree that NFLX needs to tread carefully before pushing price further, particularly given the customer backlash from the 2011 pricing change.* *** **How many US [households] will pay $9 a month on top of existing entertainment options?**[13]  *That is the key question . . . ."*

68.     On May 9, 2014, Defendants increased the price of U.S. streaming subscriptions from $7.99 per month to $8.99 per month for new members, and increased prices by $1-2 per month for new members across Netflix's international territories.

69.     On May 20, 2014, Defendant Wells spoke at J.P. Morgan's Global Technology, Media and Telecom Conference ("Conference") in Boston.  Netflix's moderator at this Conference was Doug Anmuth, a J.P. Morgan analyst who had been covering Netflix for years, and typically held a prominent role in Defendants' quarterly earnings calls.  At the Conference, Anmuth inquired of Defendant Wells: "You recently announced the pricing increase, so in the U.S. $1 for new

---

[13] Emphasis in original.

**AMENDED CLASS ACTION COMPLAINT**

members with existing members being grandfathered in. How do you think that's been received by consumers so far? Are you sensing any kind of change at all in terms of the brand?"   Wells responded, "Well, it's pretty early, it's eleven days, and I think we have learned to season our conclusions a bit.  But I would say it's generally as expected.  We were somewhat pleased, we expected a small reaction and I think we've gotten that so far."

70.     Netflix's second quarter ended six weeks later, on June 30, 2014.  Defendants reported their 2Q14 results on July 21, 2014.  Leading up to Defendants' 2Q14 earnings announcement, the market was acutely focused on the impact of Defendants' global price increases on subscription growth in the quarter.  Just before Defendants' earnings release, Morgan Stanley offered the following preview:

> **Key focus areas.** 1) The impact of the $1-2 global monthly pricing increase implemented in May on gross subscriber additions.

Analysts from RBC Capital Markets similarly wrote:

> One uncertainty this quarter is what impact the recently announced price increase could be having near-term on Gross Sub[scriber] Adds and Churn [*i.e.,* net subscriber additions].

71.     Defendants Hastings and Wells then reported Netflix's 2Q14 results after market hours on July 21, 2014.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS

72.     After market hours on July 21, 2014, Defendants announced Netflix's 2Q14 operating results.  In a signed letter to shareholders, Defendants Hastings and Wells reported a solid quarter of subscriber growth, both domestically and internationally, writing:

> Fellow Shareholders,
>
> Fifteen years after launching our subscription service, we have **over fifty million members** enjoying Netflix in over 40 countries. As we gain new members, we are investing to further improve our content and member experience, and to expand the global availability of our service. (emphasis in original)

Defendants continued:

**AMENDED CLASS ACTION COMPLAINT**

Our U.S. member base grew to more than 36 million on the strength of our ever-improving content offering, including Orange is the New Black Season 2. For Q3, we expect about 1.3 million net additions, comparable to Q3'13 in which we premiered Orange Season 1. *We are pleased our net additions in the U.S. remain on par with last year.*

73.    In addition to reporting solid subscription growth, Defendants reassured investors that their May 2014 price increases had *not* hindered subscription growth in any meaningful way.  Specifically, Defendants represented that:

In May, we raised prices modestly in most of our markets for new members on our two screens at-a-time HD plan, and introduced a one screen at-a-time, standard definition plan across our markets. Our two screen HD plan continues to be the most popular plan choice for new members. We expect [average revenue per user] to rise slowly as members at the new prices grow as a percentage of total membership. *There was minimal impact on membership growth from this price change.*

74.    Later the same day, during Netflix's 2Q14 earnings call with investors and analysts, Defendants reinforced their written representations.  In particular, a JPMorgan analyst asked:

*And Reed, in the letter, you talked about the price changes having a minimal impact on growth overall, but can you just provide a little bit more color?* Do you think, in terms of the nuances, did it impact churn, or help reduce churn in any way during the quarter? And what's your view on the way the price change could impact going forward?

Defendant Hastings responded:

*I think we've seen, really, the impact of the price change go through already, so it's pretty nominal,* both in terms of acquisition, which in principle becomes a little bit harder, because of the roughly $1 higher prices, or in retention, which could be a hair better from the grandfathered [subscribers]. *But it's only $1 difference, so I really think that it's background noise, which is what we want it to be.* We want to think of what we do, as we're steadily improving the content and the growth and the word of mouth, and that *when we make a small change in price, and handle it appropriately, it really makes no noticeable effect in the business, so that's why we're thrilled with that outcome.*

75.    Defendants Hastings and Wells thus misrepresented that the impact of Netflix's worldwide price increases on 2Q14 subscription growth was "minimal," "pretty nominal," "background noise," which had "no noticeable effect in the business."  Those representations were materially false and misleading when made, and Defendants knew, or at the very least, deliberately disregarded the falsity of their representations as of July 21, 2014.  The truth—

**AMENDED CLASS ACTION COMPLAINT**

which Defendants would be forced to admit about twelve weeks later—was that the Company's May 2014 price increases *had* substantially and negatively impacted Netflix's 2Q14 growth.

76.     The true, undisclosed facts were that: (a) Netflix's net subscriber additions, or "net adds," had continued to slow very substantially, both in the United States and in international markets, in the weeks before and after Defendant Wells admitted to a "small reaction" in their growth numbers on May 20, 2014; (b) this visible, multi-week slowing trend in net adds was either known or deliberately disregarded by Defendants given their personal experience with Netflix's 2011 price increase, Defendants' detailed pricing tests of early 2014, and Defendants' near-constant, real-time monitoring of Netflix's net add rates on the Cassandra Database; (c) as of July 21, Defendants Hastings and Wells also knew that without their carefully timed, one-off release of *Orange is the New Black* Season Two—Netflix's most popular show—on June 6, 2014, Netflix's 2Q14 net subscriber additions would *not* have been anywhere near "on par with last year," nor would net adds have come close to Defendants' net add projections for 2Q14.

77.     Indeed, Defendants knew that without the anomalous, short-term spike in net adds that Defendants received from the *Orange* Season Two release just four weeks after their price increases, and three-and-a-half weeks before the end of 2Q14, Netflix's 2Q14 net adds would have been hundreds of thousands of subscribers lower than both the prior year and what Defendants were able to report for the most recent quarter.

78.     In addition, Defendants' Class Period filings with the SEC failed to include price elasticity as a potential risk to Netflix's growth in the Company's risk disclosures, despite the fact that Defendants had already *seen* material changes in Netflix's net add trends in recent months.  On July 22, 2014, the Company filed its Quarterly Report on Form 10-Q with the SEC. Therein, despite the subscription price increase, Defendants misrepresented that there had been "*no material changes from the risk factors as previously disclosed* under the heading "Risk Factors" in the Company's Annual Report on Form 10-K for the year ended December 31, 2013."   Netflix's 2013 Annual Report, however, did not disclose that, based on previous experience, Defendants knew that subscription price hikes at Netflix could negatively impact

**AMENDED CLASS ACTION COMPLAINT**

the Company's subscriber numbers.   The 2013 Annual Report discusses "pricing" four times in its "Risk Factors" section, but never in relation to the company's ***own*** service costs.

79.     The 2013 Annual Report also misleadingly described how ***competition*** could damage Netflix's business with aggressive low pricing strategies, and discussed ISPs potentially introducing bandwidth caps or charging Netflix for bandwidth.  For example, one such risk disclosure stated that: "[t]he relative service levels, content offerings, pricing and related features of competitors to our service may adversely impact our ability to attract and retain members."   "Price elasticity"—which considers how demand changes in response to price changes—was concealed or recklessly omitted from the 2013 Annual Report, as was the fact that Netflix's recently implemented price increases had already materially hindered growth, and that those substantial, negative effects were likely to persist further in 3Q14.

80.     Accordingly, the statement that there had been "no material changes from the risk factors as previously disclosed" alleged in ¶78, *supra*, was materially false and misleading when made, as Defendants knew, or with deliberate recklessness disregarded, the fact that that their global price increases in 2Q14 could materially hinder, and had already materially hindered, the Company's subscription growth rates.

