1 | KEITH E. EGGLETON, State Bar No. 159842
Email: keggleton@wsgr.com
2 | RODNEY G. STRICKLAND, State Bar No. 161934
Email: rstrickland@wsgr.com
3 | LUKE A. LISS, State Bar No. 247520
Email: lliss@wsgr.com
4 | CHERYL W. FOUNG, State Bar No. 108868
Email: cfoung@wsgr.com
5 | CELINE G. PURCELL, State Bar No. 305158
Email: cpurcell@wsgr.com
6 | WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
7 | 650 Page Mill Road
Palo Alto, CA 94304-1050
8 | Telephone: (650) 493-9300
Facsimile: (650) 565-5100
9 |
Attorneys for Defendants
10 | Netflix, Inc., Reed Hastings,
and David Wells

<br>

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| JAMES ZIOLKOWSKI, Individually and On Behalf of All Other Persons Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> NETFLIX, INC., REED HASTINGS, and DAVID WELLS, <br><br> Defendants. | CASE NO.: 4:17-CV-01070-HSG <br><br> **CLASS ACTION** <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITES LAWS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> Hearing Date: Jan. 11, 2018 <br> Hearing Time: 2:00 p.m. <br> Courtroom: No. 2 |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ....................................................................................1

STATEMENT OF ISSUES (CIVIL L.R. 7-4(A)(3)) .............................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .........................................................2

INTRODUCTION ....................................................................................................................2

STATEMENT OF FACTS .......................................................................................................3

    Netflix's Business ...........................................................................................................3

    The 2014 Price Increase ................................................................................................3

    The July 21 Statements ..................................................................................................4

    The October 15 Statement .............................................................................................5

    The January 20, 2015 Statement ....................................................................................6

THE STANDARDS APPLICABLE TO THIS REFORM ACT CASE ..................................6

ARGUMENT ............................................................................................................................8

I.     THE COMPLAINT DOES NOT PLEAD A MATERIALLY FALSE OR
       MISLEADING STATEMENT. ............................................................................8

      A.   Plaintiff Fails To Plead Particularized Facts That The July 21 Statements
           Were Materially False Or Misleading When Made. .............................................8

      B.   The October 15 Statement Fails To Establish Falsity. .......................................11

      C.   The January 20, 2015 Report Contradicts The Basis For Plaintiff's Case...........12

      D.   The Risk Disclosures Were Not False Or Misleading. .......................................13

II.    THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF
      SCIENTER. ...........................................................................................................13

      A.   Plaintiff Alleges No Direct Evidence Of Scienter..............................................14

      B.   The "Facts" Plaintiff Does Plead Do Not Support A Strong Inference Of
           Scienter. ...............................................................................................................15

           1.   There Is No Motive Alleged.....................................................................15

           2.   The Four Bases For Plaintiff's Scienter Allegations Do Not Support
               An Inference Of Fraud. .............................................................................16

               a.   The Company's experience with the 2011 price increase....................16

               b.   Netflix's early 2014 pricing tests ........................................................17

c.   The alleged real-time monitoring of net add rates .................................17

d.   The alleged carefully timed, one-off release of OITNB ........................17

3.   The Sarbanes Oxley Certifications Do Not Support A Strong Inference Of Scienter. ........................................................................18

C.   The Competing Inferences Undermine Scienter. ...................................................18

III.   THE COMPLAINT IS TIME-BARRED AS A MATTER OF LAW. ..............................20

A.   The Standards Applicable To Dismissal Under Section 1658(b)(1). ....................20

B.   The Facts Pleaded By Plaintiff Were Known And Knowable More Than Two Years Before The Lawsuit Was Filed. ............................................................21

1.   The Complaint concedes the "Truth" was revealed on October 15, 2014. ........................................................................................................21

2.   The facts alleged to demonstrate scienter were known by the end of the Class Period. ........................................................................................22

a.   The Complaint reveals that a reasonably diligent plaintiff knew in 2014 that a price increase could impact subscribers. ............................22

b.   The Complaint reveals that a reasonably diligent plaintiff knew in 2014 that Defendants had access to subscriber data. ...............................23

c.   The Complaint reveals that a reasonably diligent plaintiff knew in 2014 that Netflix increased prices in Ireland. ..........................................23

d.   The Complaint reveals that a reasonably diligent plaintiff knew in 2014 that the release of the new OITNB season was a big success and could increase subscribership. ..........................................................24

CONCLUSION ............................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alfus v. Pyramid Tech. Corp.*,
    745 F. Supp. 1511 (N.D. Cal. 1990) ............................................................... 19

*Applestein v. Medivation, Inc.*,
    561 F. App'x 598 (9th Cir. 2014).................................................................... 15

*Arco Capital Corps. v. Deutsche Bank AG*,
    949 F. Supp. 2d 532 (S.D.N.Y. 2013) ............................................................ 25

*Baron v. Smith*,
    285 F. Supp. 2d 96 (D. Mass. 2003),
    *aff'd*, 380 F.3d 49 (1st Cir. 2004)................................................................... 13

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017).......................................................................... 19

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA Inc.*,
    637 F.3d 169 (2d Cir. 2011) ........................................................................... 21

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013),
    *aff'd*, 691 F. App'x 393 (9th Cir. 2017) ............................................. 14, 15, 19

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) .......................................................................................... 7

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
    68 F. Supp. 3d 530, 536 (S.D.N.Y. 2014),
    *aff'd*, 639 F. App'x 664 (2d Cir. 2016) ......................................................... 25

*Glazer Capital Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008)........................................................................... 18

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
    189 F.3d 971 (9th Cir. 1999)........................................................................... 17

*In re Bare Escentuals, Inc. Sec. Litig.*,
    745 F. Supp. 2d 1052 (N.D. Cal. 2010) ......................................................... 13

*In re Copper Mountain Sec. Litig.*,
    311 F. Supp. 2d 857 (N.D. Cal. 2004) ............................................................. 9

*In re Downey Sec. Litig.*,
    No. CV 08-3261-JFW, 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ........... 17

*In re Fusion-io, Inc. Sec. Litig.*,
    No. 13-CV-05368-LHK, 2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ...... 8, 12

*In re GlenFed, Inc. Sec. Litig.*,
 42 F.3d 1541 (9th Cir. 1994),
 *superseded by statute on other grounds*, 15 U.S.C. §78u-4(a) *et seq.*. .............................. 8

*In re Netflix, Inc. Sec. Litig.*,
 647 F. App'x 813 (9th Cir. 2016) ....................................................................... 4

*In re Netflix, Inc. Sec. Litig.*,
 No. 12-00225 SC, 2014 WL 212564 (N.D. Cal. Jan. 17, 2014),
 *aff'd*, 647 F. App'x 813 (9th Cir. 2016) .......................................................... 13

*In re Netflix, Inc. Sec. Litig.*,
 No. C04-2978 FMS, 2005 WL 1562858 (N.D. Cal. June 28, 2005) ................... 13

*In re NVIDIA Corp. Sec. Litig.*,
 768 F.3d 1046 (9th Cir. 2014) ..................................................................... 7, 19

*In re Rigel Pharm., Inc. Sec. Litig.*,
 697 F.3d 869 (9th Cir. 2012) ......................................................................... 15

*In re Silicon Graphics, Inc. Sec. Litig.*,
 183 F.3d 970 (9th Cir. 1999),
 *abrogated on other grounds by S. Ferry LP, No. 2 v. Killinger*,
 542 F.3d 776 (9th Cir. 2008) ......................................................................... 15

*Karpov v. Insight Enters., Inc.*,
 No. CV 09-856-PHX-SRB, 2010 WL 4867634 (D. Ariz. Nov. 16, 2010),
 *aff'd*, 471 F. App'x 607 (9th Cir. 2012) .......................................................... 17

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*,
 902 F. Supp. 2d 329 (S.D.N.Y. 2012) ............................................................ 25

*Lipton v. Pathogenesis Corp.*,
 284 F.3d 1027 (9th Cir. 2002) ....................................................................... 15

*McCasland v. FormFactor Inc.*,
 No. C 07-5545 SI, 2008 WL 2951275 (N.D. Cal. July 25, 2008) ..................... 14

*Merck & Co. v. Reynolds*,
 559 U.S. 633 (2010) ..................................................................................... 20