81.     The market, however, remained unaware of the true facts over the next three months.  Following Defendants' July 21-22, 2014 misrepresentations, the market breathed a collective sigh of relief from Defendants' purportedly harmless price increases.  For example, on July 21, Evercore analysts reported that ***"[t]he $1 price increase seemed to have a negligible impact."***  Analysts from Jefferies echoed: ***"Importantly, the company raised prices during 2Q to minimal impact on sub growth."***  MKM Partners reported the same on July 22, 2014, writing:

- ***Thesis intact: Momentum in domestic and int'l subscriber additions continues.***
- ***No noticeable impact from price increase***: Mgmt. believes they are through any ill-effects of recently announced price increases and characterize the impact as "background noise."

**AMENDED CLASS ACTION COMPLAINT**

82.    On July 23, the Motley Fool published an article titled *Netflix Price Increase Doesn't Slow Growth*, which stated, ***"Any fear that raising the cost of new subscriptions would hurt growth for the streaming service seems unfounded after [Netflix] released its [July 21] letter to shareholders."***[14]

83.    Simply put, the market believed exactly what Defendants said: that Netflix had successfully increased prices worldwide without meaningfully impacting the Company's subscription growth rates.  For the rest of 3Q14 and into the beginning of 4Q14—from July 22, 2014 to October 15, 2014—Netflix stock consistently traded well above $400 per share, hitting new all-time highs of over $489 per share on September 9, 2014.

84.    At market close on October 15, 2014, Netflix stock stood at $448.59 per share.  But a few minutes later, Defendants would announce their 3Q14 financial results, which included the full truth about Netflix's worldwide price increases 2Q14.

**Defendants Reveal the Truth About Netflix's Global Price Increases**

85.    After market hours on October 15, 2014, Defendants announced Netflix's 3Q14 financial results.  In another letter to shareholders (the "October 15 Shareholder Letter"), Defendants Hastings and Wells reported dismal net subscriber additions, writing:

> We added [less than] a million new members in the US, ending Q3 with 37.22 million members, ***with lower net additions than our forecast and versus the prior year.***  Domestic streaming revenue of $877 million, in-line with forecast, grew 25% [year over year] and faster than membership due to the expansion of [average subscription price] from the price changes implemented in Q2.

Defendants had projected 1.33 million additional U.S. subscribers for Q3: ***35% more*** than the 980,000 they were now reporting, and compared to 1.29 million net adds in the prior year's third quarter.   Moreover, Defendants reported 2.04 million net subscriber additions internationally, versus their stated expectation of 2.36 million.  In total, net streaming additions came in nearly ***700,000 subscribers lower*** than (purportedly) expected just ten weeks prior.

---

[14]    *See*    http://www.fool.com/investing/general/2014/07/23/netflix-price-increase-doesnt-slow-growth.aspx ("If any business has shown it can learn from past mistakes, it's **Netflix** (NASDAQ: NFLX).  The company in 2011 botched a price increase so badly, it bled subscribers, nearly fired CEO Reed Hastings, and drained years of built-up customer goodwill.  Three years later, it has pulled off a rate increase flawlessly.").

**AMENDED CLASS ACTION COMPLAINT**

Relative to Defendants' strong track record of projecting quarterly net adds over the years, these were significant shortfalls of abnormal magnitude.

86.    Given the damage done, Defendants sought to spin their huge shortfall in net adds as an ordinary missed forecast, writing:

> As a reminder, we provide you our internal forecast for the current quarter. For the prior three quarters, we under-forecasted membership growth. This quarter we over-forecasted membership growth. We'll continue to give you our internal forecast for the current quarter, and it will be high some of the time and low other times.

But this failed to explain *why* Netflix's subscription growth was so poor in 3Q14.  Defendants went on to explain exactly why, writing:

> [Y]ear on year net additions in the US were down (1.3 million in Q3 2013 to [less than] 1 million in Q3 2014). *As best we can tell, the primary cause is the slightly higher prices we now have compared to a year ago. Slightly higher prices result in slightly less growth*, other things being equal, and this is manifested more clearly in higher adoption markets such as the US.

As one sophisticated market observer noted: "'[s]lightly less growth' [wa]s a bit of an understatement."[15]  This was a massive decrease in Netflix terms; there was nothing "slight" about it.  In addition, the price increases that Defendants were now blaming for their net add slowdown occurred well before 3Q14.  The price increases had occurred in the front half of 2Q14 (on May 9).  And a full ten weeks *after* those price increases had occurred, Defendants explicitly represented to investors that any impact on Netflix's subscription growth was "minimal," "nominal," "background noise" having "*no noticeable effect* in the [Company's] business."

87.    Defendants struggled to explain the stark discrepancy between their July 21, 2014 and October 15, 2014 statements, writing:

---

[15] *See* "Netflix Says $1 Price Increase Crushed Its Subscriber Growth," Slate.com (Oct. 15, 2014), *available* *at* http://www.slate.com/blogs/moneybox/2014/10/15/netflix_earnings_the_company_says_price_hikes _crushed_its_subscriber_growth.html. (quoting Defendants' October 15 Shareholder Letter).

**AMENDED CLASS ACTION COMPLAINT**

***In hindsight, we believe that [in] late Q2 and early Q3*** [i.e., before our July 21 statements] ***the impact of higher prices appeared to be offset for about two months by the large positive reception to Season Two of Orange is the New Black.*** We remain happy with the price changes and growth in revenue and will continue to improve our service, with better content, better streaming and better choosing. ***The effect of slightly higher prices is factored into our [slashed] Q4 forecast.***

88.     In other words, Defendants conceded that there ***was*** a substantial, negative impact on subscription growth in "late Q2 and early Q3" from Netflix's subscription price increases of May 2014, well before Defendants assured investors of the opposite on July 21. Yet, according to Defendants, they were unaware of any negative impact as of July 21 because it "appeared to be offset for about two months" by the large positive impact of releasing *Orange* Season Two in 2Q14.  One observer commented on Defendants' *post hoc* explanation as follows:

"Slightly less growth" is a bit of an understatement. The slowdown suggests that streaming customers might be more cost-conscious than it previously seemed. ***When prices first went up in the spring, subscription growth didn't seem to take a hit. But now, the company thinks that may have been due to "the large positive reception to Season Two of Orange Is the New Black."*** [16]

89.     At first glance, Defendants' explanation appears plausible, but the truth was that, when Defendants reassured the market on July 21, 2014, they knew or deliberately disregarded the fact that their price increases ***had*** substantially hindered subscription growth in "late Q2 and early Q3."  Defendants' *post hoc* explanation regarding *Orange is the New Black* Season Two was nothing but a contrivance designed to conceal their material misstatements to investors on July 21-22, 2014.  The fact that Defendants' gamble--concealing bad news in the hope that it will be overtaken by good news--failed is not inconsistent with its having been a considered gamble, and a reckless one because of the known risk.

---

[16] "Netflix Says $1 Price Increase Crushed Its Subscriber Growth," Slate.com (Oct. 15, 2014), *available*                                                                                                                             *at* http://www.slate.com/blogs/moneybox/2014/10/15/netflix_earnings_the_company_says_price_hikes _crushed_its_subscriber_growth.html. (quoting Defendants' October 15 Shareholder Letter).

**AMENDED CLASS ACTION COMPLAINT**

90.   As a direct consequence of "[t]he effect of slightly higher prices," Defendants slashed their 4Q14 earnings forecast by nearly half.   Investors immediately reacted to Defendants' surprising after-hours announcement on October 15, 2014.[17]

91.   Analysts from Dougherty & Company reported that Netflix's "[d]isappointing sub adds both during Q3, and within the Q4 guidance, led to a 25% after-market shellacking of the stock. *** Management believes some of the disappointment in domestic adds can be traced to the price increase but any impact in Q2 and the early part of Q3 was muted by the draw of season two of *Orange is the New Black*."