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
 547 U.S. 71 (2006) ......................................................................................... 6

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
 540 F.3d 1049 (9th Cir. 2008) ................................................................ 7, 9, 14

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
 380 F.3d 1226 (9th Cir. 2004) ....................................................................... 14

*Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization
 Transactions, Inc.*,
 730 F.3d 263 (3d Cir. 2013) .......................................................................... 21

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
 759 F.3d 1051 (9th Cir. 2014) ............................................................... 7, 17, 20

*Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*,
648 F.3d 533 (7th Cir. 2011)...................................................................................25

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001).....................................................................................9

*Rudolph v UTStarcom*,
560 F. Supp. 2d 880 (N.D. Cal. 2008) .....................................................................14

*Sabbag v. Cinnamon*,
No. 5:10-cv-02735-JF (HRL), 2010 WL 8470477 (N.D. Cal. Dec. 10, 2010) ...............21

*ScripsAmerica, Inc. v. Ironridge Global, LLC*,
No. CV 14-03962 MMM, 2015 WL 12747908 (C.D. Cal. Mar. 26, 2015).....................20

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
802 F. Supp. 2d 1125 (C.D. Cal. 2011)...........................................................21, 25

*Strategic Diversity, Inc. v. Alchemix Corp.*,
666 F.3d 1197 (9th Cir. 2012)..................................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ...........................................................................6, 7, 14, 18

*Williams v. Globus Med., Inc.*,
869 F.3d 235 (3d Cir. 2017)....................................................................................13

*Winer Family Trust v. Queen*,
503 F.3d 319 (3d Cir. 2007).....................................................................................19

*Yates v. Mun. Mortg. & Equity, LLC*,
744 F.3d 874 (4th Cir. 2014)....................................................................................19

*Yourish v. Cal. Amplifier*,
191 F.3d 983 (9th Cir. 1999)..............................................................................8, 12

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009).........................................................................7, 15, 16, 18

**STATUTES, RULES AND REGULATIONS**

15 U.S.C. §78j(b) .............................................................................1, 6, 20, 24

15 U.S.C. §78t(a).....................................................................................1, 20

15 U.S.C. §78u-4(a) .......................................................................................1

15 U.S.C. §78u-4(b)(1)(B) ..............................................................................7

15 U.S.C. §78u-4(b)(2)(A) ..............................................................................7

15 U.S.C. §78u-4(b)(3)(A) ..............................................................................7

17 C.F.R. §240.10b-5 .................................................................................1, 6

28 U.S.C. §1658(b)(1) ................................................................................................ 1, 20

Fed. R. Civ. P. 9(b) .............................................................................................................. 1

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 1, 21

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on January 11, 2018, at 2:00 p.m., or as soon thereafter as the matter may be heard, before The Honorable Haywood S. Gilliam, Jr. of the United States District Court for the Northern District of California, located at 1301 Clay Street, Oakland, California, Courtroom 2, 4th Floor, defendants Netflix, Inc. ("Netflix" or the "Company"), Reed Hastings and David Wells (collectively "Defendants") will, and hereby do, move to dismiss the Amended Complaint for Violation of Federal Securities Laws ("Complaint") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), the Private Securities Litigation Reform Act of 1995 ("Reform Act"), 15 U.S.C. §78u-4(a) *et seq.*, and 28 U.S.C. §1658(b)(1).  This Motion is based on this Notice of Motion, Motion, and Memorandum of Points and Authorities, the Declaration of Luke A. Liss ("Liss Decl.") and attached exhibits, Defendants' Request for Judicial Notice and Notice of Incorporation By Reference, the [Proposed] Order, the arguments of counsel, and any other matters properly before the Court.

**STATEMENT OF ISSUES (CIVIL L.R. 7-4(a)(3))**

1.      Should the claims asserted under 15 U.S.C. §78j(b), Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)"), and 17 C.F.R. §240.10b-5 ("Rule 10b-5"), be dismissed for failure to plead sufficiently that any Defendant made a materially false or misleading statement?

2.      Should the claims asserted under Section 10(b) and Rule 10b-5 be dismissed for failure to plead particularized factual allegations giving rise to a strong inference of scienter?

3.      Should the control person claim under 15 U.S.C. §78t(a), Section 20(a) of the Exchange Act ("Section 20(a)"), be dismissed because Plaintiff has failed to state a claim under Section 10(b)?

4.      Should the Complaint be dismissed on statute of limitations grounds pursuant to 28 U.S.C. §1658(b)(1) because it was filed more than two years after a reasonably diligent plaintiff would have discovered the facts constituting the alleged violation?

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

In April 2014, Netflix announced that it would raise the price of its service by $1 per month for people who joined after the price increase took effect (May 9, 2014). As the Complaint acknowledges, Netflix also explained that it had taken steps to minimize the impact of the price increase on the Company's business in an effort to avoid the significant negative impact it experienced following a larger price increase in 2011.

On July 21, 2014, Netflix reported that more people had joined the service in the second quarter of 2014 than it had publicly forecast months earlier. With this good news, Netflix also told investors that the impact of the price increase was "minimal" and had "no noticeable effect in the business."

On October 15, 2014, Netflix announced that fewer people had joined the service in the third quarter of 2014 than it had forecast. Netflix told investors that "[a]s best we can tell, the primary cause [was] the slightly higher prices." ¶¶86, 130.[1] In January 2015, following additional analysis, Netflix disclosed that it no longer believed the $1 price increase for new subscribers had caused the slower-than-forecast growth of new subscribers in the third quarter.

This securities fraud class action lawsuit was filed more than 25 months later. Ignoring the January 2015 statement altogether, Plaintiff alleges that the October 2014 "as best we can tell" statement proves that Defendants knew in July 2014 that their statements about the price increase were false when made.

The Complaint should be dismissed for three independent reasons.

First, Plaintiff fails to plead any facts demonstrating that the July 2014 statements were false when made, as required by the Private Securities Litigation Reform Act (the "Reform Act"). Nowhere in the Complaint does Plaintiff plead facts reflecting that the price increase's impact on the business was not "minimal" as of July 21, 2014.

---

[1] All references to "¶" are to the Complaint. All exhibits cited are attached to the Liss Declaration. All emphasis herein is added unless otherwise noted.

Second, Plaintiff fails to satisfy the Reform Act's stringent requirement for pleading a strong inference of scienter—a mental state embracing intent to deceive, manipulate, or defraud. The Complaint lacks any direct evidence of scienter—statements from purported confidential witnesses, for example—and the allegations on which Plaintiff does rely fall far short of the Ninth Circuit's standard for pleading scienter.  Indeed, the facts pleaded *undermine* an inference of scienter.

Third, Plaintiff's claims are barred by the statute of limitations.  As explained below, the Complaint itself reveals that all of the facts on which the Complaint is based—including those allegedly supporting the required strong inference of scienter—were known more than two years before Plaintiff filed this lawsuit.

Because the Complaint fails as a matter of pleading and is barred by the statute of limitations, it must be dismissed.

## STATEMENT OF FACTS

**Netflix's Business**.  Netflix is the world's leading internet television network.  ¶21. Defendant Reed Hastings is its Chief Executive Officer and Chairman, and defendant David Wells is its Chief Financial Officer.  ¶¶22, 24.

The vast majority of Netflix's revenues are generated by its domestic and international streaming services, which allow subscribers to view movies, television shows, and other content over the Internet in exchange for a monthly membership fee.  The streaming service has experienced incredible growth since it launched in 2007:  by the end of 2013 (the last full year before the events at issue in this lawsuit), Netflix had more than 44 million streaming members, and today it has over 100 million members in over 190 countries.  Ex. 10 at 18.  Netflix's total revenues grew from $1.2 billion in 2007 to $4.37 billion in 2013 to $8.83 billion in 2016.  Ex. 6 at 27; Ex. 2 at 16; Ex. 9 at 16.  Netflix's shareholders have benefitted tremendously from this growth:  its stock price has more than tripled since the end of the Class Period.  Ex. 11.

**The 2014 Price Increase**.  In April 2014, Netflix announced a $1 per month price increase for new domestic streaming subscribers that would take effect on May 9, 2014 (existing subscribers were grandfathered at their existing price for two years).  ¶¶7, 68.  It did so because

1  the "unpaid content obligations" that it must pay to obtain the rights to stream videos was

2  growing by "billions…per year."  ¶¶2-3, 46.