92.   Likewise, J.P. Morgan analysts wrote that:  "Netflix reported disappointing 3Q results as both US and international streaming subs were below guidance and consensus [estimates] due to the impact of worldwide price increases in 2Q and a lack of marquee originals in 3Q. *** International net adds of 2M also came in below guidance of 2.36M, suggesting the global price increases—rather than market saturation—were the drivers of weak 3Q subscriber growth."[18]

93.   Wedbush Securities further elaborated that:

> Netflix's slowing subscriber growth is explainable, but still troubling.   The company raised price for new subscribers late in Q2, but it saw little attrition due to its launch of season 2 of "Orange is the New Black" in June.  The bloom faded in Q3, and the price increase showed some impact on subscriber additions both domestically and internationally, and Netflix guidance suggests that the impact will once again be felt in Q4.  In Q1:15, we expect season 3 of "House of Cards to once again reinvigorate subscriber additions, and we expect Netflix shares to once again rally.  However, we think history is destined to repeat itself next year, and once again the following year, as ***price increases are highly likely to impact growth forever***.

94.   Janney Capital markets also reported that:

> ***There was little to like in NFLX quarter as subs missed on price increases.*** Higher intl costs, VAT issues, HBO headlines and spike in obligations amplify

---

[17] *See, e.g., **"Netflix Price Increase Slows Subscriber Growth,"** New York Post (Oct. 15, 2014), available at* http://nypost.com/2014/10/15/netflix-price-increase-slows-subscriber-growth; ***"Netflix Blames Missed Sub-Growth Targets on Price Increase, As Stock Gets Hammered,"*** Variety.com (Oct. 15, 2014), *available at* http://variety.com/2014/digital/news/netflix-misses-sub-growth-targets-adding-980000-u-s-streaming-customers-1201331000.

[18] Emphasis in original.

the ugly quarter. ***Elasticity is the key concern as it could undermine the pricing leverage central to our thesis. *** The subs miss commensurate with the pricing increase, which suggests NFLX is not an inelastic brand yet. This casts doubt on NFLX's future ability to raise prices – the cornerstone of our thesis.***

95.     Analysts from SunTrust Robinson Humphrey concluded:

Management attributed the shortfall to pressure on gross sub adds from the recent $1/month price hike.  The subscriber shortfall does not appear to be competition related with no change in subscriber viewing or retention metrics.

96.     Finally, BMO Capital Markets reported that Netflix "posted combined streaming subscriber net adds that were roughly 20% lower than Street expectations.  We believe the subscriber miss was largely due to price hikes for new subscribers, ***the effect of which was masked in the prior quarter*** with the positive reception to Season Two of *Orange is the New Black*.  Total Streaming Content Obligations also increased significantly . . . ."

97.     The next trading day, on October 16, 2014, Netflix stock plummeted from the prior day's close of $448.59 to $361.70 per share, a nearly 20% decline, as the market digested Defendants' price-induced growth stall.  As Forbes.com reported, ***"[t]he massive sell-off was not surprising, considering that Netflix's stock has traded mostly on its subscriber growth."*** Lead Plaintiff and the Class suffered significant investment losses as a result of Defendants' false and misleading statements on July 21-22, 2014.

**ADDITIONAL ALLEGATIONS REGARDING DEFENDANTS' SCIENTER**

98.     Defendants October 15 Shareholder Letter conceded that their price increases had a material, negative impact on subscriber growth in "late Q2 and early Q3."  Defendants admitted this negative impact existed ***before*** they spoke on July 21, 2014 but claimed not to have noticed before July 21 because it "appeared to be offset for about two months by the large positive reception to Season Two of *Orange is the New Black*."  Defendants, however, were always aware leading up to and during the Class Period that their price increases had materially, negatively affected Netflix's 2Q14 subscription growth because:

(a) Defendants knew from their experience with Netflix's 2011 price increase that even modest monthly increases could stem if not destroy the Company's subscription growth and market value, so Defendants were acutely focused on the impact of

**AMENDED CLASS ACTION COMPLAINT**

Netflix's global price increases in 2014 before writing and speaking to investors on July 21;

(b) Defendants also knew from their pre-Class Period experience that releasing a uniquely popular television show significantly skews short-term subscriber growth to the upside upon and immediately after Netflix's release date;

(c) Defendants routinely accessed and relied upon Netflix's state-of-the-art database, Apache Cassandra, to closely monitor net subscriber additions on a weekly and even daily basis throughout 2014, and particularly throughout May and June 2014, and as a result, Defendants knew that *Orange* Season Two's release had anomalously salvaged 2Q14's net add totals as Defendants had intended before 2Q14 even began; and

(d) Defendants' specifically timed and promoted the release of *Orange* Season Two for 2Q14, rather than 3Q14, for the particular purpose of "offsetting" any substantial impact from their price increases, and Defendants Hastings and Wells had tested this same "offset" strategy in Ireland during 1Q14.

**Defendants' Hastings and Wells Had Seen This Movie Before**

99.    May 9, 2014 was not the first time that Defendants had increased Netflix's monthly subscription prices.  As set forth in ¶¶37-41, *supra*, in late 2011, Defendants Hastings and Wells increased the price of Netflix's (then) most popular subscription plan by $5.99 per month.   At the time, the effect of that price increase on Netflix's subscriber levels was devastating to the Company's operations.   Far worse than noticeably ***slowing*** growth (as occurred in 2014), Defendants' 2011 price increase caused Defendants to ***shed*** more than 800,000 U.S. subscribers in one quarter.

100.    The harmful effects on Netflix's share price persisted for months, as shares declined by more than 75% in the 20-week period following Defendants' 2011 price increase. This included a 37% drop in one day when Defendants revealed the true impact of their price

**AMENDED CLASS ACTION COMPLAINT**

increase on membership.[19]  Indeed, Defendants' 2011 price increase had been so devastating to the Company that industry observers were still discussing it a full year after it happened.[20]

101.    And while the harmful effects on Netflix's stock price persisted for months, the harmful effects on Netflix's business actually persisted for years.  Indeed, Netflix equity analysts believed that Defendants were *still* feeling the sting of their 2011 price increase shortly before the Class Period, even though the Company's share price had more than recovered at that point.  Specifically, between 2011 and 2014, analysts at RBC Capital Markets conducted a series of proprietary surveys of over 1,000 internet users and Netflix customers, in an effort to understand the behaviors and preferences of Netflix subscribers.  In or about May 2014, around the time that Defendants increased Netflix's subscription prices, RBC analysts conducted their eleventh proprietary survey in three years, and found that:

> 63% of current Netflix subscribers are still "Extremely satisfied" or "Very satisfied" with their subscription — a robust level of satisfaction, but down modestly from the recent high of 66% in our February 2014 survey (Netflix announced a $1 price increase for new members on April 21, which has recently taken effect).  This is the 2nd highest level we have tracked since the H2:11 [second-half 2011] branding/pricing challenges — indicating a trend of gradual recovery over the last three years.  *As we have previously noted, it is our belief that these levels are below the satisfaction levels Netflix enjoyed in H1:11 [first-half 2011,] highlighting the magnitude and duration of the brand "hit" Netflix inflicted on itself [in late 2011].*

102.    For these reasons, leading up to and after Defendants' May 2014 price increases, Defendants were intensely focused on the impact those increases would have—and actually had—on Netflix's subscription growth.

---

[19] *See, e.g.,* "Netflix Drops Most Since 2004 After Losing 800,000 Customers," Bloomberg Business (Oct. 25, 2011), *available at* http://www.bloomberg.com/news/articles/2011-10-24/netflix-3a-subscriber-losses-worse-than-forecast ("Netflix Inc. *dropped the most in seven years* after the video-rental service said it lost 800,000 U.S. subscribers in the third quarter, more than expected, and predicted more cancellations *over a price increase.*").

[20] *See* "Netflix Price Hike's One Year Anniversary: *A Look Back at One of the Great Tech Blunders*," Huffington Post (July 12, 2012), *available at* http://www.huffingtonpost.com/2012/07/12/netflix-price-hike-anniversary_n_1668382.html.