3       This was not Netflix's first price increase.  In July 2011, it raised subscription prices by

4  $5.99 per month.  At that time, the Company charged $9.99 per month for a combination package

5  which included streaming and one DVD at a time.  The cost of this combination was raised to

6  $15.98 per month.  ¶¶36-37.  Following that increase, Netflix suffered a loss of 800,000

7  subscribers and its stock price declined significantly.  ¶¶6, 38, 61, 67, 99-101.[2]  This decline did

8  not last:  "subscriber growth resumed at a pace of several million net subscriber additions per

9  year" and the stock price "tripled" in 2013.  ¶43.

10       Plaintiff acknowledges that Defendants were "motivated to carefully manage and monitor

11  their subscription price increases of 2014" to avoid the "2011 pricing debacle."  ¶¶6-8, 119.

12  Indeed, the Complaint identifies the steps Netflix took before raising prices.  It considered a flat

13  $1-$2 worldwide increase on the most popular streaming plan while grandfathering existing

14  subscribers at current prices for up to two years.  ¶120.  It then "began testing potential pricing

15  structures" (¶119) and rolled out the test in Ireland, one of its "smallest markets."  ¶121.  It

16  disclosed the results of the test, showing a "limited" impact.  ¶122.  It then instituted the price

17  increase in the U.S. and released Season Two of its most popular show, Orange is the New Black

18  ("OITNB"), about a month thereafter.  ¶¶123, 125.

19       **The July 21 Statements**.  On July 21, 2014, when reporting its 2Q 2014 results,

20  Defendants described the impact of the May 2014 price increase as "minimal," "pretty nominal,"

21  and "background noise" that had "no noticeable effect in the business."  ¶¶10, 86.  Specifically, in

22  its July 21, 2014 letter to shareholders, the Company stated:

23       In May, we raised prices modestly in most of our markets for new members on our
     two screens at-a-time HD plan, and introduced a one screen at-a-time, standard

24       definition plan across our markets.  Our two screen HD plan continues to be the
     most popular plan choice for new members.  We expect [average revenue per user]

25       to rise slowly as members at the new prices grow as a percentage of total

26

27     [2] Securities class action lawsuits were filed following this stock price drop.  The Honorable
Samuel Conti granted motions to dismiss and entered judgment in 2013.  The Ninth Circuit
unanimously affirmed dismissal on April 11, 2016.  *In re Netflix, Inc. Sec. Litig.*, 647 F. App'x

28  813 (9th Cir. 2016).

membership.   There was minimal impact on membership growth from this price change.

¶73 (alteration in original).   The Complaint notes that same day, during the earnings call, an analyst asked:

> And Reed, in the letter, you talked about the price changes having a minimal impact on growth overall, but can you just provide a little more color?… [D]id it impact churn…?   And what's your view on the way the price change could impact going forward?

[Mr.] Hastings responded:

> I think we've seen, really, the impact of the price change go through already, so it's pretty nominal….   But it's only $1 difference, so I really think that its background noise, which is what we want it to be….   [W]hen we make a small change in price, and handle it appropriately, it really makes no noticeable effect in the business, so that's why we're thrilled with that outcome.

¶74 (emphasis omitted).   Although Netflix's stock price dropped slightly following the above-quoted statements, Plaintiff alleges those statements—and only those statements—were fraudulent.   According to the Complaint, Defendants admitted the statements were false three months later when they allegedly revealed the "truth":   that (according to Plaintiff) the price increase "had substantially hindered subscription growth."   ¶89.

**The October 15 Statement**.   Specifically, on October 15, 2014, Netflix announced its results for the third quarter of 2014.   While the Company added over 3 million members globally in 3Q14, including one million in the U.S., the domestic additions were lower than it had forecast and were lower than the 1.3 million added in the third quarter of the prior year.   Ex. 5 at 2. Netflix explained the missed forecast as follows:

> *As best we can tell*, the primary cause is the slightly higher prices we now have compared to a year ago.   Slightly higher prices result in slightly less growth, other things being equal, and this is manifested more clearly in higher adoption markets such as the [U.S.]

> *In hindsight*, we believe that [in] late Q2 and early Q3…the impact of higher prices appeared to be offset for about two months by the large positive reception to Season Two of [OITNB].

> We remain happy with the price changes and growth in revenue and will continue to improve our service, with better content, better streaming and better choosing.

¶¶86, 130 (some emphasis omitted); *see also* ¶¶13, 15, 75, 84-85, 134, 140; Ex. 5 at 2.  Netflix's

stock price fell following this announcement.

**The January 20, 2015 Statement**.  Plaintiff alleges the October 15 statement revealed the

"full truth," namely that the July 21, 2014 statements quoted above were false.  *See* ¶85; *see also*

¶¶13, 15, 75, 84, 134, 140.  Plaintiff ignores, however, that more than *two years* before this

lawsuit was filed Netflix explained publicly that its October 2014 conclusion ("as best we can

tell") did not hold water after further analysis.  Specifically, Netflix disclosed to investors on

January 20, 2015 that the price increase had *not* been the cause of the missed third quarter

forecast:

> In October, we judged the leading factor of the similar decline in Q3 y/y [year over year] net adds to be our May price change.  *Since then, with additional research, we now think that the decline in y/y net adds would have largely taken place independent of the price change.  We've found our growth in net adds is strongest in the lower income areas of the US, which would not be the case if there was material price sensitivity.*  Additionally, we implemented a similar price change in Mexico during Q4, and saw no detectable change in net additions.
>
> *We think, instead, the reduction in y/y net additions is a natural progression in our large US market as we grow.*  We have built in flexibility to our business model in terms of how quickly we grow content and marketing spend, so we intend to keep US contribution margins growing even with lower membership growth.

Ex. 8 at 2.  Netflix also announced that (despite the May price increase) it had added a record 13

million total subscribers in 2014—nearly 2 million more than in 2013—to finish the year with

57.4 million subscribers.  *Id*. at 1.

### THE STANDARDS APPLICABLE TO THIS REFORM ACT CASE

Plaintiff alleges violations of Section 10(b) and Rule 10b-5 of the Exchange Act and

therefore his claims are subject to the Reform Act's heightened pleading requirements.  Congress

enacted the Reform Act in response to "perceived abuses" of class action securities lawsuits,

which included "nuisance filings, targeting of deep-pocket defendants, vexatious discovery

requests," and "extortionate settlements."  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,

547 U.S. 71, 81 (2006); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313

(2007) (the Reform Act was enacted as a "check against abusive litigation by private parties").

The "control measures" that Congress enacted include "[e]xacting" and "heightened pleading requirements." *Tellabs*, 551 U.S. at 313, 321.

The Reform Act mandates that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1)(B). A plaintiff must satisfy "formidable pleading requirements" including "exacting requirements for pleading 'falsity'" and "the pleading of specific facts" indicating why those statements were false. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1054-55, 1070 (9th Cir. 2008).

A plaintiff must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2)(A). Scienter "refers to a mental state embracing intent to deceive, manipulate, or defraud." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). Scienter in the Ninth Circuit requires deliberate recklessness or conscious misconduct. *Id.* Courts must "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323-24. Factual allegations must be "compelling," "persuasive," "effective," and "powerful." *Id.* "A complaint will survive…only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Courts consider the allegations collectively and examine the complaint as a whole. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1006-07 (9th Cir. 2009); *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014). The Reform Act mandates that if a complaint fails to meet the pleading requirements, the court "shall" dismiss the complaint. 15 U.S.C. §78u-4(b)(3)(A).