**AMENDED CLASS ACTION COMPLAINT**

**Defendants Knew From Pre-Class Period Experience That Releasing a Hit Show Temporarily Skews Net Adds to the Upside**

103.   Prior to 2014, Defendants knew from personal experience that releasing a hit TV show causes a sizable, temporary uptick in subscription growth immediately before and after Netflix's release date.  One year before the Class Period, Defendants reported strong subscriber growth for 2Q13 and, at the time, Defendants pointed directly to the release of their (then) most popular television show, *Arrested Development*, as a major, anomalous driver of subscription growth in the quarter.  Specifically, in their July 22, 2013 letter to shareholders, Defendants explained Netflix's abnormally strong 2Q13 growth as follows:

> ***This Q2 . . . was an exception, we believe due to the launch of*** *Arrested Development [Season Four].* ***This show already had a strong brand and fan base, generating a small but noticeable bump in membership when we released it.*** Other great shows don't have that noticeable effect in their ***first*** season because they are less established.[21]

104.   Later the same day, during the Company's 2Q13 earnings interview, analysts asked Defendants to elaborate on the "noticeable bump" they enjoyed from the release of *Arrested* Season Four, stating:

> You alluded to the impact of *Arrested Development* in the quarter, but you didn't actually specify how much it had. Could you give us a sense of how many of your subscribers came from adding that programming?

Defendant Hastings responded:

> *Arrested* was a unique look forward because it already had a developed brand and we were bringing out Season Four. What we did see was a little rise in gross additions, which translate into net additions, ***more than the weekly pattern would have suggested.*** But, it was not particularly -- ***it was enough to move our net [subscriber additions for the quarter] higher than last year***, but it was not tremendously significant . . . .[22]

Defendant Hastings further downplayed the impact of *Arrested Development* by stating:

---

[21] While entering its fourth season as a TV series, *Arrested Development* was debuting this new season exclusively on Netflix for the first time ever.  Its first three seasons had originally aired on Fox from 2003 to 2006.  *Arrested Development*'s fifth season will not premiere on Netflix until 2018.

[22] In fact, it was a short-term surge of well over 100,000 net subscriber additions in late May and early June 2Q13.

**AMENDED CLASS ACTION COMPLAINT**

> In general, remember that people subscribe and retain with us for a variety of content, not just a single show. So, they might be -- become that *Arrested Development* was the excuse to join, but then they start watching all of our other great content, so think of it as part of the content mix.

Another analyst pushed back:

> ***But, you chose to single out*** *Arrested Development*. ***Does that mean*** *Arrested Development* ***was responsible for, say, 15% of the subscriber growth this quarter? Can you give us any number to actually quantify what you indicated in the letter?***

Netflix's Chief Content Officer, Ted Sarandos, replied:

> ***I believe we point it out because it breaks the seasonal pattern [of subscriber additions] in a way that can be attributed more directly to that [show].***

Defendant Hastings added:

> Julia, when a subscriber, a new member joins, they don't say it's because of *Arrested [Development]*. There's a whole wide variety of reasons. ***Arrested, again, is unique because we are starting with an already created brand.*** The general case with *Hemlock* [*Grove* Season One], with *Orange* [Season One], with *House of Cards* [Season One][23] is for us to be the first season in debut. So, think of *Arrested* as an ***unusual***, a nice opportunity, but the general case for Netflix Original programming is more like *House of Cards* [Season One], *Hemlock* [Season One] and *Orange* [Season One].

Ms. Boorstin then asked the next logical question:

> Does that indicate that you expect to see an uptick for *House of Cards' **second season***, for example?

Defendant Hastings replied:

> ***I think [we] would probably see a little bump there in our numbers. That would make sense. Hopefully***, by the time we get to Season 3, 4, 5, if we are fortunate enough to get there, ***then we've turned it into a Harry-Potter-esque global massive phenomen[on]*** – when is the next season coming? ***Then, we certainly would.***

105.    Eleven months later, in June 2014, the release of *Orange is the New Black* Season Two proved to be precisely that type of "global massive phenomenon."  Defendants Hastings and Wells knew this when their July 21 Shareholder Letter stated that:

> The release of Orange is the New Black Season 2 has been ***every bit the global media event we had hoped for***; critically acclaimed and embraced by a fervent and growing fan base.  ***In its first month, Orange became the most watched series in every Netflix territory [worldwide]. . . .***

---

[23] All of these popular shows were premiering their first seasons at the time.

**AMENDED CLASS ACTION COMPLAINT**

1   When Defendants made their July 21, 2014 misrepresentations, they had already witnessed a
2   very "noticeable bump" that broke the "weekly pattern" and "seasonal pattern" of net adds in a
3   way that was "directly attributable" to the release of *Orange* Season Two on June 6, 2014.
4   Moreover, Defendants knew on July 21, 2014 that Netflix's large, anomalous surge in June
5   2014 net adds—which was "directly attributable" to *Orange* Season Two's release date—was
6   responsible for "offsetting" the substantial, quantifiable slowing of net adds that Defendants
7   had already seen for several weeks in the wake of their May 9, 2014 price increases.

8   **Netflix's Cloud Database, Apache Cassandra, Was Defendants' "Source of Truth"**

9       106.   Netflix's global price increases went into effect on Friday, May 9, 2014.  On May
10   20, 2014, Defendant Wells told attendees at the J.P. Morgan Global Technology, Media and
11   Telecom Conference that Defendants had already seen a "small reaction" in Netflix's
12   subscription numbers in the first eleven days after their price increases.  This "small reaction"
13   was a substantial, quantifiable reduction in daily and weekly net adds relative to the same period
14   in 2013.  This substantial reduction continued for at least another two weeks.  The Company's
15   net adds were not "on par with last year."  *See* ¶72, *supra*.

16       107.   As Defendants acknowledged in their October 15 Shareholder Letter, their May 9
17   price increase ***did*** significantly impact Netflix's subscriber growth in "late Q2 and early Q3."
18   In fact, it did so immediately upon taking effect, as consumers who would otherwise have
19   subscribed balked at the increased prices, thus visibly slowing Netflix's "weekly pattern" and
20   "seasonal pattern" of net adds.  In the same October 15 Shareholder Letter, Defendants wrote
21   that this impact was "offset for about two months [*i.e.,* between May 9, 2014 and Defendants'
22   statements to the market on July 21, 2014] by the large positive reception to Season Two of
23   Orange is the New Black."  However, ***there was no large positive reception of Orange Season***
24   ***Two until its release on June 6, 2014.***  Netflix's net subscriber additions slowed very
25   substantially for several weeks, before anomalously spiking immediately before and after the
26   June 6 release of *Orange* Season Two.

27       108.   Defendants Hastings and Wells personally monitored these significant, numerical
28   pattern shifts in Netflix's net subscriber additions between May 9 and early June 2014.  Indeed,

**AMENDED CLASS ACTION COMPLAINT**

Defendant Hastings has publicly admitted that he and Defendant Wells personally monitor Netflix's net subscriber additions ***"every week" and "every day."*** *See* ¶46, *supra*. Defendants Hastings and Wells have also repeatedly told investors that net subscriber additions are their "core performance measurement." *See* ¶46, *supra*. If there was a materially negative impact on subscriber growth in "late Q2 and early Q3"—as Defendants admitted there was on October 15, 2014—then Defendants personally witnesses this impact ***after*** May 8, 2014 and ***before*** June 6, 2014.

109. The "small reaction" to Defendants' price increases, which Defendant Wells personally discerned and disclosed to analysts on May 20, 2014 only continued to accrue sequentially between May 21, 2014 and early June 2014. It was only this same, persistent slowing of net adds that continued to accrue to Netflix's detriment during 3Q14, after the anomalous *Orange* surge subsided. At all relevant times, Defendants Hastings and Wells personally saw these shifting net add trends—both domestically and internationally—through their daily and weekly accessing of Netflix's real-time, state-of-the-art Cassandra database.