## ARGUMENT

**I.   THE COMPLAINT DOES NOT PLEAD A MATERIALLY FALSE OR MISLEADING STATEMENT**.

The Complaint sets forth the purportedly materially false and misleading statements and omissions in ¶¶72-83.  Plaintiff's core allegation is that Defendants intentionally misled investors on July 21, 2014, when they described the impact of the May 9, 2014, price increase as "minimal" and "pretty nominal" and "background noise" that had "no noticeable effect in the business." ¶¶10, 86.  To survive this motion, Plaintiff must "plead with particularity sufficient facts to establish that the various representations were false when made."  *Yourish v. Cal. Amplifier*, 191 F.3d 983, 998 n.17 (9th Cir. 1999); *see also id*. at 993 (plaintiff "must 'set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading when made'" (citation omitted)); *In re GlenFed, Inc. Sec. Litig*., 42 F.3d 1541, 1549 (9th Cir. 1994) ("a plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made*" (emphasis in original)), *superseded by statute on other grounds*, 15 U.S.C. §78u-4(a) *et seq.*; *In re Fusion-io, Inc. Sec. Litig.*, No. 13-CV-05368-LHK, 2015 WL 661869, at *18 (N.D. Cal. Feb. 12, 2015).  Plaintiff has not done so.

**A.   Plaintiff Fails To Plead Particularized Facts That The July 21 Statements Were Materially False Or Misleading When Made**.

Plaintiff alleges that the July 21 statements were false when made because the impact of the price increase, according to him, was not "minimal" or "pretty nominal" at that time.  ¶¶10, 86.  But Plaintiff nowhere sets forth what the subscriber numbers were as of July 21 or any facts reflecting that new subscriber growth had slowed *at all* by July 2l, let alone slowed "substantially" by that date.  *See* ¶¶75, 107 (alleging "net subscriber additions…had continued to slow very substantially…in the weeks before and after…May 20, 2014").  Plaintiff asserts that Messrs. "Hastings and Wells personally monitored these significant, numerical pattern shifts…between May 9 and early June 2014" (¶108) on a "daily basis" (¶¶9, 98(c)) and that they allegedly had access to "Big Data" (¶¶110-118), Cassandra (¶¶9, 98c, 109) and non-public

information (¶¶26, 28).  But Plaintiff does not allege what that data revealed on July 21.  This is a fatal flaw in the Complaint.  It is not enough to say data existed; to satisfy the Reform Act a plaintiff must plead facts showing that the data contradicted the challenged statements.[3]  Plaintiff has not done that here.  The Complaint provides no facts reflecting that the impact of the price increase was *not* "minimal" or "nominal" at the time Defendants made the challenged statements on July 21, 2014.

Plaintiff not only fails to document or support a substantial drop-off of new subscribers by July 21, he also ignores salient facts that *undermine* his falsity allegations.  On July 21, Netflix reported its results for 2Q 2014.  Netflix *exceeded* the forecast for 2Q 2014 that it made on April 21, 2014, in that it added 570,000 new U.S. subscribers compared to its projection of 520,000.[4]  That increased subscribership as of June 30 was seven weeks *after the May 9 price* increase.  The end of the second quarter was also three weeks *after* the release of OITNB Season 2, which in its first month of release (starting June 6, 2014), it "became the most watched series in every Netflix territory."  Ex. 4 at 3.  Netflix reported on July 21 (in its first sentence discussing its financial performance), "[o]ur U.S. member base grew to more than 36 million *on the strength of our ever-improving content offering, including [OITNB] Season 2*."  ¶72; Ex. 4 at 2.

Plaintiff does not acknowledge the increased subscribership for the second quarter, or plead facts demonstrating a sudden and material drop in the new subscriber growth rate in the intervening three weeks between June 30 and July 21.  Plaintiff instead theorizes that the release of OITNB on June 6 was "specifically timed" to offset the price impact.  ¶¶98(d), 105.[5]  Plaintiff

---

[3] *See Ronconi v. Larkin*, 253 F.3d 423, 430-31, 433 (9th Cir. 2001) (rejecting allegedly false statement that "sales growth was accelerating" where "[t]he complaint fails to describe, chart or graph what sales actually did"; statement that merger "contributed to a decrease in operating expenses" fails to describe what expenses allegedly were deferred); *Metzler*, 540 F.3d at 1070 (rejecting allegation that financial results were false and misleading as a result of the scheme to inflate enrollment figures; a "litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false" is inadequate); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 867-68 (N.D. Cal. 2004) ("[W]ithout sufficient detail regarding the amount of reductions in customer orders, it is not possible to know the scope of the impact of such reductions on CM's business and thus whether the projected revenues and earnings would be impossible to meet.").

[4] *Compare* Ex. 3 at 1, *with* Ex. 4 at 1.

[5] In fact, Netflix disclosed the June 6 release date on February 15, 2014, nearly three months before the price increase took effect.  ¶125.

alleges that Defendants knew "releasing a hit TV show causes a sizable, temporary uptick in subscription growth immediately before and after Netflix's release date."  ¶103; *see* ¶126 ("Defendants knew all along that there was going to be…a temporary 'offset'"); ¶105 ("[w]hen Defendants made their July 21, 2014 misrepresentations, they had already witnessed a very 'noticeable bump' that broke the 'weekly pattern'"); ¶¶11, 14, 77, 118, 129 (alleging there were "anomalous spikes" in subscriber additions because of the release date).  But Plaintiff does not plead particularized facts quantifying these "bumps" or "spikes" or detail how the release of Season Two—which helped *increase* the number of new subscribers—actually masked a reduction in the growth of new subscribers.

Tacit in Plaintiff's "anomalous spike" allegations is that Netflix's new subscribers would sign up only for the release of a new season of a popular show, only to quit the service promptly after watching the new episodes.  Plaintiff does not plead facts supporting this theory.  Instead, he pleads facts that *contradict* it.  As the Complaint reflects, in 2013 Netflix offered a free one-month trial subscription to new customers and also launched at once all episodes of House of Cards, Season One.  Netflix reported that "out of millions of free trials in the quarter" only 8,000 people watched the show and then cancelled.  ¶113 (emphasis omitted).  The Complaint alleges that "*there was very little free-trial gaming.*"  *Id*.  Given this pleaded fact, Plaintiff does not explain why Netflix should have expected subscribers to join the service, binge watch Season Two of OITNB, and then cancel their membership because their price was $1 higher than existing subscribers' price.

Further, the Complaint reflects that viewers remain as members because of Netflix's variety of content:

> Reed Hastings: When we look at original content, whether it's House of Cards or Arrested Development, we're just in the very early innings of this….  [I]f we do it right, these will turn into real franchises, that is House of Cards season 2, Orange season 2, season 3, season 4, will be just tremendous assets for the company…. *[P]eople subscribe and retain with us for a variety of content, not just a single show.*  So they might be—become that Arrested Development was the excuse to join but then they start watching all of our other great content….

1    Theodore A. Sarandos: [W]ith every series that we've launched, *both the viewing*
2    *audience and the total hours viewed has grown sequentially with every single—with*
     *every series that we've launched….*[6]

3    Plaintiff does not refute that Netflix provides a continuous rollout of content, which has received

4    widespread popular and critical acclaim.[7]  The Complaint even acknowledges that Netflix's

5    "virtuous cycle," the catalyst of its growth, "holds that Netflix's growing subscriber base provides

6    the Company with more cash with which to purchase more and improved video content, which in

7    turn drives further subscriber growth, as customers are attracted to the improved viewing

8    options."  ¶44.

9    **B.    The October 15 Statement Fails To Establish Falsity**.

10          Unable to plead any facts reflecting that the price increase was having a negative impact

11   on July 21, 2014 (and therefore that the July statements were false when made), Plaintiff relies on

12   the statement made on October 15, 2014, the last day of the Class Period.  Plaintiff contends that

13   the October 15 statement "revealed the truth" and was an admission that the July 21 statements

14   were false.  *See* ¶85; *see also* ¶¶13, 15, 75, 84, 134, 140.  However, the October 15 statement did

15   not address subscribership on July 21.  It did not say that Netflix was experiencing more than a

16   "minimal" impact from the price increase on July 21.  Instead, using the data available as of *the*

17   *end* of the quarter (September 30, 2014), Netflix announced that "as best we can tell" the price

18   increase had contributed to subscriber additions falling below the number it had forecast for the

19   third quarter.  ¶¶86, 130.

20          Even in the absence of the additional analysis Netflix reported in January 2015, *see infra*,

21   the October 15 statement itself was not the "admission" that Plaintiff makes it out to be.  Netflix

22   _____

23       [6] *See* Ex. 1 at 5-6; ¶104; *see also* Ex. 7 at 4 (noting that the launch of a successful show
     builds "momentum" both with the release of new seasons as well as the premiere launches of
24   new original content (Bojack Horseman, animated series for adults), epic series (Marco Polo,
     The Weinstein Co.) and new children's series (DreamWorks Animation)).