110. Indeed, Defendants are leaders in the field of "Big Data," a term which refers to the collection and analysis of large data sets to inform business decisions. At the center of Netflix's streaming business is its cloud-based subscriber data hosted on Cassandra. All of Defendants' content acquisition choices, as well as the delivery of Netflix's streaming services to subscribers, involve heavily data-dependent decision-making at the highest levels.

111. Netflix stores on Cassandra everything from real-time subscriber data, to movie metadata, to all kinds of viewing statistics, which are searchable down to the customer level. The Cassandra Database allows Defendants to instantly analyze terabytes of data using a variety of standardized or custom queries. For example, Cassandra can readily tell Defendants how many hours of a particular program or movie were watched over a particular time period. Cassandra also records when and how much ***each customer*** watches a particular program or

**AMENDED CLASS ACTION COMPLAINT**

movie type. Such informational agility allows Defendants to tap a host of data points to understand consumer behaviors like preferred viewing times and content preferences.[24]

112. Defendants also utilize Cassandra-based subscriber data to make optimal choices in acquiring *new* Netflix content: be it movies, television shows, or documentaries. Defendants actually determine the prices that they're willing to pay content owners for particular movies and shows based on how much subscriber traffic (and thus revenue) each movie or show can be expected to generate based on Cassandra's data/algorithms. Cassandra is so integral to Defendants' ultimate business decision-making that some of the Company's senior technology personnel refer to Cassandra as Netflix's "source of truth database."

113. For example, in 2013, Netflix investors had voiced a particular concern about the impact of offering free, one-month trial subscriptions to new customers. In an April 22, 2013 Shareholder Letter, Defendants Hastings and Wells directly addressed that concern with stunning particularity, stating:

> Our decision to launch all episodes [of *House of Cards* Season One] at once created enormous media and social buzz, reinforcing our brand attribute of giving consumers complete control over how and when they enjoy their entertainment. ***Some investors worried that the*** *House of Cards* ***fans would take advantage of our free trial, watch the show, and then cancel. However, there was very little free-trial gaming - less than 8,000 people did this - out of millions of free trials in the quarter.***

This was a remarkable insight on the part of Defendants Hastings and Wells that demonstrated their hands-on approach to managing the Company's core streaming operations. This insight required Defendants to know: (1) not only how many net subscribers were added during the quarter, but how many new subscribers (or "gross adds") received a free trial ("Free Trial Subscribers"); (2) how many Free Trial Subscribers watched *House of Cards* within their first

---

[24] This is how Netflix makes personalized viewing recommendations to each of its streaming subscribers through the subscriber interface. Included in Netflix's subscriber interface are personalized content sections titled "Recently Watched by [Subscriber Name]" and "Recommended for [Subscriber Name]." Cassandra allows Netflix to provide such recommendations to its streaming subscribers based not only on individual viewing histories, but also on aggregate subscriber responses to particular programs. Netflix uses Cassandra to accurately predict—in advance—how highly (or lowly) individual subscribers will rate particular movies or TV shows ***before the subscriber even views them***.

**AMENDED CLASS ACTION COMPLAINT**

month of membership; and (3) how many Free Trial Subscribers who watched *House of Cards* within their first month of membership later cancelled their subscription within their first month of membership.  All of this information was readily attainable through a straightforward query of the Cassandra Database.  Cassandra could also have told Defendants exactly who those ~8,000 opportunistic *House of Cards* fans were, where they lived, exactly how many episodes each one watched, and when they watched each episode.  This is just one example of the near-limitless informational power of the Cassandra Database.

114.    Essentially the same scenario arose again in July 2014, except with much higher stakes for Defendants.  Investors were deeply concerned leading up to July 2014 about the effect Netflix's price increases would have on subscription growth.  Before fielding a single question in their 2Q14 earnings interview, Defendants Hastings and Wells directly answered investors' concerns by writing that the impact on subscriber growth had been "minimal." Defendants later reinforced their written representation by calling the impact "pretty nominal," characterizing it as "background noise" which had "no noticeable effect in the business."  Yet Defendants well knew from Cassandra, *inter alia*:

       (a) exactly how many new subscribers joined Netflix during 2Q14;

       (b) that a disproportionately large share of those new subscribers had joined Netflix in early-to-mid June 2014 to first and/or only watch *Orange is the New Black*;

       (c) that *Orange* Season Two's release had reversed Netflix's slowing "weekly pattern" and "seasonal pattern" of net adds to an extent that "offset" the known, negative impact of Netflix's price increases, as seen by Defendants in the Company's significantly slowing net add numbers during May 2014; and

       (d) that no other "global media event" would be unleashed in 3Q14 to offset the substantial, visible impact that Netflix's price increases were having on subscription growth.

115.    Indeed, the informational agility and business intelligence that Defendants are able to generate from Cassandra is staggering. As another example, in a 2014 interview, Defendant Hastings reminisced about telling the creator of *House of Cards* that many viewers left

41

**AMENDED CLASS ACTION COMPLAINT**

1   the show after the first few minutes of the first episode, after Kevin Spacey's character killed a dog.

2   "A lot of people just—click, turned off. When we watch the stats, it's like this," Hastings said,

3   pointing down to the floor.  Defendant Hastings knew not only when and how many subscribers

4   started watching *House of Cards*, but also the particular point in one episode at which particular

5   numbers and percentages of subscribers ***stopped*** watching.

6        116.    One newspaper explained Defendants' routine use of Cassandra as follows:

7        In order to appeal to global audiences, Netflix didn't take the traditional route
         – they didn't try to hire on-the-ground media experts to teach them about local
8        tastes. Instead, they leveraged their copious amounts of data collected over 20
         years, right from its DVD days.
9
10       Even before Netflix started making successful original content, its license-
         only service was built on the bedrock of user data. According to Todd Yellin,
11       Netflix's head of product innovation,  a typical member logs in and scrolls
         through 40 titles, before giving up and logging out.

12       From the thousands of titles available on the entertainment channel, Netflix
         has to bubble up the few dozen you want to the top of your page. "That's why
13       your Netflix page will look starkly different to your neighbour's," Yellin said.
         The ultimate goal is to figure out what to put in front of you, so you come
14       back every single time.

15       The data Netflix collects is ***startling in its granularity***: what devices members
         watch on, how many devices they watch on, what time of day they watch a
16       piece of content, what day of week, how long they watch for, do they watch
         three minutes and abandon a program forever or come back to it? Did they
17       binge through five episodes of something in one night? Did they watch on one
         profile or three, what did they watch right before, what did they watch right
18       after?

19                                              * * *

20       "***We do really deep data analysis to find how much a new program would be
         viewed, and therefore how much budget we should put behind it***," Hastings
21       explained. Ultimately, it is not about absolute numbers or ratings but the ratio
         of content spend to number of viewers.
22
23       117.    Similarly, Netflix's Director of Product Analytics has emphasized the

24   importance of Cassandra to Defendants' operations:

25       I can say that no changes in Netflix's products are not tested and validated,
         and we do not just test to test . . . . If we do not believe it will improve, it will
26       not be tested. We have 300 major tests of products and dozens of variations
         within.  When you go into Netflix, hopefully we are improving your
27       experience. How do we increase streaming? ***How do we increase customer
         retention? We mine lots of data for those sorts of things.***

28

---
**AMENDED CLASS ACTION COMPLAINT**

118.   During 2Q14, when Defendants Hastings and Wells saw on Cassandra that Netflix's net adds trended substantially slower in the several weeks immediately after they increased prices, and **then** saw an anomalous spike of six-figures worth of net adds immediately around their *Orange* Season Two release, they were not at all surprised.  Instead, Defendants had long known, intended and expected that this short-term spike in net adds from *Orange* would temporarily offset global price increases and allow them to salvage what would otherwise have been historically low net add totals for 2Q14.