25       [7] The Company launched original programming (content that Netflix itself produces) in
     2012.  As of December 31, 2013, Netflix's original series productions received "over 80 major
26   award nominations and wins, including Emmy and Golden Globe recognition of House of Cards,
     Orange is the New Black ["OITNB"], Arrested Development and Hemlock Grove."  Ex. 7 at 3.
27   The American Film listed House of Cards and OITNB among the best 10 TV series of 2013.  *Id.*
     Netflix launched The Square, nominated for an Academy Award as Best Documentary Feature.
28   *Id.*

reported that "[i]n *hindsight*, we believe that [in] late Q2 and early Q3…the impact of higher prices appeared to be offset for about two months by the large positive reception to Season Two of [OITNB]." ¶130 (emphasis omitted). Plaintiff does not challenge that the Company had additional data by October or explain how that additional data impacted the July 21 statements or rendered those earlier statements false when made.

Judge Koh's rejection of falsity in *Fusion-io* is instructive. Judge Koh dismissed for failure to plead statements were false when made where plaintiffs relied on a later statement reducing guidance:

> Plaintiffs do not plead "specific facts indicating why these statements were false when made."… [A]s the Ninth Circuit has held, it is "clearly insufficient for plaintiffs to say that [a] later, sobering revelation[] make[s] [an] earlier, cheerier statement a falsehood."… That [defendants] made statements which, in retrospect, may have been wrong or optimistic, are not facts "that would support an inference that the company's more optimistic [statements] were known to be false or misleading at…that time by the people who made them."… [E]ven assuming that [the statements] ultimately proved to be wrong or were undermined by subsequent events, this alone is not an adequate basis upon which "this court can make inferences [of falsity] permissible under Rule 9(b)."

2015 WL 661869, at *18 (some alterations in original) (citing, *inter alia*, *Yourish*, 191 F.3d at 997). The same is true here.

**C.    The January 20, 2015 Report Contradicts The Basis For Plaintiff's Case.**

The October 15 statement was not Netflix's last disclosure on whether the price increase adversely impacted subscriber additions in the third quarter of 2014. On January 20, 2015, Netflix announced its results for the fourth quarter of 2014. The Company explained that it had continued to review the impact of the price increase on third quarter results, had performed "additional research," and had concluded that "the decline in [year over year] net adds would have largely taken place independent of the price change." Ex. 8 at 2. In other words, Netflix announced that it no longer believed the "as best we can tell" analysis disclosed in October— which Plaintiff says was the "truth" (¶84)—was accurate.

Notably, the January 20 statement was made in the ordinary course of Netflix's business and not in reaction or response to an investor lawsuit. Indeed, Plaintiff did not file this action until March 1, *2017*. Plaintiff therefore had plenty of time to review the January 20, 2015

1    disclosure before accusing Defendants of making false statements about the reason for the

2    disappointing subscriber growth in the third quarter of 2014.  Plaintiff simply chose to end the

3    Class Period on October 15 and ignore the January 2015 correction in his Complaint.[8]

4    **D.      The Risk Disclosures Were Not False Or Misleading**.

5          In addition to alleging the July 21, 2014 statements were false, the Complaint faults

6    Netflix for not warning that a price increase could impact subscriber growth.  ¶78 ("Class Period

7    filings with the SEC failed to include price elasticity as a potential risk"); ¶79.  But it is silly to

8    suggest that reasonable investors need to be told that prices could impact customers—especially

9    given the history recited in the Complaint.  *See* ¶¶8, 60 ("2011 pricing debacle"); ¶61 ("last

10   pricing increase turned into a PR nightmare"); *Baron v. Smith*, 285 F. Supp. 2d 96, 104 (D. Mass.

11   2003) ("The federal securities laws do not require the defendants to state the obvious."), *aff'd*,

12   380 F.3d 49 (1st Cir. 2004).  Nonetheless, Netflix warned its ability to retain and attract new

13   members would "be adversely affected" if members cancel because of "the need to cut household

14   expenses…[or] competitive services provide a better value or experience"; due to competitors'

15   "pricing"; and "[i]f consumers do not perceive our service offering to be of value."  Ex. 2 at 3.

16   *See In re Netflix, Inc. Sec. Litig.*, No. C04-2978 FMS, 2005 WL 1562858, at *7 (N.D. Cal.

17   June 28, 2005) (rejecting falsity where risk disclosure in fact disclosed risks of competition).

18   **II.      THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER**.

19         As an initial matter, the Court need not consider Plaintiff's scienter allegations where, as

20   here, Plaintiff has failed to plead any actionable statement.[9]  However, even if Plaintiff had

21   _____

22      [8] Recently, in *Williams v. Globus Medical, Inc.*, 869 F.3d 235 (3d Cir. 2017), the plaintiff
     alleged the company had made a false projection for the fiscal year, which fiscal year did not
23   conclude until months after the class period ended.  The Third Circuit reviewed the fiscal results
     of the performance report when they became available, after the class period.  The Court
24   unanimously affirmed dismissal, finding the earlier year-long projection was not materially false
     or misleading, as demonstrated in the later report.  *Id.* at 244.

25      [9] *See In re Netflix, Inc. Sec. Litig.*, No. 12-00225 SC, 2014 WL 212564, at *2 (N.D. Cal.
     Jan. 17, 2014) (dismissing for failure to plead falsity; "the Court did not need to address scienter
26   because it found that Plaintiffs failed to allege a false statement"), *aff'd*, 647 F. App'x 813, 816
     (9th Cir. 2016) ("Because Plaintiffs' FAC fails to meet the PSLRA's heightened pleading
27   standard as to the falsity element, we need not address Plaintiffs' scienter arguments."); *In re
     Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1077 (N.D. Cal. 2010) (failure to plead
28   falsity provides independent basis for dismissal, irrespective of scienter allegations).

1    identified an actionable statement—and he has not—the Complaint fails because Plaintiff has not

2    adequately pleaded scienter.

3        Pleading the required strong inference of scienter requires allegations of "specific

4    contemporaneous statements of conditions that demonstrate the intentional or the deliberately

5    reckless false or misleading nature of the statements when made." *Metzler*, 540 F.3d at 1066

6    (citation omitted).  Scienter allegations must be "plead[ed] '*in great detail*'" and contain "facts

7    [constituting] strong circumstantial evidence of deliberately reckless or conscious misconduct."

8    *Rudolph v UTStarcom*, 560 F. Supp. 2d 880, 889 (N.D. Cal. 2008) (citation omitted).  Plaintiff's

9    allegations fall far short and lack the "cogent and compelling" force needed to raise a strong

10   inference of scienter.  *Tellabs*, 551 U.S. at 324.

11   **A.     Plaintiff Alleges No Direct Evidence Of Scienter**.

12       The crux of the Complaint is that Defendants lied when they said in July 2014 that the

13   price increase was having a "minimal" impact on subscriber growth.  ¶¶10-11, 89.  Plaintiff

14   pleads no direct factual allegations regarding Mr. Hastings or Mr. Wells' state of mind at the time

15   of the challenged statements or at any other point during the Class Period.  Unlike the typical

16   securities fraud complaint, the Complaint here contains neither quotations from purported

17   confidential witnesses nor reference to any internal document, conversation, report, or admission

18   by any defendants.  *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226,

19   1230 (9th Cir. 2004) ("The most direct way to show [knowingly false statement] is via

20   contemporaneous reports or data, available to the party, which contradict the statement.").  As one

21   court in the Northern District observed:

> [T]he basic problem is that the complaint does not allege the sort of detail or
> corroboration from other sources—meetings, conversations, and internal
> memoranda and reports—to support the inference that any of the individual
> defendants actually believed FormFactor's public statements might be false or
> misleading at the time they were made.

25   *McCasland v. FormFactor Inc.*, No. C 07-5545 SI, 2008 WL 2951275, at *8 (N.D. Cal. July 25,

26   2008) (footnote omitted).[10]  The Complaint suffers from the same flaw:  Plaintiff has not pleaded

---

[10] *Metzler*, 540 F.3d at 1066, 1068, 1071 (affirming dismissal notwithstanding witness
statement that CFO was aware of inflated enrollment; no specific allegations conveyed and
related to the fraud); *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d

any internal documents or witnesses reflecting that Defendants did not believe the July 2014

statements were accurate when they were made.