**Defendants' Irish Test Case in 1Q14 Mirrored the "Offset"**
**Strategy that Defendants Later Executed in 2Q14**

119.   In late 2013 and early 2014, between ISPs' ransom demands and Netflix's soaring content obligations, Defendants Hastings and Wells realized that they needed to raise subscription prices sooner rather than later.  Thus, Defendants began testing potential pricing structures that would allow them to raise revenues while also minimizing any hindrance to Netflix's subscription growth rates.   Net adds, after all, remained Defendants' "core performance measurement" and the "cornerstone" of Wall Street's investment thesis.

120.   One of several price increases Defendants' considered (and the one they ultimately executed) was a flat $1-$2 increase worldwide on Netflix's most popular streaming plan, while grandfathering existing subscribers at current prices for up to two years. Defendants hypothesized that while price increases on new members might hinder subscriber acquisition (or "gross adds"), grandfathering existing members at current prices could help limit subscriber attrition (or "churn"), thus limiting the total impact on Netflix's "net adds." But Defendants' hypothesis needed to be tested.

121.   Accordingly, Defendants elected to test this theory in one of their smallest markets: Ireland.  On January 10, 2014, Defendants raised streaming prices for new subscribers in Ireland from €6.99 to €7.99 per month, while grandfathering existing members at €6.99 per month for up to two years.  Defendants then monitored Irish subscriber growth metrics over the ensuing weeks and months to see whether—and how much—net adds would slow down in the

**AMENDED CLASS ACTION COMPLAINT**

wake of the increase. This test would ultimately serve as a prototype for Defendants' global price increases in May 2014.

122. When Defendants Hastings and Wells reported Netflix's 1Q14 earnings on April 21, 2014, they specifically addressed their Irish price test in a letter to shareholders:

> *As expected, we saw limited impact from our January price increase for new members in Ireland (from €6.99 to €7.99)* which included grandfathering all existing members at €6.99 for two years. In the U.S we have greatly improved our content selection since we introduced our streaming plan . . . . Our current view is to do a one or two dollar increase, depending on the country, later this quarter for new members only. Existing members would stay at current pricing (e.g. $7.99 in the U.S.) for a generous time period. These changes will enable us to acquire more content and deliver an even better streaming experience.

Defendants, however, declined to mention **why** or **how** the "impact from [their] January price increase . . . in Ireland" had been "limited."

123. Going into 2014, Defendants had two—and only two—megahit TV shows to release from Netflix's content arsenal: *Orange is the New Black* (Netflix's most popular show), Season Two, and *House of Cards* (Netflix's second most popular show), Season Two, both of which became wildly popular after their first-season debuts in 3Q13 and 1Q13, respectively.[25]

124. Defendants executed their Irish price increase on January 10, 2014. Exactly five weeks later, on February 14, 2014, Defendants released their second-most popular show, *House of Cards* Season Two, in Ireland and elsewhere. Fast-forwarding to Defendants' **global** price increase of May 9, 2014, Defendants released their number-one most popular hit, *Orange is the New Black* Season Two, exactly **four** weeks later, on June 6, 2014 (but still a few weeks before quarter-end on June 30). The timing of Defendants' Irish **test** increase and **second-best** hit release closely tracks the timing of Defendants' **global** price increase and **number-one** hit release. Defendants' used (or at a minimum, clearly saw) their second-best release as the "offset" in their Ireland test case, and then proceeded to use their number-one release as the

---

[25] Netflix never made a Season Five of *Arrested Development* (it is currently in production now, in 2017), so Defendants had no new releases forthcoming from their previous most popular show. Their only big hits available for release at any point in 2014 were *House of Cards* and *Orange is the New Black*.

**AMENDED CLASS ACTION COMPLAINT**

"offset" for their global price increases in May 2014.  After that, Defendants were simply out of dry powder for the rest of 2014.  They simply had no comparable hits left to release.

125.   Defendants' customary practice in releasing subsequent seasons of their original TV shows was to have each subsequent season debut in the same quarter as the prior year's release.  For instance, *House of Cards* Season One debuted in 1Q13, and therefore *House of Cards* Season Two debuted in 1Q14.  But *Orange is the New Black* was treated differently: and treated differently only in 2014, commensurate with Defendants' price increase.  *Orange* Season One had previously debuted in 3Q13, but *Orange* Season Two's release date was pulled up from ***3Q14*** into the middle/end of ***2Q14***.  Moreover, Defendants publicly announced their accelerated *Orange* Season Two release date only ***after*** they were several weeks into their Irish test case.  In fact, *Orange* Season Two's accelerated release date was announced ***the day after House of Cards Season Two premiered***: on February 15, 2014.

126.   Contrary to Defendants' October 15 Shareholder Letter, the "offsetting," anomalous impact of *Orange* Season Two was ***not*** some new revelation that Defendants only noticed "[i]n hindsight" after Netflix's dismal 3Q14 growth numbers came in.  Defendants' had ***specifically timed*** *Orange*'s release date for a few weeks after their price hike—and a few weeks before quarter-end—for the purpose of offsetting the always expected, known, substantially negative impact of increasing Netflix's subscription prices on a global scale. Defendants knew all along that there was going to be—and had been—a temporary "offset" that salvaged (if not provided substantially all of) total 2Q14 subscription growth during a few weeks in June alone.

127.   Indeed, even before their Irish test case of early 2014, Defendants Hastings and Wells were specifically evaluating whether—and to what extent—they could drive short-term surges in net adds with one big release.  For example, in January 2013, shortly before their release of *House of Cards* Season One, Defendant Wells was asked by a Morgan Stanley analyst: "in the 1Q[13] [net add guidance,] I think you noted that [for] 2Q[13] you're not specifically attributing any subs[cribers] to *Arrested Development*, but is that also the same

45

**AMENDED CLASS ACTION COMPLAINT**

thing for *House of Cards*, is there no specific attribution for *House of Cards* [Season One] in

1Q[13]?" Defendant Wells responded:

> [O]n *House of Cards* Season One, we think it's going to be a pretty small benefit for Q1. We talked about how overall it's a generally small share of hours [viewed]. Really happy about the quality and the fanfare that we're getting with the show and there'll be some publicity, but overall pretty small benefit we think to subscriber additions.

Defendant Hastings then added:

> **So would it be fair to say David that it's a very small impact of** *House of Cards* [Season One] **that's modeled into our guidance forecast? And since we have no data to base it on, that's the conservative and correct approach. But some of us are optimistic that it may in fact be substantial, but we really don't know and we don't want to count on it until it happens.**

Wells: "I would say that's fair."

128.    Three months later, going into 2Q13, Defendants were asked: "Why wouldn't we

expect *Arrested Development* to drive significantly higher net additions in Q2?  The guidance

implies a rather modest sequential gain [in subscriptions]."  Defendant Hastings replied:

> **Well, if in Q1 we had seen, for example, the week before** *House of Cards* **[Season One] launched and the week after a big spike, I think then we would be forecasting bigger numbers around particular titles like** *Arrested Development* **[Season Four].** But, what we've seen with *House of Cards* [Season One] is **a very nice impact** but a gentle impact, not one that's an overnight impact. And, *Arrested Development's* coming in in the end of May, and so it's going to be great for us. **But, it's not a step function where on that day -- we've had no evidence and no history of it being a step function.**

129.    However, a short-term "spike" and "step function," delivering well over 100,000

additional net adds, was exactly what Defendants got—and personally saw on Cassandra—one

month later, upon releasing *Arrested Development* Season Four in May 2013.  That was Defendants'

first piece of evidence that one megahit release could drive a short-term, material surge in Netflix's

subscription growth.  Their second piece of evidence came from *House of Cards* Season Two,

commensurate with their Irish test case.  And their third piece of evidence came when Defendants

saw a short-term "spike" around *Orange* Season Two's release date, which anomalously delivered

hundreds of thousands of net adds in a matter of a few weeks.  Without this short-term surge,

Defendants knew that Netflix's 2Q14 net add numbers would have been a good six figures lower

**AMENDED CLASS ACTION COMPLAINT**

than what they were ultimately able to report on July 21, 2014 and also hundreds of thousands of subscribers lower than what they had achieved in the second quarter of the prior year.