**B.      The "Facts" Plaintiff Does Plead Do Not Support A Strong Inference Of Scienter**.

**1.      There Is No Motive Alleged**.

Plaintiff not only fails to allege direct evidence of scienter, he fails to articulate a coherent

theory or any motive for the "fraud."  The Complaint acknowledges that Mr. Hastings has

substantial stock holdings in Netflix and therefore would suffer significant losses if the stock

price fell as a result of the price increase.[11]  In fact, the Complaint underscores that Mr. Hastings

suffered enormous financial losses following the price change in 2011 and stock drop.  *See* ¶39

("Hastings lost up to $641 million in net worth because of this collapse in Netflix's share price,

due to Defendants' 2011 price increase" (emphasis omitted)).  Plaintiff does not explain why

Defendants Hastings or Wells would engage in a "scheme" or would benefit—financially or

otherwise—by deliberately understating the impact of the $1 price increase while knowing that

Netflix would report its new subscriber numbers a few months later, as it does every quarter.

In securities class action lawsuits, plaintiffs typically attempt to demonstrate that

individual defendants engaged in suspicious stock sales as a means to constitute indirect or

"circumstantial evidence of scienter." *Zucco*, 552 F.3d at 1005 (citation omitted).[12]  Here, while

Plaintiff alleges that Messrs. Hastings and Wells engaged in a scheme to "artificially inflate the

---

1092, 1132 (E.D. Wash. 2013) ("No confidential witness has come forward to say that
Defendants were aware of secret, adverse financial information and failed to disclose it, much
less that such adverse information contradicted Defendants' public representations.  There are no
documents or internal communication to show that Defendants were apprised of adverse
financial information which they then failed to communicate to the public."), *aff'd*, 691 F. App'x
393 (9th Cir. 2017); *Applestein v. Medivation, Inc.*, 561 F. App'x 598, 600-01 (9th Cir. 2014)
(rejecting scienter; "there is no allegation that any CW relayed [that the drug study was
unblinded] to any defendant").

[11] *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) (scienter is absent
where an officer holds "'onto most of [his] [company's] stock and incur[s] the same large losses'
as plaintiffs" (second alteration in original) (citation omitted)).

[12] The Ninth Circuit, however, rejects motive and opportunity allegations as insufficient to
create a strong inference of scienter.  *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 979
(9th Cir. 1999) (Congress "expressly rejected…'motive and opportunity' and…must have
intended a standard that lies beyond the Second Circuit standard"), *abrogated on other grounds
by S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008); *In re Rigel Pharm., Inc. Sec.
Litig.*, 697 F.3d 869, 884 (9th Cir. 2012).

price" of Netflix's stock (¶135; *see* ¶¶29, 134, 137, 146, 150), Plaintiff makes no attempt to even

allege motive and opportunity based on stock sales, and there is no allegation of "suspicious"

stock sales that are "dramatically out of line with prior trading practices at times calculated to

maximize personal benefit from undisclosed inside information."  *Zucco*, 552 F.3d at 1005

(citation omitted).

> **2.      The Four Bases For Plaintiff's Scienter Allegations Do Not Support An Inference Of Fraud**.

Lacking confidential witnesses, internal documents, and a motive, Plaintiff attempts to rest

his scienter allegations on four publicly known facts that allegedly demonstrate the Defendants

knew the July 21, 2014 statements were false when made.  ¶¶76, 98.  As explained below, none of

these facts gives rise to the required strong inference that the Defendants intended to deceive

investors.

> **a.      The Company's experience with the 2011 price increase**

The Complaint alleges that based on Defendants' "personal experience with Netflix's

2011 price increase" they "knew or deliberately disregarded" the "visible, multi-week slowing

trend in net adds."  ¶¶76, 98(a).  The Complaint does not, however, allege any facts reflecting a

"multi-week slowing trend" or that similar negative information existed as of July 21, 2014.  Nor

does the Complaint reflect that Defendants believed the 2014 price increase would have the same

negative impact that followed the larger 2011 price increase.  The 2011 pricing increase was

approximately six times larger, applied to all subscribers, and resulted in a loss of 800,000

subscribers.  *Supra* at 4.  In 2014, the price increase was only $1, and applied only to new

subscribers.

Moreover, the Complaint itself documents the careful steps that Netflix took for the

purpose of assuring that there would *not* be a similar adverse impact.  ¶¶119-122.  The Complaint

does not plead a single fact suggesting that Defendants believed those measures would fail or

prove unsuccessful.  And they were not unsuccessful:  Plaintiff pleads no facts suggesting that the

2014 price increase had a negative impact similar to the one experienced in 2011.

### b.   Netflix's early 2014 pricing tests

The Complaint alleges the "detailed pricing tests of early 2014" support scienter. ¶76. But the Company reported the Ireland price test showed only "limited impact." ¶122. The Complaint does not dispute this. Plaintiff pleads no facts suggesting that the "limited impact" from the Ireland test was different than the "minimal" and "pretty nominal" impact that the Defendants described on July 21 after the price increase took effect in the U.S. The Ireland test results, therefore, appear consistent with the description on July 21 of the price impact in the U.S. as Defendants described, and thus *negate*, rather than support, any inference of scienter.

### c.   The alleged real-time monitoring of net add rates

The Complaint alleges that Defendants engaged in "near-constant, real-time monitoring of Netflix's net add rates on the Cassandra Database" and thus knew net additions had "continued to slow very substantially." ¶¶76, 98. But the Complaint does not provide any specific data for any time period supporting his claim that the data showed subscriber growth slowing. Plaintiff does not identify how the net subscriber additions "continued to slow very substantially," how the release of OITNB "anomalously salvaged Q214's net add totals," or how he purportedly knows what the internal data allegedly showed. ¶¶76, 98. Courts consistently reject such unsupported allegations.[13]

### d.   The alleged carefully timed, one-off release of OITNB

The Complaint alleges that Defendants "specifically timed and promoted the release of [OITNB] Season Two for Q214, rather than Q314, for the particular purpose of 'offsetting' any substantial impact from their price increases." ¶¶76, 98(d). First, there was no suspect timing

---

[13] *See Intuitive Surgical*, 759 F.3d at 1061-63 (rejecting statement that "100% that hospitals were cutting back" where allegations omit "how many hospitals were cutting back, how much and when"); *Karpov v. Insight Enters., Inc.*, No. CV 09-856-PHX-SRB, 2010 WL 4867634, at *9 (D. Ariz. Nov. 16, 2010) (complaint did "not pinpoint even one particular transaction or describe the specific impact of such a [phantom] sale or an aggregation of such sales"), *aff'd*, 471 F. App'x 607 (9th Cir. 2012); *In re Downey Sec. Litig.*, No. CV 08-3261-JFW (RZx), 2009 WL 2767670, at *6 (C.D. Cal. Aug. 21, 2009) (confidential witness statements that option ARM loans were "toxic" and "horrible" do not provide particularized facts that such loans are inherently risky); *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 979 (9th Cir. 1999) (allegations "are far too speculative to give rise to a 'strong inference of intent'" (citation omitted)).

because Netflix publicly disclosed the show's release date on February 15, 2014 (¶125), three months before the price increase was implemented.  Second, Plaintiff provides no particulars of any impact on subscriber growth from the release.  *Supra* at 8-9.  Third, OITNB is Netflix's "most popular" show.  ¶123.  Should Netflix instead have released an unpopular show when raising prices?  Finally, as noted *supra* at 6-7, it is fundamental to Netflix's business model that new content was continuously rolled out and that Netflix's subscribership is not dependent on any one show.

### 3.    The Sarbanes Oxley Certifications Do Not Support A Strong Inference Of Scienter.

Plaintiff makes boilerplate allegations that Messrs. Hastings and Wells signed certifications on the July 22, 2014 Form 10-Q pursuant to Sarbanes-Oxley.  ¶¶132-133.  The Ninth Circuit repeatedly has found such allegations "add nothing substantial to the scienter calculus."  *Zucco*, 552 F.3d at 1003-04; *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 747-48 (9th Cir. 2008).