130.    Investors, however, simply believed what Defendants told them: namely, that everything was "on par with last year," that there was nothing but a "minimal" and "pretty nominal" impact on 2Q14 growth, and that any negative impact at all on growth was merely "background noise" that had "no noticeable effect in the business."  For this reason, the market also bought into Defendants' *forward-looking* projections for net adds in 3Q14, which were simply "on par" with 3Q13's net adds (1.33 million versus 1.29 million domestically).  When and if Defendants' 3Q14 net adds came in historically and "unexpectedly" low, Defendants could simply claim mistake-by-"hindsight."  And that is exactly what they did on October 15, 2014, writing:

> We added [less than] a million new members in the US, ending Q3 with 37.22 million members, with lower net additions than our *forecast* and versus the prior year*.*  Domestic streaming revenue of $877 million, in-line with *forecast*, grew 25% [year over year] and faster than membership due to the expansion of [average subscription price] from the price changes implemented in Q2.

> ***

> As a reminder, we provide you our internal *forecast* for the current quarter. For the prior three quarters, we under-*forecasted* membership growth. This quarter we over-*forecasted* membership growth. We'll continue to give you our internal *forecast* for the current quarter, and it will be high some of the time and low other times.

> Separate from *forecast* variability, year on year net additions in the US were down (1.3 million in Q3 2013 to [less than] 1 million in Q3 2014). As best we can tell, the primary cause is the slightly higher prices we now have compared to a year ago. Slightly higher prices result in slightly less growth, other things being equal, and this is manifested more clearly in higher adoption markets such as the US.

> ***In hindsight,*** we believe that [in] late Q2 and early Q3 [i.e., before our July 21 statements] the impact of higher prices appeared to be offset for about two months by the large positive reception to Season Two of Orange is the New Black. We remain happy with the price changes and growth in revenue and will continue to improve our service, with better content, better streaming and better choosing. The effect of slightly higher prices is factored into our [slashed] Q4 *forecast.*

131.    This was no "forecast" problem, regardless of what Defendants' well-counseled corrective disclosure might have suggested.  The market had valued Netflix shares during the Class Period based on Defendants' affirmative statements that price increases had not significantly

**AMENDED CLASS ACTION COMPLAINT**

1  dampened subscription growth, when the reality was that Defendants were only ***betting and hoping***

2  that the significant, known impact of their price increases would soon diffuse, allowing them to

3  satisfy investors' 3Q14 net add expectations without any major "offset" during the third quarter.

4  The law may protect against liability for forward-looking statements, but the law does not protect

5  against liability for fraudulent hindsight statements that may or may not be ***revealed as*** fraudulent in

6  the future.  Defendants lost their gamble, and Class members lost their money as a result.

7  **Sox Certifications**

8      132.   Defendants Hastings and Wells signed certifications pursuant to the Sarbanes-Oxley

9  Act of 2002 ("SOX") that they filed with the SEC in connection with the filing of Netflix's July 22,

10  2014 Form 10-Q. They each certified that the quarterly report "fully complies with the requirements

11  of Section 13(a) and 15(d) of the Securities Exchange Act of 1934" and that the information

12  contained therein "fairly presents, in all material respects, the financial condition and results of

13  operations of Netflix for the periods presented [t]herein." Hastings and Wells further certified that

14  they each "reviewed this quarterly report" and:

15      Based on my knowledge, this report does not contain any untrue statement of
16      a material fact or omit to state a material fact necessary to make the
        statements made, in light of the circumstances under which such statements
17      were made, not misleading with respect to the period covered by this report;

18      Based on my knowledge, the financial statements, and other financial
        information included in this report, fairly present in all material respects the
19      financial condition, results of operations and cash flows of the registrant as of,
        and for, the periods presented in this report.

20      133.   These statements add to the inference that Defendants acted with scienter because

21  they either actively concealed or deliberately disregarded that their July 22, 2014 quarterly report for

22  2Q14, filed with the SEC on Form 10-Q, failed to warn investors about the known and already

23  materialized risks related to the recent increase in Netflix's subscription prices.

24                              **LOSS CAUSATION**

25      134.   When Defendants' material misrepresentations and omissions were revealed and

26  became apparent to investors, the price of Netflix securities declined precipitously, as the prior

27  artificial inflation in the price of the Company's securities was eliminated on October 16, 2014.

28

**AMENDED CLASS ACTION COMPLAINT**

As a result of their purchases of Netflix stock during the Class Period, Lead Plaintiff and other Class members suffered economic losses and damages under the federal securities laws.

135. The economic loss suffered by Lead Plaintiff and other members of the Class was a direct result of Defendants' scheme to artificially inflate the price of Netflix's securities and the subsequent significant decline in the value of the Company's securities when Defendants' prior misstatements were revealed. The timing and magnitude of Netflix's stock price declines negate any inference that the losses suffered by Lead Plaintiff and other Class members were caused by changed market conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to Defendants' fraudulent conduct.

136. At all relevant times, the material misrepresentations and omissions alleged in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Netflix's core business and operations.

137. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Netflix and its business, prospects, and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period caused Lead Plaintiff and other members of the Class to purchase Netflix stock at artificially inflated prices, thus causing the damages complained of herein.

138. As a direct consequence of Defendants' misleading Class Period statements about the "minimal" and "nominal" impact the Company's subscription price hikes had on Netflix's subscription growth, Defendants slashed their 4Q14 earnings forecast by nearly half on October 15, 2014. During an earnings conference call on October 15, 2014, Defendant Wells admitted that the price increase was a "major" reason for the Company's poor net add results in 3Q14. Similarly, in a Letter to Shareholders signed by Defendants Hastings and Wells, dated October 15, 2014, they stated that the Company had "over-forecasted membership growth" for 3Q14 and that "the **primary cause** [for lower subscription growth] is the **slightly higher prices** we now

**AMENDED CLASS ACTION COMPLAINT**

have compared to a year ago.  ***Slightly higher prices result in slightly less growth***, other things being equal, and this is manifested more clearly in higher adoption markets such as the US."

139.    The next trading day, October 16, 2014, Netflix shares plummeted from the prior day's closing price of $448.59 to $361.70 per share: a nearly 20% decline, erasing more than $5 billion of the Company's market value in one day, on unusually high trading volume of 92,304,996 shares.  Lead Plaintiff and the Class suffered enormous investment losses as a result.

140.    Numerous analysts confirmed that Netflix's share price decline was causally linked to the Company's earlier misstatements and the revelation of the truth about Defendants' misstatements.  On October 16, 2014, for instance, Piper Jaffray noted that the "miss in Q3 net adds was primarily attributed to a negative impact from the recent price increase, ***calling into question the minimal effect*** most expected to see from the $1/month increase."  Barclays similarly concluded that the "company believes the recent price increase did have some impact on sub[scription] trends … [i]f so it does call into question the price elasticity of the product as well as NFLX's long-term capability to continue to raise prices."

141.    Stern Agee also stated on October 16, 2014 that the "recent $1 increase in monthly subscription price appears to be the chief culprit in this slowdown …. Management has attributed the slowdown to its May price increase of $1 per month for the streaming service. ***This pressure on growth is quite surprising to us*** and suggests consumers are more sensitive than previously thought to even small price increases when it comes to using NFLX. Obviously, this has meaningful implications for NFLX's long-term model, its subscriber growth rate, and margins."

## CLASS ACTION ALLEGATIONS

142.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Netflix common stock during the Class Period (the "Class") and were damaged upon the revelation of Defendants' after-hours disclosures on October 15, 2014. Excluded from the Class are Defendants, the officers and directors of Netflix, at all relevant

**AMENDED CLASS ACTION COMPLAINT**

times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

143.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Netflix common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Netflix or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

144.   Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law, as is complained of herein.