### C.    The Competing Inferences Undermine Scienter.

The Ninth Circuit has instructed that in conducting a holistic review of a plaintiff's securities fraud claims, all allegations are "properly considered" and that courts "must also 'take into account plausible opposing inferences' that could weigh against a finding of scienter."  *Zucco*, 552 F.3d at 1006 (quoting *Tellabs*, 551 U.S. at 323).  Here, Plaintiff's inference is that Defendants must have known on July 21 that the price increase had negatively impacted new subscriber growth rates.  But that inference is not compelling at all, and is not as compelling as competing exculpatory inferences.

The more compelling inference from the series of disclosures is that Netflix did not make any misrepresentation of the price impact on July 21.  Rather, there was variation in new subscriber growth over time, which Netflix continued to analyze.  Netflix provided updated information—favorable or not—to its shareholders.  More specifically, when Defendants announced 2Q 2014 results, they reported that Netflix exceeded its April 21, 2014 forecast for 2Q 2014.  This report on July 21 was months after the price increase on May 9, and well after the

release of Season Two of OITNB.  Plaintiff does not allege a single fact to suggest that by July

21, the impact from the price increase was more severe than the "nominal" impact Defendants

reported.  Several months later, however, by the end of 3Q 2014, Netflix experienced softness in

the growth numbers.  It candidly told its shareholders on October 15 that the price increase may

be the primary reason "as best we can tell."  ¶130.  That the situation appeared different on

October 15 does not mean the situation was misrepresented on July 21 based on information

available at that time.  *See NVIDIA*, 768 F.3d at 1060 ("Simply because scientists were able to

explain in retrospect the science behind NVIDIA's chip failures, it does not mean that NVIDIA

knew or should have known it would be liable for those failures during the class period….").  On

January 20, 2015, Netflix provided investors with its most current research and analysis.  It

disclosed its view that "the decline in y/y net adds would have largely taken place independent of

the price change."  Ex. 8 at 2.  That the data accumulated and varied over a matter of months with

different interpretations of the price increase's impact does not smack of fraud.[14]

     The more compelling inference is innocuous for another reason.  As courts have

recognized, "[r]obust disclosure of risks and problems…'negates an inference that the company

acted with intent to defraud.'"  *Sterling*, 963 F. Supp. 2d at 1142 (citation omitted).[15]  Defendants

disclosed the subscriber data at the end of each quarter, which Plaintiff does not dispute.  The data

allowed investors to draw their own conclusions.  *See Sterling*, 963 F. Supp. 2d at 1132 ("that

Defendants disclosed the adverse information publicly negates an inference of scienter…by

providing investors with the same adverse information and allowing them to reach their own

conclusions").  The Company offered its interpretations of the impact from the price increase,

---

[14] *See Winer Family Trust v. Queen*, 503 F.3d 319, 328 (3d Cir. 2007) (most plausible inference is that defendant revised its preliminary cost estimates as it learned renovations would be more extensive than estimated); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 621 (9th Cir. 2017) (plaintiff failed to allege "the precise assumptions that Defendants used in [their] goodwill valuation"; "the more compelling inference is that Defendants made a good faith but mistaken determination in its goodwill valuations that the positive factors outweighed the negative ones").

[15] *See Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 892-93 (4th Cir. 2014) (affirming despite restatement; disclosures "tend[] to negate an inference that the defendants acted with an intent to defraud" and "bolster the inference that the…defendants acted in good faith"); *see also Alfus v. Pyramid Tech. Corp.*, 745 F. Supp. 1511, 1520 (N.D. Cal. 1990) (similar).

both on October 15, 2014 and January 20, 2015.  Notably, Defendants' assessments were not

entirely favorable for the Company.  Indeed, on January 20, Defendants stated that that "the

reduction in y/y net additions is a natural progression in our large US market as we grow."  Ex. 8

at 2.  Defendants' candid and frank disclosures are inconsistent with an inference of scienter.[16]

In sum, the Section 10(b) claim must be dismissed.[17]

## III.      THE COMPLAINT IS TIME-BARRED AS A MATTER OF LAW.

Although Plaintiff has not adequately pleaded either falsity or scienter, the Complaint also

fails on the independent ground that it was filed too late.

## A.        The Standards Applicable To Dismissal Under Section 1658(b)(1).

The time limit to bring a Section 10(b) claim is two years from "discovery of the facts

constituting the violation."  28 U.S.C. §1658(b)(1).  In *Merck & Co. v. Reynolds*, 559 U.S. 633

(2010), the Supreme Court held that a Section 10(b) "cause of action accrues (1) when the

plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered,

'the facts constituting the violation,'—whichever comes first."  *Id.* at 637.  Discovery includes

"not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff

would have known."  *Id.* at 648.  The Court held that "'facts constituting the violation' include the

fact of scienter."  *Id.* at 637.  A defendant bears the burden "to demonstrate that a reasonably

diligent plaintiff would have *discovered* the facts constituting the violation."  *Strategic Diversity,*

*Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1206 (9th Cir. 2012) (emphasis in original).

This action was filed March 1, 2017.  ECF No. 1.  Therefore, if Plaintiff discovered or a

reasonably diligent plaintiff would have discovered the facts constituting the purported violation

before March 1, 2015, the action is time-barred.  *See Merck*, 559 U.S. at 638.  Although *Merck*

did not decide the quantum of discovered facts for the limitations trigger, courts have held that a

"fact is not deemed 'discovered' until a reasonably diligent plaintiff would have sufficient

---

[16] *See ScripsAmerica, Inc. v. Ironridge Global, LLC*, No. CV 14-03962 MMM (AGRx), 2015 WL 12747908, at *22 (C.D. Cal. Mar. 26, 2015) (disclosures made "are inconsistent with an intent to deceive" and "give rise to an alternate, more compelling inference" that plaintiff entered agreement knowing defendant could sell shares in manner it desired).

[17] Because Plaintiff fails to state a claim under Section 10(b), the control person claim under Section 20(a) also fails.  *See Intuitive Surgical*, 759 F.3d at 1064 n.6.

-20-

1   information about that fact to adequately plead it in a complaint…with sufficient detail and

2   particularity to survive a 12(b)(6) motion to dismiss." *Pension Trust Fund for Operating Eng'rs*

3   *v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 275 (3d Cir. 2013) (alteration in

4   original) (quoting *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA Inc.*, 637 F.3d 169, 175 (2d Cir.

5   2011)).   A motion to dismiss on limitations grounds is "appropriate where the complaint,…

6   documents referred to therein, and public press reports yield no other plausible inference than that

7   a reasonably diligent plaintiff should have discovered facts sufficient to state a claim more than

8   two years before suit was actually filed." *Stichting Pensioenfonds ABP v. Countrywide Fin.*

9   *Corp.*, 802 F. Supp. 2d 1125, 1136 (C.D. Cal. 2011).

10  **B.      The Facts Pleaded By Plaintiff Were Known And Knowable More Than Two Years**
            **Before The Lawsuit Was Filed**.

11

12          The Complaint reveals on its face that the facts alleged by Plaintiff to support his claim

13  were all publicly known long before March 1, 2015.

14          **1.       The Complaint concedes the "Truth" was revealed on October 15, 2014**.

15          The Complaint asserts that Defendants made statements on July 21, 2014 that were

16  revealed to be false on October 15, 2014, the last day of the Class Period.  Specifically, Plaintiff

17  claims that the October 2014 statements "Reveal the Truth About Netflix's Global Price

18  Increases."  Complaint at p. 29; ¶84 (October 15, 2014 announcement "included the full truth

19  about Netflix's worldwide price increases 2Q14"); ¶75 ("The truth, which defendants would be

20  forced to admit about twelve weeks later—was that the Company's May 2014 price increases *had*

21  substantially and negatively impacted Netflix's 2Q14, growth.").  Plaintiff's admission that the

22  "truth" has been publicly known since October 2014—more than 28 months before he sued—

23  proves the untimeliness of this action. *See Sabbag v. Cinnamon*, No. 5:10-cv-02735-JF (HRL),

24  2010 WL 8470477, at *4 (N.D. Cal. Dec. 10, 2010) (holding as time barred Section 14(a) claim,

25  which also requires "discovery of the facts constituting the violation," where complaint itself

26  alleged that defendant "'had finally disclosed the truth about all of [D]efendants' misleading

27  statements' as of May 2009" (alteration in original)).