145.   Lead Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to, or in conflict with, the interests of the Class.

146.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are whether: (a) the federal securities laws were violated by Defendants' acts as alleged herein; (b) statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Netflix; (c) Netflix's May 2014 price increase had a significantly negative impact on subscription growth before the Class Period; (d) Defendants knew or recklessly disregarded the fact that Netflix's May 2014 price increase had a substantially negative impact on subscription growth leading up to the Class Period; (e) Defendants knew or recklessly disregarded that Netflix's 2Q14 subscription growth had been disproportionately driven by a one-time "global media event" (*i.e.,* Defendants' release of *Orange is the New Black* Season Two), which had "offset" the expected, known, substantially negative effects of

**AMENDED CLASS ACTION COMPLAINT**

Defendants' May 2014 price increases; (f) the price of Netflix stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and (g) whether Class members have sustained damages, and the proper measure of damages.

147.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**APPLICATION OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET**

148.   Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that: (a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period; (b) the omissions and misrepresentations were material; (c) Netflix common shares have at all relevant times traded in an efficient market; (d) the Company's shares were liquid and traded with heavy volume during the Class Period; (e) the Company traded on the NASDAQ and was covered by multiple analysts; (f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and (g) Lead Plaintiff and the Class purchased, acquired and/or sold Netflix shares between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

149.   As a regulated issuer, Netflix filed periodic reports with the SEC and the NASDAQ.   Netflix regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services. Netflix was followed by numerous securities analysts employed by major brokerage firms who wrote

**AMENDED CLASS ACTION COMPLAINT**

reports that were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

150.   As a result of the foregoing, the market for Netflix's stock promptly digested current information regarding Netflix from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Netflix's stock during the Class Period suffered similar injury through their purchase of Netflix's securities at artificially inflated prices, and the *Basic* and *Affiliated Ute* presumptions of reliance apply.

151.   Based upon the foregoing, Lead Plaintiff and other members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## NO SAFE HARBOR

152.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint.   Many of the specific statements pleaded herein were not identified as and were not "forward-looking statements" when made.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

153.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Insider Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Netflix who knew that those statements were false when made.

**AMENDED CLASS ACTION COMPLAINT**

**COUNT I**

**(Against All Defendants For Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder)**

154.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

155.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

156.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Netflix stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire Netflix stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

157.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Netflix stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Netflix's finances and business prospects.

---

**AMENDED CLASS ACTION COMPLAINT**

158.   By virtue of their positions at Netflix, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

159.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Netflix's, the Insider Defendants had knowledge of the details of Netflix's internal affairs.

160.   The Insider Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Insider Defendants were able to and did, directly or indirectly, control the content of Netflix's statements. As officers and/or directors of a publicly-held company, the Insider Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Netflix's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Netflix stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Netflix's business and financial condition which were concealed by Defendants, Lead Plaintiff and other members of the Class purchased or otherwise acquired Netflix stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

161.   During the Class Period, Netflix stock traded on an active and efficient market. Lead Plaintiff and the other members of the Class, relying on the materially false and

misleading statements described herein, which Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Netflix stock at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiff and the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true value of Netflix stock was substantially lower than the prices paid by Lead Plaintiff and other members of the Class. The market price of Netflix stock declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

162.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

163.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their respective purchases, acquisitions and sales of Netflix securities during the Class Period, upon disclosure that the Company had been disseminating materially false or misleading statements to the investing public.

### COUNT II
### (Violations of Section 20(a) of the Exchange Act against the Individual Defendants)

164.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

165.    During the Class Period, the Insider Defendants participated in the operation and management of Netflix, and conducted and participated, directly and indirectly, in the conduct of Netflix's business affairs. Because of their senior positions, they knew the adverse undisclosed information about Netflix's finances and operations.

166.    As officers and/or directors of a publicly owned company, the Insider Defendants had a duty to disseminate accurate and truthful information with respect to Netflix's financial condition

**AMENDED CLASS ACTION COMPLAINT**

1    and results of operations, and to correct promptly any public statements issued by Netflix which had

2    become materially false or misleading.

3          167.    Because of their positions of control and authority as senior officers, the Insider

4    Defendants were able to, and did, control the contents of the various reports, press releases and

5    public filings which Netflix disseminated in the marketplace during the Class Period concerning the

6    Company's results of operations. Throughout the Class Period, the Insider Defendants exercised their

7    power and authority to cause Netflix to engage in the wrongful acts complained of herein. The

8    Insider Defendants therefore, were "controlling persons" of Netflix within the meaning of Section

9    20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which

10   artificially inflated the market price of Netflix common stock.

11         168.    Each of the Insider Defendants, therefore, acted as a controlling person of Netflix. By

12   reason of their senior management positions and/or being directors of Netflix, each of the Individual

13   Defendants had the power to direct the actions of, and exercised the same to cause, Netflix to engage

14   in the unlawful acts and conduct complained of herein. Each of the Insider Defendants exercised

15   control over the general operations of Netflix and possessed the power to control the specific

16   activities which comprise the primary violations about which Lead Plaintiff and the other members

17   of the Class complain.

18         169.    By reason of the above conduct, the Insider Defendants are liable pursuant to Section

19   20(a) of the Exchange Act for the violations committed by Netflix.

20                               **PRAYER FOR RELIEF**

21   WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

22         A.      Determining that the instant action may be maintained as a class action under

23   Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class

24   Representative, and the law firms of Kahn Swick & Foti LLC and Finkelstein & Krinsk LLP as Class

25   Counsel;

26         B.      Requiring Defendants to pay damages sustained by Lead Plaintiff and the

27   Class by reason of the acts and transactions alleged herein;

28

**AMENDED CLASS ACTION COMPLAINT**

C.      Awarding Lead Plaintiff and other members of the Class prejudgment and post-judgment interest, as well as reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.


Dated: August 14, 2017                              Respectfully submitted,


Ramzi Abadou (SBN 222567)
**KAHN SWICK & FOTI, LLP**
912 Cole Street #251
San Francisco, CA 94117
Telephone:  504-455-1400
Facsimile:   504-455-1498
ramzi.abadou@ksfcounsel.com

By: ___*s/Ramzi Abadou*_____
        Ramzi Abadou


**FINKELSTEIN & KRINSK LLP**


By: ___*s/ David J. Harris, Jr.*_____
        David J. Harris, Jr.


Jeffrey R. Krinsk, Esq.
David J. Harris, Jr., Esq.
Trenton R. Kashima, Esq.
550 West C Street, Suite 1760
San Diego, California 92101-3579
Telephone: (619) 238-1333
Facsimile:  (619) 238-5425

*Attorneys for Lead Plaintiff and*
*the Putative Class*

**AMENDED CLASS ACTION COMPLAINT**

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on August 14, 2017, I electronically filed the foregoing with the Clerk of

3    the Court using the CM/ECF system which will send notification of such filing to the e-mail

4    addresses registered, as denoted on the attached Electronic Mail Notice List, and I hereby certify that

5    I have mailed the foregoing document or paper via the United States Postal Service to the non-

6    CM/ECF participants indicated on the attached Manual Notice List.

7

8                                              /s/ *David J. Harris, Jr.*
                                          _____
9                                              DAVID J. HARRIS, JR.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**AMENDED CLASS ACTION COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Mailing Information for a Case 4:17-cv-01070-HSG Ziolkowski v. Netflix, Inc. et al

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzi.abadou@ksfcounsel.com,dawn.hartman@ksfcounsel.com

- **Keith E. Eggleton**
  keggleton@wsgr.com

- **David J. Harris , Jr**
  djh@classactionlaw.com

- **Trenton Ross Kashima**
  trk@classactionlaw.com,rag@classactionlaw.com

- **Jeffrey R. Krinsk**
  jrk@classactionlaw.com,trk@classactionlaw.com,rag@classactionlaw.com,lrp@classactionlaw.com,ska@classactionlaw.com,fk@classactionlaw.legal,jrk@classactionlaw.legal,fk@classactionlaw.com

- **Luke Anthony Liss**
  lliss@wsgr.com,fgarcia@wsgr.com

- **Adam Christopher McCall**
  amccall@zlk.com

- **Celine Georges Purcell**
  cpurcell@wsgr.com

- **Rodney Grant Strickland , Jr**
  rstrickland@wsgr.com,lkoontz@wsgr.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

60

AMENDED CLASS ACTION COMPLAINT