28

2.      **The facts alleged to demonstrate scienter were known by the end of the Class Period**.

As discussed *supra* at 16-18, Plaintiff alleges four "facts" that allegedly gave rise to a strong inference of scienter.  ¶76.  All four "facts" were publicly known by the end of the Class Period in October 2014 and therefore were available to Plaintiff and any reasonably diligent plaintiff more than two years before this case was filed.

a.      **The Complaint reveals that a reasonably diligent plaintiff knew in 2014 that a price increase could impact subscribers**.

The Complaint alleges that "Defendants knew from their experience with Netflix's 2011 price increase that even modest monthly increases could stem if not destroy…subscription growth."  ¶98(a).  A reasonably diligent plaintiff knew that too:  as the Complaint reflects, it was well-publicized in 2011, years before the Class Period here and again in 2014 in connection with the price increase described in the Complaint.  *E.g.*, ¶¶38, 40, 42.  In fact, Plaintiff quotes media reports in 2014 (at the time of the price increase at issue in this case) specifically describing the fallout from the 2011 price increase:

> Sterne Agee analysts wrote on April 22, 2014 that "the imminent price increase for new subscribers worldwide could dampen growth somewhat….  Morgan Stanley [wrote] that…*most investors agree that NFLX needs to tread carefully before pushing price further, particularly given the customer backlash from the 2011 pricing change.***How many US [households] will pay $9 a month on top of existing entertainment options?  That is the key question."

¶67 (last alteration in original) (emphasis altered) (footnote omitted); *see* ¶101 (RBC analyst survey "in or about May 2014…highlight[ed] the magnitude and duration of the brand 'hit' Netflix inflicted on itself [in late 2011]" (emphasis omitted)); ¶70 ("[l]eading up to Defendants' 2Q14 earnings announcement, the market was acutely focused on the impact of Defendants' Global price increases on subscription growth" (second alteration in original) (emphasis omitted) (citing Morgan Stanley, RBC Capital Markets)).

1

**b.     The Complaint reveals that a reasonably diligent plaintiff knew in
2014 that Defendants had access to subscriber data.**

2

3          Plaintiff alleges that Defendants had "real-time…access to Netflix's past and latest 'net

4   add' numbers" through the "Cassandra Database" which they accessed "likely, every day."  ¶9;

5   *see* ¶14 (Defendants monitored "the Cassandra Database throughout May and June 2014"); ¶98(c)

6   ("Defendants routinely accessed and relied upon Netflix's database, Apache

7   Cassandra…throughout 2014").[18]  A reasonably diligent plaintiff knew that too.  In fact, the

8   Complaint alleges that Defendants made clear to investors on July 22, 2013, that they had access

9   to data on subscribership, including changes and additions to subscribership.  ¶46 ("[D]uring

10   Netflix's July [22,] 2013 earnings call, Defendant Hastings emphasized:…  'I am looking at net

11   adds all the time…in terms of net [subscriber ] additions…we do check every week, every day.'"

12   (second alteration in original) (emphasis omitted)); ¶108.  Investors therefore knew, well before

13   March 1, 2015, that Netflix had subscriber data on a real-time basis.

14

**c.     The Complaint reveals that a reasonably diligent plaintiff knew in
2014 that Netflix increased prices in Ireland.**

15

16          Plaintiff alleges that before implementing a price increase in the U.S., Netflix engaged in a

17   pricing test in Ireland that had a "limited impact" on subscriber additions.  ¶¶63-66, 121-122.  A

18   reasonably diligent plaintiff knew that too, because Netflix disclosed the test to its investors in its

19   April 21, 2014 letter to shareholders.  ¶¶64, 66, 122.  Analysts publicly reported the fact of the

20   test as well.  ¶65 (Janney Capital Markets, other Netflix analysts); ¶67 (Stern Agee, Morgan

21   Stanley).

22

23

24

25

26          [18] *See* ¶98(c) ("Defendants routinely accessed and relied upon…Cassandra[] to closely
monitor net subscriber additions on a weekly and even daily basis throughout 2014 and
27   particularly throughout May and June 2014…and…knew that Orange Season Two's release had
anomalously salvaged 2Q14's net add totals as Defendants had intended before 2Q14 even
28   began.")

1              **d.      The Complaint reveals that a reasonably diligent plaintiff knew in
2                        2014 that the release of the new OITNB season was a big success and
                         could increase subscribership**.

3           Plaintiff alleges that "one megahit release could drive a short-term, material surge in

4   Netflix's subscription growth."  ¶129.  A reasonably diligent plaintiff knew that too.  The

5   Complaint cites to Defendants' colloquies with analysts in 2013 about whether subscriber

6   additions could be attributed to releases of a successful series.  ¶127 (discussing in January 2013

7   potential "substantial" impact); ¶128 (discussing in April 2013, "House of Cards [Season One] is

8   a very nice impact" (alteration in original)).  The Complaint alleges that shortly after these

9   exchanges, in May 2013, Netflix enjoyed 100,000 additional net additions to subscribership upon

10  the release of Arrested Development [Season Four].  ¶129.  In the Company's July 22, 2013 letter

11  to shareholders, "[d]efendants reported strong subscriber growth for 2Q13 and…pointed directly

12  to the release of their (then) most popular television show, Arrested Development, as a major,

13  anomalous driver of subscription growth in the quarter" stating:

14          This Q2…was an exception, we believe due to the launch of Arrested Development
            [Season Four].  This show already had a strong brand and fan base, generating a
15          small but noticeable bump in membership when we released it.  Other great shows
            don't have that noticeable effect in their first season because they are less
16          established….

17          …Arrested was a unique look forward because it already had a developed brand and
            we were bringing out Season Four….  [I]t was enough to move our net [subscriber
18          additions for the quarter] higher than last year.

19  ¶¶103-104 (some alterations in original) (emphasis omitted).  Also on July 22, 2013, Netflix

20  specifically acknowledged it attributed 15% of the subscriber growth that quarter to the release of

21  Arrested Development [Season Four].  ¶104.  And it stated its expectation at that time to

22  "probably see a little bump" from the release of House of Cards [Season Two].

23                                              ***

24          Assuming solely for the sake of this argument that the four allegations discussed above

25  give rise to a strong inference of scienter (as Plaintiff alleges), the Complaint is nonetheless time-

26  barred as a matter of law because Plaintiff's own pleading reveals that all four were publicly

27  known long before March 1, 2015—and therefore more than two years before Plaintiff filed this

28  suit.

Numerous courts have dismissed on limitations grounds where public information was disclosed and available to investors. *See Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 68 F. Supp. 3d 530, 536 (S.D.N.Y. 2014) (dismissing Section 10(b) claims as time barred where "substantial portion of [the] information" constituting scienter "was either known or freely available to investors much earlier," including in SEC filings), *aff'd*, 639 F. App'x 664 (2d Cir. 2016); *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 346-48 (S.D.N.Y. 2012) (dismissing Section 10(b) claims as time-barred where Form 6-K filed with the SEC had detailed the relevant facts); *Stichting*, 802 F. Supp. 2d at 1135-37 (dismissing as time-barred where earlier publicly-filed complaints and press reports "make clear that a reasonable investor would have been aware of problems with underwriting at Countrywide" more than two years before the plaintiff filed the complaint); *Arco Capital Corps. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 545-46 (S.D.N.Y. 2013) (dismissing Section 10(b) claim as time barred where complaint alleged publicly-known facts supporting scienter); *Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*, 648 F.3d 533, 537 (7th Cir. 2011) (affirming dismissal where "all of the *facts* needed to make out a claim of fraud…were in the public domain" (emphasis in original)).

For all the foregoing reasons, this action is time-barred and cannot be salvaged by amendment.

## CONCLUSION

This case should not have been filed. Plaintiff has no coherent theory of fraud and, in any event, his claim is time-barred. Defendants respectfully submit that the Complaint should be dismissed with prejudice.


Dated: October 13, 2017          Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI

By: /s/ Keith E. Eggleton
        Keith E. Eggleton

Attorneys for Defendants
Netflix, Inc., Reed Hastings and David Wells